Samuel S. Lionel, Nevada Bar No. 1766
*slionel@lionelsawyer.com*
David N. Frederick, Nevada Bar No. 1548
*dfrederick@lionelsawyer.com*
Robert Hernquist, Nevada Bar No. 10616
*rhernquist@lionelsawyer.com*
LIONEL SAWYER & COLLINS
1700 Bank of America Plaza
300 South Fourth Street
Las Vegas, Nevada 89101
Telephone: (702) 383-8888
Facsimile:  (702) 383-8845

*Attorneys for Defendants Las Vegas Sands
Corporation, Venetian Casino Resort, LLC,
Eli Castro, Linda Hagenmaier, William Lovegren,
Anthony Bronson, Kevin Neanover, Kim Gorman,
Paul Tanner and Tony Whiddon*

# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| JASON A. PEREZ-MORCIGLIO and SEBASTIAN PEREZ-MORCIGLIO, <br><br> Plaintiffs, <br><br> vs. <br><br> LAS VEGAS METROPOLITAN POLICE DEPARTMENT; SHERIFF DOUGLAS GILLESPIE (individually and in his official capacity as Sheriff of the Las Vegas Metropolitan Police Department); LAS VEGAS METROPOLITAN POLICE DEPARTMENT OFFICERS T. SCOTT and S. SCHAIER (in their individual capacities); LAS VEGAS SANDS CORPORATION, a Nevada corporation; VENETIAN RESORT HOTEL & CASINO, LLC, a Nevada limited liability company; ELI CASTRO; LINDA HAGENMAIER; RON HICKS; WILLIAM LOVEGREN; ANTHONY BRONSON; KEVIN NEANOVER; KIM GORMAN; PAUL TANNER; and TONY WHIDDON <br><br> Defendants. | Case No. 2:10-cv-00899-PMP-(RJJ) <br><br><br> **DEFENDANTS LAS VEGAS SANDS CORP. AND VENETIAN CASINO RESORT, LLC'S OPPOSITION TO PLAINTIFFS' MOTION TO COMPEL** |

LIONEL SAWYER
& COLLINS
ATTORNEYS AT LAW
1700 BANK OF AMERICA PLAZA
300 SOUTH FOURTH ST.
LAS VEGAS,
NEVADA 89101
(702) 383-8888

Defendants Las Vegas Sands Corp. ("LVSC") and Venetian Casino Resort, LLC ("VCR" and, collectively and together with LVSC, "LVS") submit the following Memorandum of Points and Authorities in response to the Motion to Compel filed by the Plaintiffs (Doc. No. 68).

## I.    PRELIMINARY STATEMENT

Plaintiffs' instant motion is both wholly unfounded and patently vexatious.  The ACLU has already received all of the information it now asks the Court to compel!  Incredibly, this is actually reflected in the exhibits attached to the Plaintiffs' motion.  The ACLU contends it has never been informed whether its litigation freeze letter was circulated, yet the exhibits attached to the Motion to Compel establish that the ACLU has known for months that it was.  The ACLU also claims it is clueless regarding LVS's efforts to search for and locate responsive materials, but once again the exhibits attached to the motion show that this information was provided at the deposition of LVS's Executive Director of Security (Tony Whiddon), as well as directly from LVS's counsel.  Finally, the ACLU castigates LVS because the security officers involved in the incident were not informed of the litigation hold letter and were not asked to search for responsive documents on behalf of LVS.[1]  The ACLU neglects to inform the Court that it is already aware that the security officers do not have custody, control or possession of **any** documents relating to security functions at LVS.  Court decisions recognize what common sense confirms—there is no need to tell people to "preserve" and/or "search for" documents when the people in question do not keep documents.

Plaintiffs already know the answers to their questions.  They now claim they need more information, but have made no showing as to why those additional questions were not posed to Tony Whiddon or some other witness during discovery.  If Plaintiffs desired more information regarding LVS's searches or the litigation hold letter, they knew the identities of additional LVS employees with knowledge on those subjects.  However, none of those persons was deposed.  Instead, the ACLU demands "assurances" from counsel which it has already repeatedly been given

---

[1]  As discussed in detail *infra*, LVS determined long ago that the security officers did not have custody over any responsive documents or electronic data.  Knowing this, the security officers were not later asked to search for what LVS knew they did not have.  When the ACLU later served requests for production on the officers in their individual capacities, each and every one of them searched for responsive documents and produced all responsive materials in their possession.

LIONEL SAWYER
& COLLINS
ATTORNEYS AT LAW
1700 BANK OF AMERICA PLAZA
300 SOUTH FOURTH ST.
LAS VEGAS,
NEVADA 89101
(702) 383-8888

2

and seeks sanctions for imagined misconduct with no factual basis for doing so. While LVS recognizes that the ACLU has an institutional affinity for conspiracy theories and is institutionally committed to doubt even the most obvious of facts, rank speculation and wholly unfounded innuendo will not support meritless attacks on opposing parties and counsel. Plaintiffs' Motion to Compel is contradicted by the record and fails to establish any negligence (let alone spoliation). It must be denied.

II.    **STATEMENT OF FACTS**

A.    **Nature of the Case, Plaintiffs' Litigation Hold Letter and LVS's Discovery Responses**

In this case, Plaintiffs Jason Perez-Morciglio ("Jason") and Sebastian Perez-Morciglio ("Sebastian") assert various constitutional violations as well as tort claims against LVS based upon events that occurred on the evening of January 15, 2010, on the sidewalk area between the Venetian and Las Vegas Boulevard and in the LVS security office. Jason, a self-proclaimed "street performer", was dressed as the character Zorro and was observed soliciting sales of plastic swords to tourists. Jason was told he could not solicit and was asked to leave. Jason refused, became argumentative and demanded that LVS call the police. After Jason repeatedly refused to leave the premises and was duly trespassed, he was taken into custody to await the arrival of Metro. While LVS security officers were addressing Jason, Sebastian confronted the security officers. Sebastian was perceived as a threat, refused to leave, and was also taken into custody to await Metro. Metro arrived at the Venetian's security office, spoke with Plaintiffs and LVS security officers, and issued Plaintiffs a written warning. They were not arrested. Plaintiff's Fourth Amended Complaint contains twelve causes of action against LVS, VCR, the Las Vegas Metropolitan Police Department ("Metro"), Sheriff Douglas Gillespie, the Director of LVS's security department, eight LVS security officers and three Metro police officers. (Doc. No. 59). Plaintiffs have amended their Complaint four times—it appears that each time a new name was referenced during discovery the ACLU responded by suing that person.

On March 2, 2010, more than three months before the action was commenced,[2] the ACLU sent a letter to LVS on behalf of Plaintiffs which requested LVS to ensure that all relevant records

LIONEL SAWYER
& COLLINS
ATTORNEYS AT LAW
1700 BANK OF AMERICA PLAZA
300 SOUTH FOURTH ST.
LAS VEGAS,
NEVADA 89101
(702) 383-8888

3

1   were preserved (the "litigation hold letter").  (Exhibit 3).

2          The substance of the incident was recorded on video by LVS, and copies of these three

3   security videos were produced to Plaintiffs as part of LVS's Initial Disclosures.  LVS has also

4   produced all written reports regarding the incident, as well as the training materials used to train its

5   security officers, LVS security policies, employment and disciplinary files, incident reports for

6   unrelated events that occurred on the sidewalk, internal emails regarding the sidewalk, and emails

7   regarding meetings conducted by LVMPD and an organization of security departments of various

8   Strip properties.  (Hernquist Decl. at ¶ 2, attached as Exhibit 1).  In total, LVS has produced 4,600

9   pages of documents, three security videos of the incident and an audio CD of radio transmissions

10  that were broadcast during the evening in question.  (*Id*.).

11  **B.     The ACLU Already Knows That The Litigation Hold Letter was Circulated**

12         Two months the Motion to Compel was filed, the ACLU was provided information

13  regarding the dissemination of the litigation hold letter.  Despite that knowledge, the ACLU now

14  pretends it is in the dark and asks this Court to compel LVS to provide Plaintiffs with information

15  they already possess.

16         In a letter dated March 8, 2011, counsel for LVS explained that the litigation hold letter

17  was circulated within days of its receipt and that relevant materials were preserved, and also noted

18  that communications regarding the litigation freeze letter are disclosed in LVS's Privilege Log.

19  (Exhibit 4).  During a telephone call with Ms. McLetchie on March 14, 2011, one of LVS's

20  attorneys again explained that the litigation freeze letter was circulated and pointed out that this

21  was evident upon review of LVS's Privilege Log.  (Hernquist Decl. at ¶ 4, Exhibit 1).  During a

22  telephone conference on April 15, 2011, this same conversation was repeated: once again

23  Plaintiffs' attorneys were informed that the litigation hold letter was circulated and once again Ms.

24  McLetchie was reminded that this was disclosed via LVS's Privilege Log.  (*Id*. at ¶ 5).  Ms.

25  McLetchie memorialized these numerous conversations in an email dated April 15, 2011, stating

26  "you have assured me that the freeze letter was circulated."  (Exhibit 6).  Ms. McLetchie's email

27

28

[2] The Complaint was filed on June 6, 2010, and LVS was not served until July 14, 2010.

LIONEL SAWYER
& COLLINS
ATTORNEYS AT LAW
1700 BANK OF AMERICA PLAZA
300 SOUTH FOURTH ST.
LAS VEGAS,
NEVADA 89101
(702) 383-8888

1  did not request any further action on this subject. (*Id.*). In their Motion, Plaintiffs now complain

2  that LVS has not "produce[d] documents showing that Plaintiffs' litigation freeze letter was

3  actually disseminated." (Doc. 68 at 5:24-25). However, documents attached as exhibits in support

4  of Plaintiffs' motion establish that the ACLU has known for months that such documents exist, as

5  stated in LVS's Privilege Log. (*See* letter from Robert Hernquist to Margaret McLetchie at p. 2,

6  attached as Exhibit 5 to Doc. 68, explaining that the circulation of the litigation hold letter is

7  disclosed in LVS's Privilege Log).

8      As disclosed in LVS's Privilege Log, five separate e-mail communications were exchanged

9  between March 4, 2010 and March 9, 2010 regarding the litigation hold letter. (Exhibit 5). The

10  Privilege Log also shows that the bulk of these communications were between Brian Nagle, who

11  holds the title of Senior Vice President and Chief Security Officer[3], and Fred Kraus, who is VCR's

12  General Counsel. (*Id.*). Plaintiffs chose not to depose Brian Nagel. If Plaintiffs had done so, they

13  may have learned that Brian Nagel took numerous steps to ensure that all relevant evidence was

14  preserved. (Nagel Decl. at ¶ 3-4, attached as Exhibit 2). Upon receipt of the litigation hold letter,

15  Mr. Nagel identified and made efforts to ensure the preservation of all records related to the

16  incident including the security video footage and written reports. (*Id.*).

17      Plaintiffs' attempt to substantiate their argument by referencing a snippet of Tony

18  Whiddon's testimony, where he stated that he did not remember seeing the litigation hold letter.

19  Mr. Whiddon actually said "I'm just trying to think. I'm sure I saw this document. I just don't

20  remember, honestly I don't." (Whiddon Depo. Tr. at 38:19-20, Exhibit 7). Mr. Whiddon then

21  explained that "If this document was sent to me, I would have read it. But I don't recall reading it."

22  (*Id.* at 39:4-5). Although Mr. Whiddon is listed on LVS's Privilege Log as a recipient of the

23  litigation hold letter, the ACLU apparently takes the position that LVS should be sanctioned

24  because a witness was truthful about his lack of memory. In fact, other portions of Mr. Whiddon's

25  testimony is consistent with the Privilege Log. Mr. Whiddon had earlier testified that he

26  conducted searches about six months before his April 2011 deposition, and also testified that

27

28
_____

[3] Tony Whiddon reports to Brian Nagel. (Whiddon Depo. at 40:20-22).

LIONEL SAWYER
& COLLINS
ATTORNEYS AT LAW
1700 BANK OF AMERICA PLAZA
300 SOUTH FOURTH ST.
LAS VEGAS,
NEVADA 89101
(702) 383-8888

before conducting those searches he had received something "earlier last year" regarding the need to collect and preserve any relevant data:

> Q.   You did the searches within the last six months.  Were you given any instruction before that you should make sure that you retained any information that might be relevant to this lawsuit?
>
> A.   Yes, I believe we received something earlier last year.
>
> Q.   Who was that from?
>
> A.   I don't recall.  I just I think we received something about the case.  I'm not sure.
>
> Q.   What steps did you take to ensure that you would retain the documents that were relevant to this case?
>
> A.   All video was held and we haven't changed any policies and procedures. So all documents were saved and all reports indefinitely saved.

(Whiddon Depo. Tr. at 29:20-30:8, Exhibit 7).  The only document served by Plaintiffs "early last year", e.g., the early months of 2010, was the litigation hold letter.  Thus, while Mr. Whiddon may not have specifically remembered receiving the litigation hold letter, it is obvious that he not only received it but that he also took measures to ensure that relevant evidence was preserved.

The ACLU argues that LVS acted improperly because some of the LVS security officers never saw the litigation hold letter.  As discussed below, there was no need to do so.  The security officers do not have custody or control over any LVS records, and do not use email accounts. There was nothing for them to preserve.  This is substantiated by the fact that Plaintiffs' Motion to Compel does not identify *any* documents or information that LVS failed to preserve.

**C.   The ACLU Already Knows that The Security Officers Involved in the Incident Do Not Use Email at Work and Do Not Retain Possession or Control Over Any LVS Security Records**

As a result of the numerous depositions taken in this case, the ACLU already knows that LVS security officers do not use email at work, do not have LVS email accounts, and do not have custody or access to LVS security documents, reports, policies or training materials.  Simply put, the security officers are not custodians of any LVS corporate documents.  The ACLU attempts to manufacture a dispute with a half truth—the ACLU knows these individuals do not actually have access or control over anything, yet it has filed a motion seeking sanctions on the grounds that

LIONEL SAWYER
& COLLINS
ATTORNEYS AT LAW
1700 BANK OF AMERICA PLAZA
300 SOUTH FOURTH ST.
LAS VEGAS,
NEVADA 89101
(702) 383-8888

6

LVS was somehow negligent because it did not ask these persons to search for what LVS already knew they did not possess.

Tony Whiddon, Executive Director—Security for LVS, explained at his deposition that LVS security officers do not have company email accounts and do not use computers for anything other than the official security reports that have already been produced in this case:

> Q.    So were the security officers were never instructed to search for and retain responsive documents?
>
> A.    They wouldn't have any documents as far as the case is related, they don't keep personal copies of the reports.
>
> Q.    Can you explain to me why they wouldn't have any documents?
>
> A.    The report writing system is electronic.  So they input a report, they're inputting the data electronically into a drop-down and a format provide any documentation, anything that they would have, witness statements or attachments with it would be scanned in.  So once the report is scanned in, it goes to a supervisor for approval all electronically.  They would look at it and make sure all the information is retained in there and forwarded on to investigations.  Investigations reviews it, make sure all the documentation, everything, answers all the questions.  They either approve it or kick it back for additional comments.

(Whiddon Depo. Tr. at 32:24-33:19, Exhibit 7).

This was confirmed by the security officers.  Mr. Lovegren testified that as a security officer he did not use email at work or maintain control over any records, and was forbidden from personally retaining any security records or documents relating to his work:

> Q.    When you were a security officer, you didn't have a place to put your coat, or put  pieces of paper, or put any documents that you might receive?
>
> A.    You're not allowed to keep anything that was company paper, no.  A Venetian voluntary, no.
>
> Q.    So you would complete the—when you would complete those kinds of forms,  where would you put them?
>
> A.    I would hand them to my manager, and whatever they would do with it.
>
> * * *
>
> Q.    Did you have an e-mail mailbox?
>
> A.    No, I did not.

(Lovegren Depo. Tr. at 33:3-4, 15-23, Exhibit 8).  Ms. Hagenmaier also testified that she does not

LIONEL SAWYER
& COLLINS
ATTORNEYS AT LAW
1700 BANK OF AMERICA PLAZA
300 SOUTH FOURTH ST.
LAS VEGAS,
NEVADA 89101
(702) 383-8888

7

1   use email at work, and does not maintain or have custody or control of any manuals, training

2   materials, binders or hard copy files.  (Hagenmaier Depo. Tr. at 23:19-23, 26:7-13, 27:10-14 &

3   28:10-16, Exhibit 9).   Mr. Castro testified that although there are computers available to the

4   security officers, those computers do not have internet access, that the security officers may only

5   use them to write reports, and that the only documents he ever prepares using a computer are

6   incident reports.  (Castro Depo. Tr. at 35:3-23, Exhibit 10).

7         Additionally, during the March 14, 2011 meet and confer conference between counsel,

8   LVS's attorney informed the ACLU that the security officers do not maintain custody or control

9   over any LVS data or documents, and also explained that an incident such as this simply does not

10   generate a lot of documents.[4]  (Hernquist Decl. at ¶ 4, Exhibit 1).

11   **D.    The ACLU Already Knows About the Custodians and Sources That Were**
       **Searched, and Failed to Make Further Inquiry Despite Knowing the Identities of the**
12       **Individuals Who Conducted Those Searches**

13         The ACLU has also known about LVS's searches for responsive information for quite some

14   time.   Tony Whiddon testified at length about LVS's searches for responsive documents.   Mr.

15   Whiddon testified about the searches he conducted, the searches he directed his subordinates to

16   conduct, and the searches of electronic data that were performed by LVS's IT Department.

17   (Whiddon Depo. Tr. at 28:7-39:20, Exhibit 7).   He also testified about the preservation of

18   documents before suit was filed.  (*Id*. at 30:6-8, 38:1-12).  LVS's counsel also provided the ACLU

19   with information regarding searches for electronic data.  (Hernquist Decl. at ¶ 4-5, Exhibit 1).

20   Despite already having this knowledge, and despite having had the opportunity to explore this

21   further when discovery was still open, the ACLU now asks this Court to force LVS and/or its

22   counsel to once again reassure the ACLU that discovery requirements were complied with.

23         Counsel for the Plaintiffs extensively questioned Tony Whiddon about searches during his

24   deposition.   Mr. Whiddon described his role with LVS, explaining that he directly oversees all

25

26   _____

      [4]   The Court should also review Mr. Hernquist's March 8, 2011 letter to Ms. McLetchie,
27   which was attached as Exhibit 5 to Plaintiffs' Motion to Compel.  In that letter, Mr. Hernquist
      once again informed the ACLU that LVS security officers do not do not have company-issued
28   email, do not use email in the course of their employment, and do not maintain custody over
      documents or data.  (Exhibit 4).

LIONEL SAWYER
& COLLINS
ATTORNEYS AT LAW
1700 BANK OF AMERICA PLAZA
300 SOUTH FOURTH ST.
LAS VEGAS,
NEVADA 89101
(702) 383-8888

training, policies, personnel matters and the day-to-day operations of the security department. (Whiddon Depo. Tr. at 40:9-17, Exhibit 7).  Mr. Whiddon testified that he directed the effort to search for responsive documents, and that he directed his Investigation Supervisor, Fred Tuerck, and his Assistant Director, Mike Mackerly, to assist in collecting responsive documents.  (*Id.* at 31:17-32:23, 34:19-22).  Ms. McLetchie questioned Mr. Whiddon at length about the searches that were performed:

> Q.     What documents did you search for?
>
> A.     Policies, procedures, anything related to procedures.  Training material, training manual.  Policies and procedures.  Reports.  Incident summaries.  Dispatch log.  I think that's everything.
>
> Q.     Policies and procedures, what kinds of policies and procedures?
>
> A.     Our manual.
>
> Q.     That's the security manual that you were referring to earlier?
>
> A.     Yes, ma'am.
>
> Q.     And the security training manual you were referring to earlier?
>
> A.     Yes.
>
> Q.     Anything else?
>
> A.     Any e-mails that we had related to policies and procedures or training.

(*Id.* at 28:19-29:10).  Mr. Whiddon also testified that he personally searched his email folders and the H drive of his computer for responsive documents, and also testified that searches for electronic data were performed by LVS's IT Department on his computer as well as the computers of other LVS employees:

> Q.     You said that you looked for — you looked for e-mails.  Did you look for e-mails on your own computer or on the system?  How did you do that to search for e-mails?
>
> A.     I looked on my own computer and then it was tasked assigned to IT to search e-mails.
>
> Q.     Do you know what IT was told to search for, whether were they given certain search words?
>
> A.     I don't know.
>
> Q.     You didn't mention Mr. Bronson.  Did he get any instruction to collect

LIONEL SAWYER
& COLLINS
ATTORNEYS AT LAW
1700 BANK OF AMERICA PLAZA
300 SOUTH FOURTH ST.
LAS VEGAS,
NEVADA 89101
(702) 383-8888

9

1        documents?

2       A.    Other than meetings with the attorney.

3       Q.    And you don't know whether or not Mr. Nagel got any instruction to search for documents?

4

5       A.    I don't.  Our attorney said something.

       Q.    Okay.

6       A.    That I saw about a search.

7       Q.    You shouldn't tell me about the content.  But your understanding was that he was instructed by counsel to look for documents?

8

9       A.    Yes.

10      Q.    Okay.  And your understanding is Mr. Bronson was also instructed by counsel to look for documents?

11      A.    I believe IT was instructed to do the search.

12      Q.    Was it also with respect to Mr. Nagel, was it also IT that was instructed to do that search?

13

14      A.    Yes.

15      Q.    You don't know whether or not they were asked to look in their own files or look in their own computer or anything like that, right?

16

17      A.    Correct.

      Q.    So IT searched for your e-mails.  Did you also look on your own actual physical computer?

18

19      A.    I did.

20      Q.    And what did you look at?

21      A.    I looked at my policy section, my training section and I think it's a miscellaneous category I searched through e-mails.

22      Q.    When you say section, do you mean like a folder of e-mails?

23      A.    Yes.

24      Q.    Did you also look through any other documents that you have on your system, like word processing documents or Excel documents or anything like that?

25

26      A.    I looked through my I think it's H drive which is where documents are stored.

27

28      Q.    You mentioned you were looking for e-mails.  What kind of e-mails were

LIONEL SAWYER
& COLLINS
ATTORNEYS AT LAW
1700 BANK OF AMERICA PLAZA
300 SOUTH FOURTH ST.
LAS VEGAS,
NEVADA 89101
(702) 383-8888

1    you looking for or what kinds of documents were you looking for besides
2    the training?  We have already talked about the training documents and the
     reports and the incident summaries and the dispatch log.  But when you
3    were looking through these other documents, like e-mails and your other
     Word documents or however you use your computer, what kinds of things
4    were you looking for?

5    A.    Any policies that were updated or I had an e-mail format.  I looked for
           anything related to sidewalk or ACLU.  Any training, which you just talked
6          about it.  That's in a nutshell.

7    Q.    Did you look for anything about street performers?

8    A.    I did, I looked for street performers.

                                              * * *
9
     Q.    Okay. Thank you.  Earlier you also mentioned that somebody in IT did an e-
10         mail search.  Was it counsel that instructed him to do that e-mail search?

11   A.    Yes.

12   Q.    And who was that person in IT?

13   A.    It was Laura Morgan.

14   Q.    Do you know what they searched for exactly?

15   A.    I think sidewalk, street performer. I think there was a couple different
           categories, but I don't recall off the top of my head.
16

17   (*Id.* at 34:23-37:9, 39:11-20).  Plaintiffs did not depose Fred Tuerck, Mike Mackerly or Laura

18   Morgan, did not take a Rule 30(b)(6) deposition regarding LVS's searches, and did not serve any

19   written discovery regarding LVS's collection efforts.  (Hernquist Decl. at ¶ 7, Exhibit 1).

20          In addition to the extensive information provided by Mr. Whiddon, LVS's counsel also

21   provided the ACLU with details regarding searches for responsive information.   During a

22   telephone conversation on March 14, 2010, LVS's counsel confirmed for the ACLU that search

23   terms were used to locate electronic data, but that LVS considered the search terms used, the

24   information gathered from client interviews regarding custodianship, and the identities of

25   custodians searched to all constitute privileged communications and/or work product.  (Hernquist

26   Decl. at ¶ 4, Exhibit 1).  Also during that call, LVS's counsel explained that the individually-named

27   security officers did not have custody or possession of any responsive documents or electronic data

28   while at work, did not have any relevant documents in their individual capacities, and volunteered

LIONEL SAWYER
& COLLINS
ATTORNEYS AT LAW
1700 BANK OF AMERICA PLAZA
300 SOUTH FOURTH ST.
LAS VEGAS,
NEVADA 89101
(702) 383-8888

11

that her questions regarding discovery searches would hopefully be resolved at the deposition of Tony Whiddon, which occurred on April 8, 2011.  (*Id.*).  During a subsequent call on April 15, 2011, LVS's counsel disclosed the identities of the custodians whose computers and email had been searched by the LVS IT Department using search terms: Brian Nagle, Tony Whiddon, John Tarjanyi, Anthony Bronson, and two individuals who work in LVS's Legal Claims department.  (Hernquist Decl. at ¶ 5, Exhibit 1).  Plaintiffs knew the titles of all of these individuals as a result of an organization chart that was produced and Tony Whiddon's testimony.  (*See* Whiddon Depo. Tr. at 42:1-4, Exhibit 7).  The ACLU confirmed receipt of this information in an email dated April 15, 2010, wherein the ACLU acknowledges that "[y]ou also explained that the computers of Whiddon, Nagel, Bronson and Tarjanyi were searched."  (Exhibit 6).  Curiously, the ACLU includes this email as an exhibit to its Motion to Compel seeking that very same information.  (Exhibit 15 to Doc. 68).

In an effort to support their arguments, Plaintiffs claim that the security officers testified that they were not asked to search for responsive documents.  This statement is misleading.  While Plaintiffs served a request for production on LVS on January 5, 2011, Plaintiffs did not serve discovery requests on any of the individual LVS defendants until March 2, 2011.  (Hernquist Decl. at ¶ 6, Exhibit 1).  Linda Hagenmaier and William Lovegren were both deposed before the individual requests had even been served—Ms. Hagenmaier on February 25, 2010, and Mr. Lovegren on March 1, 2011.  (Exhibits 8 & 9).  Obviously neither had searched for documents yet; the requests had not even been served.  Their testimony also made it clear <u>why</u> they had not been asked to search on behalf of LVS—neither maintains custody over any documents or electronic data.  (Lovegren Depo. Tr. at 33:3-4, 15-23, Exhibit 8; Hagenmaier Depo. Tr. at 23:19-23, 26:7-13, 27:10-14 & 28:10-16, Exhibit 9).  Plaintiffs' Motion to Compel neglects to inform the Court of the timing between the depositions and production requests, and also neglects to inform the Court that each of the individual LVS defendants who was served with a production request filed a timely response with a  certification under Rule 26(g).  Each of the individual LVS defendants searched for documents, and produced those materials in their personal possession, and those documents are referenced in the written discovery responses served on behalf of each of them.  Additionally,

LIONEL SAWYER
& COLLINS
ATTORNEYS AT LAW
1700 BANK OF AMERICA PLAZA
300 SOUTH FOURTH ST.
LAS VEGAS,
NEVADA 89101
(702) 383-8888

12

1    Tony Whiddon testified that he collected their responsive documents.  (Whiddon Depo. Tr. at

2    26:2-13, Exhibit 7).

3    **E.      The ACLU Already Knows that The Security Officers Involved in the Incident Did
              Not Take Any Notes**

4
              Plaintiffs' Motion to Compel insinuates that LVS has failed or refused to produce notes

5    taken by the security officers involved in the incident.  No notes were taken.  This is blatantly

6    obvious when viewing the video footage—the security officers were engaged with the Plaintiffs,

7    and none of them is seen taking any notes.  (*See* video footage, attached as Exhibit 14 to Doc. No.

8    60).  Moreover, every security officer who was questioned on this topic testified that he or she did

9    not take any notes.

10             Linda Hagenmaier testified as follows:

11             Q:      Did you take any notes regarding this incident?

12             A:      No, I did not.

13   (Hagenmaier Depo. Tr. at 26:4-6, Exhibit 9).

14             Similarly, Anthony Bronson testified as follows:

15             Q.      Did you ever make any notes about this incident?

16             A.      No.

17             Q.      Not on the computer?

18             A.      No.

19   (Bronson Depo. Tr. at 69:9-13, Exhibit 11).

20             William Lovegren also testified that he did not take any notes:

21             Q.      Did you use the notes that you had taken outside to make your report?

22                     MR. LIONEL:  Objection.  There's nothing about notes, counsel.

23             BY MS. McLETCHIE:

24             Q.      Did you use any notes to make your report?

25             A.      No.

26             Q.      Are you sure about that?

27             A.      I — I'm pretty — I guess I don't recall, but I'm thinking there's no notes, no.
                       I don't remember any notes.

28

LIONEL SAWYER
& COLLINS
ATTORNEYS AT LAW
1700 BANK OF AMERICA PLAZA
300 SOUTH FOURTH ST.
LAS VEGAS,
NEVADA 89101
(702) 383-8888

13

Q.     But sometimes you do take notes about incidents, right?

A.     Sometimes we do.

Q.     And you don't remember all the details about what happened that day, right?
You don't remember all the details involving this incident, right?

A.     Not all details.

Q.     So it's possible that you took notes that day, right?

A.     I don't recall taking notes at all.

(Lovegren Depo. Tr. 82:17-83:12, Exhibit 8).

Eli Castro also testified that he did not take any notes about the incident, and explained that he uses his notebook to record rudimentary data such as names and license plate numbers and never makes observational notes regarding incidents.  (Castro Depo. Tr. at 40:8-41:10, Exhibit 10).  Mr. Castro also testified that he did not take any notes about this incident, and that even if he had those notes would have been immediately shredded once a report was completed using the electronic LVS security report writing system:

Q.     Did you rely on your notes when you made the report?

A.     I didn't make any notes.

Q.     Are you sure that you didn't make any notes?

A.     Pretty sure.

Q.     Pretty sure, but you're not absolutely sure?

A.     Yeah.  Because I think I got the information from those individuals off their identification as far as I know.

Q.     What do you mean you got the information from those individuals off their identification?

A.     Their names and addresses.

Q.     You mean while you were in the Security Room and while they were in the Security Room?

A.     Yes.

Q.     So you were writing your report at a computer monitor in the back office area?

A.     Yes.

Q.     And you went to go get identification and information from the brothers

LIONEL SAWYER
& COLLINS
ATTORNEYS AT LAW
1700 BANK OF AMERICA PLAZA
300 SOUTH FOURTH ST.
LAS VEGAS,
NEVADA 89101
(702) 383-8888

14

1   Perez-Morciglio while you were doing that?

2   A.   I don't know if I got them or they were available to me.  I don't know if I had
     gotten them or somebody wrote the information down on a piece of paper or
3   what.

4   Q.   So it's possible you had written the information down in your notebook.

5   A.   Not in my notebook, no.

6   Q.   Isn't that usually where you write that kind of information down?

7   A.   Typically, yes.

8   Q.   So why would you follow a different protocol on the date of the incident?

9   A.   I just used a scrap piece of paper.

10   Q.   What would you have done with that scrap piece of paper?

11   A.   I would have shredded it because it had personal information on it.

12   (Castro Depo. Tr. 83:15-85:1, Exhibit 10).

13   Tony Whiddon also testified that even if notes had been made, they would not have been

14   retained because they contain personal information:

15   Q.   What about be any — I understand from reading your policies and
     procedures, and from deposing some of the officers, that notes are
16   sometimes taken by security officers.  Was there any attempts to ensure that
     relevant notes would be retained?
17
18   A.   I believe when we received this [the litigation hold letter], most of their
     documentation is destroyed quickly once they write an incident report or
19   take any notes they didn't retain anything.  So I would say we didn't receive
     notice until a couple months after the incident, so I would say no.

20   Q.   What's your understanding of how long you're supposed to retain the notes
     that the guards keep?
21
22   A.   The officers?

23   Q.   I'm sorry, the security officers keep?

24   A.   Well, typically they destroy them right away because of PII, personal
     identifiable information.  So they destroy and typically that's what's kept in
25   their notes.

26   (Whiddon Depo. Tr. at 30:9-31:1, Exhibit 7).  At his deposition, Tony Whiddon also explained that

27   LVS's note taking policy needs to be updated due to modern concerns about identity theft and a

28   change in the report writing system used by LVS.  (*Id.* at 256:2-6, Exhibit 7).  LVS has also

LIONEL SAWYER
& COLLINS
ATTORNEYS AT LAW
1700 BANK OF AMERICA PLAZA
300 SOUTH FOURTH ST.
LAS VEGAS,
NEVADA 89101
(702) 383-8888

produced an email to Plaintiffs, which contains a directive from Tony Whiddon to all security personnel that all documents containing sensitive or personal information should be shredded. (Hernquist Decl. at ¶ 8, Exhibit 1).

Plaintiffs argue that LVS should be sanctioned because it has a policy that security officers should take notes, and no notes were produced.  However, no notes were taken.  LVS cannot produce that which never existed.  Plaintiffs chose to ignore this extensive testimony, and filed their motion anyway.

## III.   LAW AND ARGUMENT

### A.   Plaintiffs Have Obtained Knowledge Regarding LVS Searches, Had an Opportunity to Obtain Additional Information During Discovery, and Have Made No Showing That This Court Should Now Compel LVS or its Counsel to Provide Testimony Regarding Discovery Efforts

Plaintiffs seek an order compelling LVS to provide assurances about its searches and the circulation of the litigation hold letter.   As discussed at length above, the ACLU already has this information.  Plaintiffs were informed that the litigation hold letter was circulated and that relevant information was preserved.   Mr. Whiddon also testified at length about LVS's searches and collection of relevant data.  Information regarding searches was also provided by LVS's counsel.

If Plaintiffs wanted additional testimony regarding discovery searches, they should have obtained it when discovery was still open.  There has been no showing (or even argument) by Plaintiffs that they attempted to obtain this additional information now sought in the Motion to Compel from Tony Whiddon or some other LVS representative and were unsuccessful.   For instance, Plaintiffs have not identified any specific topics regarding the searches that Mr. Whiddon did not sufficiently address at his deposition.  And even if that had been the case, Plaintiffs knew from Mr. Whiddon's testimony that Fred Tuerck, Mike Mackerly and Laura Morgan were all involved in collecting documents to produce in this case.  (Exhibit 7 at 31:17-32:23, 34:19-37:9, 39:11-20).  Plaintiffs did not depose any of them.  Similarly, although Plaintiffs took a Rule 30(b)(6) deposition[5], they did not include discovery searches as one of the designated topics.

---

[5]   Tony Whiddon was deposed in his individual capacity, and was also LVS's Rule 30(b)(6) designee.

LIONEL SAWYER
& COLLINS
ATTORNEYS AT LAW
1700 BANK OF AMERICA PLAZA
300 SOUTH FOURTH ST.
LAS VEGAS,
NEVADA 89101
(702) 383-8888

1    Plaintiffs also knew that Brian Nagel was Tony Whiddon's superior and also knew from the

2    Privilege Log that Brian Nagel exchanged four emails regarding the litigation hold letter, yet chose

3    not to depose him.  (Exhibit 5).

4            Now, after discovery has closed, Plaintiffs want to pursue discovery on discovery.

5    However, there has been no evidence of any spoliation or negligence.  Demanding certification of

6    discovery responses, above and beyond the certification already submitted pursuant to Federal

7    Rule of Civil Procedure Rule 26(g), is unwarranted here.  *Romero v. Allstate Ins.*, 271 F.R.D. 96,

8    110-11 (E.D. Pa. 2010) (denying plaintiff's motion to require certification that defendants

9    complied with their discovery obligations and took necessary steps to preserve all relevant

10   electronically-stored information because plaintiffs failed to present any evidence of spoliation);

11   *Ford Motor Co. v. Edgewood Prop.*, 257 F.R.D. 418 (D.N.J. 2009) (denying plaintiff's motion to

12   seek discovery on document production procedures, and explaining that "it is, in fact, the

13   producing party who is in the best position to determine the method by which they will collect the

14   documents"; because plaintiff was not entitled to inquire into the adequacy of defendant's

15   production procedure because it had not made even "a colorable showing" that defendant had

16   purposefully or negligently withheld documents).

17           Plaintiffs cite *Powell v. Texvans, Inc.*, 2011 WL 1099120 at *8 (D. Nev. 2011) for the

18   proposition that an attorney should be required to submit an affidavit regarding efforts to identify

19   and locate responsive documents.  In *Powell*, the plaintiff suffered a debilitating stroke and was

20   therefore unable to assist her attorneys during discovery.  *Id*.  The court responded by ordering

21   plaintiff's counsel to search plaintiff's house for records and then submit an affidavit regarding his

22   efforts to locate documents.  *Id*.  While requiring assurances of counsel may be appropriate when

23   the client is comatose, it does not stand for the proposition that an attorney must testify for its

24   client or provide a narrative regarding discovery searches.[6]  *Id*.

---

[6]  Plaintiffs also cite *Melendres v. Arpaio*, 2010 WL 582189 at *9 (D. Ariz. 2010).  In that case, the responding party admitted documents had been destroyed but argued that the destruction was unintentional.  The court ordered the responsive party to submit an affidavit, so that the court could craft an appropriate sanction "tailored to the type and degree of document destruction."  Here, there is no evidence of document destruction which would warrant such a certification.

LIONEL SAWYER
& COLLINS
ATTORNEYS AT LAW
1700 BANK OF AMERICA PLAZA
300 SOUTH FOURTH ST.
LAS VEGAS,
NEVADA 89101
(702) 383-8888

Plaintiffs have already been provided with information regarding LVS's searches, and if Plaintiffs desired additional information they could have obtained it. Plaintiffs have not presented any showing to support its unusual request for an order compelling LVS and/or its counsel to provide written assurances and details regarding discovery searches.

**B.     Sanctions Are Not Appropriate Because There is No Evidence of Spoliation**

A Court's authority to sanction parties for spoliation of evidence springs from two sources. *Leon v. IDX Systems Corp.*, 464 F.3d 951, 958 (9th Cir. 2006). The first is the inherent power of the Court to issue sanctions in response to abusive litigation practices. *Id.*; *see also Chambers v. NASCO, Inc.*, 501 U.S. 32, 33 (1991). This inherent power is broad and can range from minor sanctions, such as the awarding of attorney's fees, *Leon*, 464 F.3d at 961, to more serious sanctions, such as dismissal of claims, *Id.* at 958, or instructing the jury that it may draw an adverse inference, *In re Napster, Inc. Copyright Litigation*, 462 F. Supp. 2d 1060, 1078 (N.D. Ca. 2006). Sanctions under these "inherent powers must be exercised with restraint" and should be appropriate to the conduct that triggered the sanction. *Chambers, Inc.*, 501 U.S. at 43. The second source of authority is Federal Rule of Civil Procedure 37(b), which allows sanctions against a party who "fails to obey an order to provide or permit discovery." *Leon*, 464 F.3d at 958. A sanction under Rule 37(b) is only appropriate when a party fails to obey a Court order.[7] *Unigard Sec. Ins. Co. v. Lakewood Eng'g & Mfg. Corp.*, 982 F.2d 363, 368 (9th Cir.1992).

In order to obtain a motion granting an adverse inference due to spoliation under the Court's inherent authority, the alleging party "must establish (1) that the party having control over the evidence had an obligation to preserve it at the time it was destroyed; (2) that the records were destroyed with a culpable state of mind; and (3) that the destroyed evidence was relevant to the party's claim or defense such that a reasonable trier of fact could find that it would support that claim or defense." *Napster*, 462 F. Supp. 2d at 1078 (citing *Residential Funding Corp. v.*

---

[7]   The Court could not impose sanctions based on Plaintiffs' allegations pursuant to Rule 37. Sanctions under Rule 37 are allowed only against a party that disobeys a court issued discovery order, and the Court did not issue a discovery order concerning the discovery disputes at issue here. *Unigard*, 982 F.2d at 368; *Brandt v. Vulcan, Inc.*, 30 F.3d 752, 756 (7th Cir. 1994); *Kinnally v. Rogers Corp.*, 2008 WL 4850116, *5 (D. Ariz. 2008).

LIONEL SAWYER
& COLLINS
ATTORNEYS AT LAW
1700 BANK OF AMERICA PLAZA
300 SOUTH FOURTH ST.
LAS VEGAS,
NEVADA 89101
(702) 383-8888

1   *DeGeorge Fin. Corp.*, 306 F.3d 99, 107 (2nd Cir. 2002)); accord *Zubulake v. UBS Warburg, LLC*,

2   220 F.R.D. 212, 220 (S.D.N.Y. 2003); *Byrnie v. Town of Cromwell, Bd. of Educ.*, 243 F.3d 93,

3   107-08 (2nd Cir. 2001).  In cases where courts have found spoliation, there was a clear showing of

4   destruction of evidence.  In *Napster*, 462 F. Supp. 2d at 1066, there was evidence of an explicit

5   destruction policy that was not suspended, resulting in unquestionable destruction of relevant email

6   evidence.  In *Zubulake*, 220 F.R.D. at 220, defendant expressly acknowledged that backup tapes

7   under their control and containing relevant evidence were missing.  In *National Ass'n of Radiation*

8   *Survivors*, 155 F.R.D. 543, 557 (N.D. Cal. 1987), there were "no questions that relevant documents

9   were destroyed and are now permanently lost."  The district court in *Residential Funding*, 306 F.3d

10  at 110, originally held that "purposely sluggish" behavior was enough to warrant an adverse

11  inference instruction due to spoliation.  The Second Circuit, however, held that the district court

12  applied the wrong standard because "the evidence at issue was apparently not destroyed, but

13  merely not timely produced."  *Id.* at 112.

14          Sanctions cannot be awarded here because the ACLU has not presented any evidence

15  indicative of spoliation, let alone meeting its burden of proof on all three of the requisite elements.

16  Plaintiffs claim that the mere fact that LVS failed to produce notes is evidence of spoliation, yet

17  there is no evidence that any notes ever existed.  In fact, every security officer who asked about

18  this stated that he or she did not take notes. (Hagenmaier Depo. Tr. at 26:4-6, Exhibit 9; Bronson

19  Depo. Tr. at 69:9-13, Exhibit 11; Lovegren Depo. Tr. 82:17-83:12, Exhibit 8; Castro Depo. Tr.

20  83:15-85:1, Exhibit 10).  Plaintiffs have shown no evidence which even comes close to suggesting

21  that any evidence was destroyed.  Similarly, Plaintiffs' argument regarding circulation of the

22  litigation hold letter is baseless.   The record indicates that the litigation hold letter was

23  disseminated and that all relevant information was preserved. (Exhibit 1 at ¶ 3-5; Exhibit 2 at ¶ 2-

24  5; Exhibit 4; Exhibit 5).  Plaintiffs' argue that LVS was  negligent because it did not circulate the

25  litigation hold letter to the security officers.  However, in making this argument Plaintiffs ignore

26  the fact that the security officers were not custodians of any documents.  (Exhibit 2 at ¶ 2;

27  Whiddon Depo. Tr. at 32:24-33:19, Exhibit 7; Lovegren Depo. Tr. at 33:3-4, 15-23, Exhibit 8;

28  Hagenmaier Depo. Tr. at 23:19-23, 26:7-13, 27:10-14 & 28:10-16, Exhibit 9; Castro Depo. Tr. at

LIONEL SAWYER
& COLLINS
ATTORNEYS AT LAW
1700 BANK OF AMERICA PLAZA
300 SOUTH FOURTH ST.
LAS VEGAS,
NEVADA 89101
(702) 383-8888

1    35:3-23, Exhibit 10).

2         LVS acknowledges that it had a duty to preserve evidence relevant to the litigation.  *In re*

3    *Napster, Inc. Copyright Lit.*, 462 F. Supp. 2d 1060, 1067 (N.D. Cal. 2006).  However, a party is

4    not obligated to inform non-custodians that they must preserve documents and things that are not

5    in their control or possession.  *See Radiation Survivors v. Turnage*, 115 F.R.D. 543, 557-58 (N.D.

6    Cal. 1987) ("The obligation to retain discoverable materials is an affirmative one; it requires that

7    the agency or corporate officers having notice of discovery obligations communicate those

8    obligations *to employees in <u>possession</u> of discoverable materials*.") (emphasis added).  Imposing

9    such an obligation on employees who are not in possession of such materials is impractical and

10   nonsensical.

11        Plaintiffs make the broad statement that an organization's failure to communicate a

12   litigation hold letter to its employees constitutes negligence, and cite *Melendres v. Arpaio*, 2011

13   WL 582189 (D. Ariz. 2010) in support.  In *Melendres*, it was uncontested that relevant evidence

14   had been destroyed.  *Id*.  That is not the case here.  Although the *Melendres* court found the failure

15   to constitute "negligence" under the facts of that case, in that case the Court was faced with a

16   failure to notify persons in possession of documents.  *Id.* at *5.  Again, that is not the case here.

17   The security officers were not in possession of any documents.

18        Rather than establishing spoliation, Plaintiffs' allegations are instead based on a lack of

19   evidence and speculation.   The burden for showing destruction of relevant evidence requires more

20   than a suggestion or implication.  *See FMC Tech., Inc. v. Edwards*, 2007 WL 1725098 (W.D.

21   Wash. 2007) ("In *Leon*, spoliation of evidence was clear. Here, however, Plaintiffs' allegations

22   regarding the destruction of computer files are anything but clear and this Court cannot find

23   Plaintiffs' assertions any more or less credible than Defendants' explanations for the 'missing'

24   data.").  The inferences suggested by Plaintiffs cannot be used to trigger sanctions on the present

25   facts, and the motion should be denied.

26   / / /

27   / / /

28   / / /

LIONEL SAWYER
& COLLINS
ATTORNEYS AT LAW
1700 BANK OF AMERICA PLAZA
300 SOUTH FOURTH ST.
LAS VEGAS,
NEVADA 89101
(702) 383-8888

1

**IV.     CONCLUSION**

2

For the forgoing reasons, Plaintiffs' Motion to Compel should be denied.

3

LIONEL SAWYER & COLLINS

4

By:   /s/ Samuel S. Lionel

5

Samuel S. Lionel, Bar No. 1766
David N. Frederick, Bar No. 1548

6

Robert W. Hernquist, Bar No. 10616

7

8

9

10

**CERTIFICATE OF SERVICE**

11

I hereby certify that I am an employee of Lionel Sawyer & Collins, and that on the 26th day

of May, 2011, I caused to be served a true and correct copy of the foregoing *Opposition To*

12

*Plaintiffs' Motion To Compel* in the following manner:

13

(ELECTRONIC SERVICE) Pursuant to Fed. R. Civ. P. 5(b)(3) and LR 5-4, the above-

14

referenced document was electronically filed and served upon the parties listed below through the

15

Court's Case Management and Electronic Case Filing (CM/ECF) system:

16

17

Allen Lichtenstein
Margaret A. McLetchie

Nicholas Crosby
MARQUIS AURBACH COFFING

18

ACLU OF NEVADA
3315 Russell Rd., Suite H 222

10001 Park Run Drive
Las Vegas, NV 89145

19

Las Vegas, NV 89120

20

*Attorneys for Plaintiffs Jason A. Perez-*
*Morciglio and Sebastian Perez-*

*Attorney for Defendants Las Vegas Metropolitan*
*Police Department, Sheriff Douglas Gillespie,*

21

*Morciglio*

*Officer S. Schaier and Officer T. Scott*

22

23

/s/  Robert Hernquist
LIONEL SAWYER & COLLINS

24

25

26

27

28

LIONEL SAWYER
& COLLINS
ATTORNEYS AT LAW
1700 BANK OF AMERICA PLAZA
300 SOUTH FOURTH ST.
LAS VEGAS,
NEVADA 89101
(702) 383-8888