Allen Lichtenstein, Bar No. 3992
lichtenstein@aclunv.org
Margaret A. McLetchie, Bar No. 10931
mcletchie@aclunv.org
ACLU OF NEVADA
601 South Rancho Dr. Suite B-11
Las Vegas, NV 89106

*Attorneys for Plaintiffs*
*Jason and Sebastian Perez-Morciglio*

UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

| | |
|---|---|
| Jason A. Perez-Morciglio and Sebastian Perez-Morciglio,<br>                    Plaintiffs,<br>          vs.<br><br>Las Vegas Metropolitan Police Department; Sheriff Douglas Gillespie (individually and in his official capacity as Sheriff of the Las Vegas Metropolitan Police Department); Las Vegas Metropolitan Police Department Officers T. Scott and S. Schaier, Sergeant Kendall Bell (in their individual capacities); Las Vegas Sands Corp., a Nevada Corporation; Venetian Casino Resort, LLC, a Nevada Limited Liability Company; Venetian Security Guard Eli Castro; Venetian Security Guard Linda Hagenmaier; Venetian Security Guard Ron Hicks; Venetian Security Guard William Lovegren; Venetian Security Guard Anthony Bronson; and Venetian Security Guard Kevin Neanover; Venetian Security Guard Kim Gorman; Venetian Security Guard Paul Tanner; and Executive Director of Security Tony Whiddon,<br>                    Defendants. | Case No.:        2:10-CV-00899-PMP-RJJ<br><br><br><br>**PLAINTIFFS' OPPOSITION TO THE DEFENDANT LAS VEGAS SANDS CORP. VENETIAN CASINO RESORT, LLC, ELI CASTRO, LINDA HAGENMAIER, WILLIAM LOVEGREN, ANTHONY BRONSON, KEVIN NEANOVER, KIM GORMAN, PAUL TANNER AND TONY WHIDDON'S MOTION FOR SUMMARY JUDGMENT; PLAINTIFFS' RULE 56(F) MOTION; PLAINTIFFS' COUNTERMOTION**<br><br>**(AMENDED)** |

Pursuant to Rule 56 of the Federal Rules of Civil Procedure and United States District Court Local Rule 56-1, Plaintiffs Jason Perez-Morciglio and Sebastian Perez-Morciglio, by and through their counsel Margaret A. McLetchie of the ACLU of Nevada, hereby file this Opposition to the Motion for Summary Judgment filed by Defendants Las Vegas Sands Corp., Venetian Casino Resort, Eli Castro, Linda Hagenmaier, William Lovegren, Anthony Bronson, Kevin Neanover, Kim Gorman, Paul Tanner, and Tony Whiddon.  Plaintiffs also hereby file this Motion for Summary Judgment Pursuant to Rule 56(f) of the Federal Rules of Civil Procedure. This opposition and these motions are based upon the pleadings and papers on file in this case, the attached memorandum of points and authorities, the attached supporting declaration and exhibits, and any arguments by counsel at the time of hearing.

ACLU of Nevada

*/s/ Margaret A. McLetchie*
Margaret A. McLetchie

MEMORANDUM OF POINTS AND AUTHORITIES .................................................. 8

I.    Introduction .......................................................................................................... 8

II.   History of Litigation Regarding the Sidewalk .................................................. 11

III.  Response to Statement of Undisputed Facts ..................................................... 13

    A.   The Security Video Footage of the Incident ................................................ 14

    B.   "Plaintiffs' Factual Admissions" ................................................................. 14

    C.   "The Facts as Stated by William Lovegren" ............................................... 17

IV.   Plaintiffs' Statement of Undisputed Facts ........................................................ 18

    A.   The Venetian's Policies with Respect to the Sidewalk ................................ 18

    B.   Metro's Policies and Relationship with the Venetian ................................. 23

    C.   The Incident that Gave Rise to this Litigation ............................................ 25

V.    Argument ............................................................................................................ 35

    A.   Summary Judgment Can Be Issued in Favor of the Plaintiffs. ................... 35

    B.   Legal Standard on Summary Judgment ....................................................... 39

    C.   Plaintiffs Have Asserted Actionable Civil Rights Claims Against the Defendants,
    Who Acted Under Color of Law. .................................................................. 41

        1.   The Venetian Defendants Acted Under Color of Law. ........................... 41

            a.   The Venetian Defendants' Activities with Respect to the Sidewalk Constitute a
            Public Function. ........................................................................................... 42

            b.   The Venetian Defendants' Joint Action with Metro Also Constitutes State
            Action. ........................................................................................................... 46

               i.   The Police Gave Support to the Venetian Defendants' Actions, and Thus, the
               Requisite Joint Action Is Present. ................................................................ 46

               ii.   There Is Also Evidence of a Conspiracy. ................................................ 50

        2.   The Claims Against the Venetian Are Actionable Civil Rights Claims. ............... 52

    D.   Plaintiffs Have Valid First Amendment Claims. ......................................... 53

        1.   Jason Was Engaged in Expressive Activity when Officer Lovegren Accosted Him.
        ....................................................................................................................... 54

        2.   Jason's Zorro Role-Playing Cannot Be Reduced to a Commercial Transaction.. 58

        3.   There Is Additional Protected Speech and Expression at Issue. ........................... 60

**4.    Plaintiffs Are Entitled to Partial Summary Judgment on their First Amendment Claims.**................................................................................................................. 63

**E.    Plaintiffs' Tort Claims Survive Summary Judgment.**................................... 64

**1.    The Public Has Property Rights as well as First Amendment Rights with Respect to the Sidewalk.** ......................................................................................... 65

**2.    The Venetian Does Not Have the Legal Right to Exclude from the Sidewalk.** ..... 68

**3.    Even if the Venetian Defendants Were Entitled to Trespass People from the Public Sidewalk, There Would Be Disputed Issues of Material Fact.**........................... 70

**4.    This Court Should Enter Partial Summary Judgment in favor of Plaintiffs.**........ 71

**VI.    Conclusion** .................................................................................................... 71

# Cases

*Adickes v. S.H. Kress & Co.*, 398 U.S. 144 (1970) .......................................... 39, 40, 50, 52

*Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40 (1999)............................................ 41

*American Pipe & Steel Corp. v. Firestone Tire & Rubber Co.*, 292 F.2d 640 (9th Cir. 1961) ............. 38

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986)........................................ 39, 40, 46

*Angle v. Sky Chef, Inc.*, 535 F.2d 492 (9th Cir. 1976)............................................ 37

*Banasik et al. vs. Clark County et al.*, Case No. 2:09-cv-01242-LDG-GWF............................ 12

*Berger v. City of Seattle*, 569 F.3d 1029 (9th Cir. 2009) ...................................... 13, 56, 58

*Branderburg v. Ohio*, 395 U.S. 444 (1969) ........................................................ 61

*Brooks v. Bonnet*, 185 P.3d 346 (Nev. 2008).................................................... 67

*Brooks v. North Carolina Department of Correction*, 984 F.Supp. 940 (E.D.N.C. 1997) .............. 63

*Burton v. City of Durham*,  457 S.E. 2d 329 (N.C. App. 1995) ...................................... 63

*Caviness v. Horizon Cmty. Learning Ctr*, 590 F.3d 806 (9th Cir. 2010)........................ 45, 49

*Cinevision Corp. v. City of Burbank*, 745 F.2d 560 (9th Cir. 1984)................................ 55

*Citizens to End Animal Suffering and Exploitation, Inc. v. Faneuil Hall Marketplace, Inc.*, 745 F.Supp. 65 (D. Mass. 1990)42, 44, 45

*City of Houston v. Hill*, 482 U.S. 451 (1987)...................................................... 61

*Collins v. Womancare*, 878 F.2d 1145 (9th Cir. 1989) ............................................ 47

*Doe ex rel. Doe v. State of Hawaii Dept. of Educ.*, 351 F. Supp. 2d 998 (D. Haw. 2004) .............. 37

*Dunn v. Carroll*, 40 F.3d 287 (8th Cir.1994) .................................................... 57

*Duran v. City of Douglas*, 904 F.2d 1372 (9th Cir.1990) ........................................ 62

Fed. R. Civ. P. 56(c) ............................................................................ 39

*Franklin v. Fox*, 312 F.3d 423 (9th Cir. 2002)................................................... 50

*Gaudiya Vaishnava Soc. v. City and County of San Francisco*, 952 F.2d 1059 (9th Cir. 1990)........... 59

*Giboney v. Empire Storage & Ice Co.*, 336 U.S. 490 (1949) ...................................... 61

*Gulliford v. Pierce County*, 136 F.3d 1345 (9th Cir. 1998) ...................................... 62

*Harris v. City of Roseburg*, 664 F.2d 1121 (9th Cir. 1981) .................................... 47, 48

*Hess v. Indiana*, 414 U.S. 105 (1973)........................................................... 61

*Howerton v. Gabica*, 708 F.2d 380 (9th Cir. 1983) ........................................ 46, 47, 49, 50

1  *In re Marvin Properties, Inc.*, 76 B.R. 150 (9th Cir. 1987) ..................................................... 38

2  *Int'l Soc. for Krishna Consciousness, Inc. v. Lee*, 505 U.S. 672 (1992) ................................ 66

3  *Jeffries v. United States*, 477 F.2d 52 (9th Cir. 1973) ............................................................ 38

4  *Kennedy v. Silas Mason Co.*, 334 U.S. 249 (1948) ................................................................ 40

5  *Kirtley v. Rainey*, 326 F.3d 1088, 1092 (9th Cir. 2003) .................................................. 41, 46

6  *Lee v. Katz*, 276 F.3d 550 (9th Cir. 2002)..................................................... 42, 43, 44, 45

7  *Marsh v. Alabama*, 326 U.S. 501 (1946) .......................................................... 42, 44

8  *Matrix Motor Co., Inc. v. Toyota Jidosha Kabushiki Kaisha*, 218 F.R.D. 667 (C.D. Cal. 2003)..................... 36

9  *Mazzeo v. Gibbons*, 2010 WL 4384207 (D. Nev. 2010) .................................................. 50, 51

10 *McCarthy v. Nw. Airlines, Inc.*, 56 F.3d 323 (1st Cir. 1995) ............................................... 39

11 *Mechmetals, Corp. v. Telex Computer Products, Inc.*, 709 F.2d 1287 (9th Cir. 1983) ............... 38

12 *Meredith v. Washoe County School District*, 84 Nev. 15, 435 P.2d 750 (1968) ....................... 66

13 *Portsmouth Square v. Shareholders' Protective Comm.*, 770 F.2d 866 (9th Cir. 1985)............... 38

14 *Pourny v. Maui Police Department, County of Maui*, 127 F.Supp.2d 1129 (D. Haw. 2000) ......... 47

15 *S.O.C., Inc. v. County of Clark*, 152 F.3d 1136 (9th Cir.1998)............................................. 11

16 *Schacht v. U.S.*, 398 U.S. 58 (1970)...................................................... 55, 56, 58

17 *Tinker v. Des Moines Indep. Comm. Sch. Dist.*, 393 U.S. 503 (1969) .................................. 57

18 *U.S. v. Grace*, 461 U.S. 171 (1983) ...................................................................... 66

19 *United Church of Christ v. Gateway Econ. Dev. Corp. of Greater Cleveland, Inc.*, 383 F.3d 449 (6th Cir. 2004) ........... 42, 44, 45

20 *United States v. Fred A. Arnold, Inc.*, 573 F.2d 605 (9th Cir. 1978).................................... 40

21 *United States v. Poocha*, 259 F.3d 1077 (9th Cir. 2001)................................................... 62

22 *United States v. Schaffer*, 2010 WL 347982 (E.D. Cal., 2010) ......................................... 62

23 *United States v. Stevens*, 130 S. Ct. 1577 (2010) ......................................................... 61

24 *Venetian Casino Resort v. Local Joint Exec. Bd. of Las Vegas*, 257 F.3d 937 (9th Cir. 2001) ............................. passim

25 *Venetian Casino Resort v. Local Joint Exec. Bd. of Las Vegas*, 45 F.Supp. 2d 1027 (D. Nev. 1999)...................... passim

26 *Voggenthaler v. Md. Square, LLC*, 2010 WL 1553417 (D. Nev. 2010)................................. 36

27 *Ward v. Rock Against Racism*, 491 U.S. 781 (1989)...................................................... 55

28 *Webber v. Clark County*, Case No.2:06-cv-18-RLH-RJJ.......................................... 13, 22

Plaintiffs' Opposition to Venetian Defendants' Motion for Summary Judgment, and Rule 56(f) Motion and Countermotion

## Statutes

Clark County Code of Ordinances 16.11.070 ................................................................................................ 11

Nev. Rev. Stat. § 207.200(1)(b) ..................................................................................................................... 69

Nev. Rev. Stat. § 651.020 ........................................................................................................................ 69, 70

## Other Authorities

RESTATEMENT (THIRD) OF PROP.: SERVITUDES § 1.1(1) .................................................................................. 67

RESTATEMENT (THIRD) OF PROP.: SERVITUDES § 2.18 ............................................................................... 66, 68

RESTATEMENT (THIRD) OF PROP.: SERVITUDES § 4.1 ...................................................................................... 67

## Rules

Dist. Nev. Local R. 26-4 ................................................................................................................................ 35

Dist. Nev. Local R. 56-1 ..................................................................................................................... 2, 12, 13

Dist. Nev. Local R. 7-2 .................................................................................................................................. 37

Fed. R. Civ. P. 56(f) ....................................................................................................................... 2, 35, 37, 38

## Treatises

27A Fed. Proc. § 62:679 (2011) ..................................................................................................................... 40

## Constitutional Provisions

U.S. CONST., AMEND. I .................................................................................................................................. 54

Plaintiffs' Opposition to Venetian Defendants' Motion for Summary Judgment, and Rule 56(f) Motion and Countermotion

## MEMORANDUM OF POINTS AND AUTHORITIES

I.   **Introduction**

In 1999, this Court ruled that the sidewalk in front of the Venetian and along Las Vegas Boulevard is a public forum where the Constitution applies. *Venetian Casino Resort v. Local Joint Exec. Bd. of Las Vegas ("Venetian I")*, 45 F.Supp. 2d 1027, 1036 (D. Nev. 1999).  The Ninth Circuit affirmed this Court's ruling in 2001, making clear that, along with free speech rights, the public has property rights vis-à-vis the sidewalk – the right to freely access it. *Venetian Casino Resort v. Local Joint Exec. Bd. of Las Vegas ("Venetian II")*, 257 F.3d 937, 946 (9th Cir. 2001) *cert. denied*, 535 U.S. 905 (2002).   Yet the Venetian still claims total dominion over the public sidewalk in front of its casino.  For example, it asserts that people are still subject to Venetian policies when walking anywhere on what it claims to be "its sidewalk." Members of the public who use the public sidewalk have no way of knowing they are on Venetian "private property" or what the rules are.  But, according to the Venetian, people can be punished for violating the secret sidewalk rules and be required to leave.  Worse, if someone refuses to depart when told to do so, or if someone dares to contest the Venetian's claims, the challenger can be searched, handcuffed, restrained, and detained.

This is not a hypothetical.  In the instant case, this is exactly what came to pass.  On January 15, 2010,  a street performer, Jason, a.k.a. Zorro, and his brother, Sebastian, a.k.a. Darth Vader, were improperly and forcibly seized by Venetian security personnel from the public sidewalk in front of the casino, dragged into a holding room, and held prisoner for over an hour. For what? The Venetian Defendants[1] admit that Plaintiffs were not engaged in any *legal*

---

[1]  "The Venetian Defendants" refers to Defendants Las Vegas Sands Corp., Venetian Casino Resort LLC, Eli Castro, Linda Hagenmaier, William Lovegren, Anthony Bronson, Kevin Neanover, Kim Gorman, Paul Tanner, and Tony Whiddon.

wrongdoing before security personnel approached them; instead they contend that one security officer saw Jason, who was wearing a cape and mask along with the rest of his Zorro ensemble that day, receive money after handing a sword to a little boy.  While Jason says it was a tip, and the "arresting" security officer admits he has no evidence that Jason asked for money, the Venetian Defendants argue that it was a violation of Venetian policy and enough to give them the right to ask Jason to leave.  When Jason refused to do so, the Venetian's story goes, then *he* was breaking the law and committing trespass.  Thus, the Venetian Defendants claim they were allowed to use force to effectuate a citizen's arrest and eject him from the sidewalk.[2]  The Venetian Defendants argue that they are entitled to treat the public sidewalk like the casino premises and trespass people they do not want there in just this fashion – and that they are absolutely immune to both the tort and constitutional claims stemming from their actions on January 15, 2010.

But the Venetian Defendants are not entitled to summary judgment immunizing them from liability for the constitutional violations and torts they committed, thus cementing their theory of total control over the sidewalk.  First, they cannot claim on the one hand that they have control over the sidewalk and that they are immune from civil rights claims on the other.  Courts have made clear that when private entities engage in essential public functions, they can be sued under 42 U.S.C. Section 1983. This Court has already determined that the Venetian engages in a public function in relation to the sidewalk.  *Venetian I*, 45 F.Supp. 2d at 1035.  Therefore, Plaintiffs are entitled to summary judgment on the color of law question.  Notably, in addition to the fact that the Venetian Defendants engage in an essential public function with respect to the

---

[2] Ironically, the Venetian Defendants "ejected" Jason and his brother from the public sidewalk by forcing them *onto* Venetian property.

sidewalk, there are enough facts for a reasonable jury to find that they are state actors because they also engaged in joint action with the Las Vegas Metropolitan Police Department ("Metro").

As for the First Amendment claim, the Venetian Defendants are not entitled to summary judgment as to whether First Amendment interests are present here. Instead, this court should enter partial summary judgment for Plaintiffs on this claim. There is no legitimate dispute as to whether Jason was engaged in protected expression – while the Venetian Defendants now claim otherwise, they have themselves pointed out that he was performing when a guard approached him. Jason portraying the character "Zorro" and standing up for his First Amendment rights both fall within the First Amendment's expansive protections for expression.

Finally, the Venetian Defendants are certainly not entitled to summary judgment on their novel theory that they can trespass people from a public sidewalk and that they accordingly have a statutory defense to any tort claim whatsoever. Not only is this theory not supported by law and inconsistent with the legal status of the sidewalk, but even if it were, there would still be disputed issues of material fact as to questions such as whether the Venetian Defendants properly used force.

For all these reasons, the Venetian Defendants' motion for summary judgment ("MSJ") must be denied in its entirety.[3] Instead, summary judgment should be entered in Plaintiffs' favor that: (1) the Venetian Defendants were acting under color of law; (2) Plaintiffs were engaged in protected expression, and the Venetian Defendants thus violated their First Amendment rights; and (3) the Venetian Defendants do not have the authority to exclude people from the sidewalk.

---

[3] While the claims raise triable issues of material fact, in the interests of streamlining and simplifying this litigation, Plaintiffs hereby voluntarily dismiss their emotional distress claims.

## II.        History of Litigation Regarding the Sidewalk

"[T]he public streets and sidewalks located within the Las Vegas Resort District" are public fora. *S.O.C., Inc. v. County of Clark,* 152 F.3d 1136, 1144 (9th Cir.1998). The sidewalk in front of the Venetian is no exception. *Venetian I*, 45 F.Supp. 2d at 1036. However, that particular portion of the Strip sidewalk does have a unique history. In 1999, to accommodate projected increased traffic from the then-planned Venetian Casino Resort, Clark County widened a portion of Las Vegas Boulevard. *Venetian II,* 257 F.3d at 939. The public sidewalk had to be demolished to give room, which left no public right away. *Id.* at 939-40. Thus, the public sidewalk had to be relocated on Venetian property, and the Venetian and Clark County entered into an agreement to do so (the "1999 Agreement"). *Id.* at 940, 943.

As a result of the 1999 Agreement, both the public and the Venetian have property rights with respect to the sidewalk:

> …property that is dedicated to public use is no longer truly private. Although the owner of the property retains title, **by dedicating the property to public use, the owner has given over to the State or to the public generally "one of the most essential sticks in the bundle of rights that are commonly characterized as property," the right to exclude others.**

*Id.* at 945-46. In creating the new public sidewalk located on property held in title by the Venetian, and granting public property rights with respect to the sidewalk, nothing was "stolen" from the Venetian. As the Ninth Circuit emphasized:

> It was the Venetian that desired that Las Vegas Boulevard be widened to accommodate automobile traffic in front of its hotel casino. The construction of an additional lane required utilizing the property where the State maintained a public sidewalk, which was an integral part of the public sidewalk accommodating pedestrian traffic going from one hotel casino to another along the Las Vegas Strip. In order to maintain a continuous sidewalk for pedestrians to walk along that side of Las Vegas Boulevard, without walking in the street, it was obvious that the sidewalk had to continue on the Venetian's property.

*Id.* at 942.

Despite the fact that the original public sidewalk had to be removed to accommodate the Venetian, the resort has as a long history of hostility to the use of the replacement sidewalk as a public forum.  The first dispute arose when the Culinary Union protested on the new sidewalk in March of 1999.  *Id.* at 941.  The Venetian issued trespass warnings to protestors, and beseeched Metro to make arrests.  *Id*. at 940.  Metro refused.  *Id.* at 941.  Three days later, the Venetian filed suit against Clark County in federal court arguing that the County had engaged in a taking without providing due process by refusing to remove the protestors and seeking an injunction and declaratory relief that the sidewalk was not a public forum.  *Id.*  The protesting unions, along with the American Civil Liberties Union of Nevada, were granted leave to intervene by the district court.  *Id.*

On August 20, 1999 this Court granted summary judgment against the Venetian.  *Id.*  The Venetian appealed, and lost.  The Ninth Circuit affirmed this Court's holding, noting in part that "the sidewalk is the only means for pedestrians to travel north or south along the Venetian's side of Las Vegas Boulevard, a busy multi-lane traffic artery" and that there is "little to distinguish the replacement sidewalk in front of the Venetian from the connecting public sidewalks to its north and south."  *Venetian II*, 257 F.3d at 945.

Of course, the nature of the sidewalk has not changed since 1999.  And, since that time, other legal developments have solidified the nature of the sidewalk and the protections that apply.  For example, changes have been made to the Clark County Code to protect street performers' First Amendment rights.  Ex. 24 (LVMPD 01144-51:email attaching Memorandum of Understanding in another ACLU of Nevada case, *Banasik et al. vs. Clark County et al.,* Case No. 2:09-cv-01242-LDG-GWF, which resulted in a number of changes to Clark County Code.  *See, e.g.*, Clark County Code of Ordinances 16.11.070 (providing an exception to the prohibition

on placing things on public sidewalks for street performers).  Similarly, as a result of negotiations in *Webber, et al v. Clark County, et al.*,  Case No.2:06-cv-18-RLH-RJJ, prior code provisions banning signs over a certain size and providing for obstruction *per se* were revised to ban only actual obstruction of the sidewalk.  On a less local level, the Ninth Circuit recently expressly protected the rights of street performers in *Berger v. City of Seattle*, 569 F.3d 1029, 1034 (9th Cir. 2009).

Despite this legal landscape, which allows street performers to be on the sidewalk and portray characters there, the Venetian still maintains that it has full dominion over the entire public sidewalk, as detailed below.

III.     **Response to Statement of Undisputed Facts**

Plaintiffs address each of the purported undisputed facts relied upon by the Venetian Defendants and explain whether each fact is actually disputed, following the same letter headings and paragraph numbers used in the Venetian Defendants' Statement of Undisputed Facts. As a preliminary matter, Plaintiffs note that the Venetian Defendants have failed to meet the requirement that they identify with particularity "each fact material to the disposition of the motion which the party claims is or is not genuinely in issue."  Dist. Nev. LR 56-1.  The Venetian Defendants' statement of undisputed facts is replete with not just misstatements of the record, but also facts that are hotly contested.  It reveals that the Venetian Defendants do not have undisputed evidence to support their motion.

### A.  The Security Video Footage of the Incident

Attaching a video and stating that it documents the substance of the incident does not comply with the requirements that facts in support of a summary judgment motion be listed with particularity.  Dist. Nev. LR 56-1.  While Plaintiffs do not dispute the authenticity of the video footage, it is unclear precisely which undisputed facts the Venetian Defendants are relying on the security video footage to support, and Plaintiffs cannot address facts included without specificity.  Further, contrary to the Venetian Defendants' assertions (MSJ at p.5), the substance of the incident was not recorded on video by the Venetian Defendants.  While portions of the events that occurred on January 15, 2010 that gave rise to this litigation (the "Incident") were videotaped, (1) both the portions of events that occurred outside the Venetian and when the brothers were forced inside were recorded without sound; and (2) the events that occurred inside the Venetian security area are only partially recorded as to both sight and sound.  *See, e.g.,* Deposition of William Lovegren ("Lovegren Depo. Tr."), Ex. 6 to the attached Declaration of Margaret A. McLetchie,[4] at 48:25-49:12 (the recording was not initiated until after Security Officer Lovegren "called in the incident" which was after the alleged solicitation took place); *id.* at 71:6-20 (there are multiple rooms inside the Venetian security office).  For all these reasons, the blanket inclusion of the video as undisputed facts is improper.

### B.  "Plaintiffs' Factual Admissions"

Many of the purported "Plaintiffs' Factual Admissions" included by the Venetian Defendants are misrepresented and, in reality, constitute disputed material facts**.**

---

[4] All exhibits are attached to the McLetchie Declaration, which also serves as an index to Plaintiffs' exhibits.

2.     The Venetian Defendants claim that numerous pieces of evidence "all indicate that neither Jason nor Sebastian was engaged in expressive activity."  (MSJ at p. 6.)  Again here the Venetian Defendants fail to comply with the requirement that specific facts be listed with particularity.  In addition, they misstate the record, which shows that both Jason and Sebastian engaged in expressive activity.  Accordingly, while Plaintiffs do not dispute the accuracy of the quoted portions of Jason Perez-Morciglio's declaration, the statement that "Plaintiffs sworn testimony, along with factual accounts publicized by Plaintiffs and the ACLU, all indicate that neither Jason nor Sebastian were engaged in expressive activity" is incorrect.

3.     The Venetian Defendants state, "[a]t his deposition, Jason again testified that he was not performing and was just walking by the Venetian when he was approached by LVS security."  This is not an undisputed statement of material fact.  The cited portions reflect only part of Jason's testimony, and the Venetian Defendants ignore the following:

> 16  Q. [Mr. Lionel] You were not performing, and actually you were
> 17 going by with a -- passing the Venetian for the sole
> 18 purpose of going to Paris and/or Bellagio?
> 19 A. [Jason Perez Morciglio] Exactly.
> 20 Q. No question about that?
> 21 A. No question about it.
> 22 Q. **You were not performing**?
> 23 MS. McLETCHIE: Objection, asked and answered.
> 24 BY MR. LIONEL:
> 25 Q. Is that correct?
> 1 A. **Well, I cannot give you a short answer because**
> 2 **once you put the costume on, the performance starts from**
> 3 **the moment you put the costume on.**
> 4 Q. It starts in your own apartment?
> 5 A. I'm sorry?
> 6 Q. In your own apartment?
> 7 MS. McLETCHIE: Objection, argumentative.
> 8 A. **I start with the process like an actor to get**
> 9 **into my character at that moment. So my interaction**
> 10 **would be at that level**

(Deposition of Jason Perez-Morciglio ("JPM Depo. Tr."), Ex. 7, at 125:16-126:10 (emphasis added)).  Jason also explained: "once I step on the Las Vegas Strip, I consider part of my job to be in character regardless if I'm walking by or I'm stopping."  (*Id.* at. 127:6-7, 128:18-22.)

4.      Plaintiffs do not dispute the fact that Jason refused to leave the public sidewalk.

5.      Plaintiffs dispute these facts; Plaintiffs did suffer injuries.  (Declaration of Jason Perez-Morciglio ("Jason Decl."), Ex. 23, at ¶ 16,; Declaration of Sebastian Perez-Morciglio ("Sebastian Decl."), Ex. 23, at ¶ 19.)

6.      Plaintiffs do not dispute the contents of Sebastian's declaration, but it should be noted that emphasis was added to the quoted excerpt and the declaration should be read in its entirety.  Further, stating Sebastian and Jason Perez-Morciglio said they were "just passing by" is misleading because it is presented out of context.  As the videotape of the incident and other evidence reflects, while it was not their intended destination that day, Plaintiffs stopped in front of the Venetian.  (*See, e.g.,* JPM Depo. Tr., Ex. 7, at127:6-7; 128:18-22.)[5]  And, while there, Jason was in costume and portraying his Zorro character to the public.  (Jason Decl. at ¶ 4; Las Vegas Sands Corp. & Venetian Casino Resort LLC's Responses to Plaintiffs' First Set of Requests for Admissions (RFAs), Ex. 25, Response to RFA No.3 at p. 5.))

7.      Plaintiffs do not dispute that Sebastian was in costume.  However, as detailed below, Sebastian was engaged in protected expression.

8.      Plaintiffs do not dispute that they have not sought medical or psychiatric care.

9.      Plaintiffs do not dispute the contents of the press release.  However, they dispute its relevance and admissibility.

---

[5] In addition to misstating the complete record, by suggesting that because Plaintiffs have stated they were not "performing" at the Venetian that day, and thus that there is no expressive activity at issue, the Venetian Defendants also mistakenly rely on semantics and the use of particular terms by Plaintiffs, as detailed below.

### C.  "The Facts as Stated by William Lovegren"

The Venetian Defendants list a number of purported undisputed facts under the heading "the facts as stated by William Lovegren."  Of course, one person's version of events rarely constitutes undisputed facts.  Here, Mr. Lovegren's testimony contradicts not only that of Plaintiffs, but also that of other Venetian Defendants and Metro witnesses.

10.    Whether there was any "exchange of money for a generic toy sword" is disputed, as detailed below.  Jason contends that he voluntarily gave the sword without any expectation of renumeration and that he was given a tip, not payment.  (JPM Depo. Tr., Ex. 7,. at 81:15-83:7.) Other security guards have testified that the mere fact that someone gives something away and receives a dollar thereafter is not enough information to believe any improper sale occurred. (Deposition of Eli Castro ("Castro Depo. Tr."), Ex. 2, at 138:6-138:24.)

11.    What exactly Lovegren said when he approached Jason was not captured on the videotape of the incident, and is disputed.  Jason testified that Lovegren asked him to leave because he was in costume.  (JPM Depo. Tr., Ex. 7, at 120:1-7; 17-24.)

12.    The Venetian Defendants state that "Jason has never denied that he was soliciting the sale of plastic swords."  This is patently untrue.  In fact, Jason testified that he *never* sells swords:

        BY MR. LIONEL:
        3 Q. Do you ever sell any of these swords to the
        4 kids or the parents?
        5 A. No, these are props.
        6 Q. Huh?
        7 A. No.
        8 Q. You never have sold any? Is that what you're
        9 saying?
        10 A. Yes.
        11 MS. McLETCHIE: Objection, asked and answered.
        12 MR. LIONEL: I beg your pardon?
        13 MS. McLETCHIE: I just said asked and

14 answered.
15 BY MR. LIONEL:
16 Q. You never have?
17 A. I never have.

(JPM Depo. Tr., Ex. 7, at 81:3-17.)

Jason did explain that sometimes children ask for swords, and that he gives swords away. (JPM Depo. Tr., Ex. 7, at 82:11-19), and further explained that he accepts – but does not ask for – tips.  (JPM Depo. Tr. , Ex. 7, at 82:20-25.)

13.    Undisputed.

14.    Undisputed.

15.    Undisputed.

16.    Whether "Sebastian attempted to interfere with the security officers' handling of the incident with Jason, confronted the security officers and created a verbal disturbance and refused to stand down" is hotly disputed.


## IV.    Plaintiffs' Statement of Undisputed Facts

Plaintiffs list and describe pertinent facts in the following categories: (A) The Venetians' Policies With Respect to the Sidewalk; (B) Metro's Policies and Relationship With the Venetian; and (C) The Incident That Gave Rise To This Litigation.


### A.  The Venetian's Policies with Respect to the Sidewalk

**1.**  The Venetian has taken the position that the public has the right of passage and free speech rights only within a certain distance from the curb (eight feet), a relatively small portion of the public sidewalk in front of its casino.  (*See, e.g.,* Whiddon Depo. Tr., Ex. 22, at 130:1-7; 131:3-7.)  Several months after the incident on January 15, 2010 that is the subject of this

litigation, security officers were informed of an eight foot "easement" on the sidewalk. (Castro Depo. Tr., Ex. 2, at 130:25-131:9.)

2. The Venetian takes the position that it can make and enforce policies within the entire public sidewalk, including the easement area. For example, Tony Whiddon, the Executive Director of Venetian Security (Whiddon Depo. Tr., Ex. 22, at 7:10-11), a defendant in this action[6] and the Venetian's designated Fed. R. Civ. P. 30(b)(6), testified that panhandling on the sidewalk is against Venetian policy and can result in trespass. (Whiddon Depo. Tr., Ex. 22, at 183:9-19.) He also testified that distributing leaflets, or handbilling, is not allowed on Venetian property. (Whiddon Depo. Tr., Ex. 22, at 186:16-187:10.) Venetian Security Officer Eli Castro, who was also involved in Incident"),, says that even after the "easement policy" was in place, he would still kick people off the sidewalk for soliciting. (Castro Depo. Tr., Ex. 2, at 182:19-183:2.)

3. Castro testified that, to his knowledge, the sidewalk in front of the Venetian is private property and that he believed Jason was breaking a Venetian rule, "conducting business on property without permission." (Castro Depo. Tr., Ex. 2, at 52:17-54:4, (also noting that "as far as I knew, the sidewalk is private property owned by the Sands Corporation" and "nobody conducts business on the sidewalk").) Office William Lovegren, another Venetian Security Officer involved in the Incident, similarly testified that he told Jason that the Venetian owned the sidewalk up to the curb, although there was a public walk-though. (Lovegren Depo. Tr., Ex. 6, at 56:7-14.) Lovegren testified that Venetian Security intervenes if people on the property, including the sidewalk, are engaging in a crime such as possession of drug paraphernalia or "solicitation," and that if the wrongdoer refuses to leave, the Venetian

---

[6] All Venetian employees deposed by Plaintiffs are named defendants.

Security manager may decide that he or she should be trespassed.  (Lovegren Depo. Tr., Ex. 6, at 153:6-24.)

4.  Whiddon, on behalf of the Venetian, testified that Venetian Security enforces Venetian policy on the sidewalk and that they ask violators to leave.  If the violators refuse to leave, then they are given a trespass warning – and if they still refuse to leave, they are then violating the law and Venetian Security can effectuate a citizen's arrest. (*See, e.g.,* Whiddon Depo. Tr., Ex. 22, at 202:15-203:11 (nothing that Nev. Rev. Stat. § 207.200 gives Venetian security authority to arrest people who don't leave the property after Venetian security asks them to leave).)

5.  Anthony Bronson is the assistant manager of the Venetian Hotel.  (Deposition of Anthony Bronson ("Bronson Depo. Tr."), Ex. 1, at 7:18-21.)  He was also involved in the Incident, and testified during his deposition that he learned during his formal training that all Venetian policies apply to the sidewalk in front of the casino that runs along the Strip, and that a casino security officer is allowed to "ask someone to leave the sidewalk for violating Venetian policy."  (Bronson Depo. Tr., Ex. 1, at 44:3-45:13 (explaining that solicitation was a proper ground for trespassing Plaintiffs because it was a violation of Venetian policy).)  Members of the public can be trespassed from the sidewalk for violating Venetian policy, written or unwritten.  (*Id.* at 81:12-23 (stating that the Venetian's prohibition on solicitation is unwritten) and 151:12-152:11.)  It also applies to violations of Venetian policies that are not violations of the law.  (*Id.* at 151:12-152:11 (stating that someone would be trespassed for panhandling on the sidewalk in front of the Venetian, even though that is not illegal, because it is a violation of casino policy).)

6. Bronson also testified that anyone who was trespassed from Venetian property would not be permitted on the sidewalk in front of the casino.  (Bronson Depo. Tr., Ex. 1, at 87:19-88:8.)  Further, he testified that it is a crime to refuse to leave the sidewalk in front of the Venetian if casino personnel have asked you to leave.  (Bronson Depo. Tr., Ex. 1, at 98:19-22.)

7. Venetian Security Officer Linda Hagenmaier, another guard involved in the Incident, testified that Venetian security can ask people for identification or to leave the sidewalk if they are soliciting.  (Deposition of Linda Hagenmaier, ("Hagenmaier Depo. Tr."), Ex. 4, at 141:17-22.)

8. The Venetian has "trespassed" other individuals (besides plaintiffs) from the sidewalk.  (Castro Depo. Tr., Ex. 2, at 113:21-114:18.)  Castro once asked a guitarist to leave because the guitarist had a sign asking for money.  (Castro Depo. Tr., Ex. 2, at 143:23-144:24.)  He also trespassed a woman selling water on the sidewalk in front of the Venetian, although she then departed the property.  (Ex. 12 (Narrative Report by E. Castro) at Bates No. LVS 000132.)  Venetian Security Officers trespassed an individual dressed as Willy Wonka who was soliciting pictures for money outside the Venetian by the North Fountain.  (Ex. 15 (Narrative Report by A. Bronson) at Bates No. LVS 000144.)

9. There is no demarcation on the public sidewalk in front of the Venetian indicating a property line or a boundary which members of the public are not entitled to cross.  *Venetian II*, 257 F.3d at 945; *see also* Whiddon Depo. Tr., Ex. 22, at 182:10-14 ("[E]verything out there, the whole general area if you've ever been out there, there's no clear boundary. It all appears as one sidewalk").)  Nor is there anything indicating that members of the public are subject to Venetian rules.  *Venetian II*, 257 F.3d at 946.  As noted above, Bronson testified that even unwritten Venetian policies apply to the sidewalk.  (Bronson Depo. Tr., Ex. 1, at 81:12-23.)

**10.** The Venetian has communicated its position that they control the sidewalk and can control access to it with Metro.  Metro Captain Charles Hank was in charge of the Convention Area Command, the Metro division responsible for much of the area that includes "the Strip."  On May 21, 2010, he sent an email describing the fact that the Venetian "[e]xpressed there was a property line on the sidewalk where they can legally restrict/deny access." (Ex. 28, LVMPD 01131- 32.)  In response, Deputy Chief Gary Schofield noted that it has been a long-standing position of the Venetian that they control the sidewalk.  *Id.*  ("It was always a contention of the Venetian that they control the whole pavement.")

**11.** Similarly, during his deposition, Hank testified that there is a history of the Venetian contending they own the sidewalk.  ((Hank Depo. Tr."), Ex. 5, at 42:18-43:3 ("So the Venetian on quite a few occasions would want to say, we own this and we can do this and we can do that...").)

**12.** Bronson and Castro testified that, after the lawsuit was filed there were changes in Venetian policy with regards to the sidewalk – specifically, to "[l]eave [people in costumes] alone outside." (Bronson Depo. Tr., Ex. 1, at 116:10-118:13; *see also id.* at 120:1-123:11 (stating that Venetian security officers were told at briefings, "basically, just to leave [street performers] alone if they were within eight feet" of the wall running along Las Vegas Boulevard).)

**13.** Street performers have reported being harassed by Venetian security for performing on the sidewalk. (Ex. 16 (Declaration of Claudio Meloni) at ¶ 4.) A street preacher reported that he was harassed by Venetian Security Guards.  (Ex. 17 (First Amended Complaint from Case # 2:06-cv-00181-RLH-RJJ, *Jim Webber et al.* v. *Clark County, Nevada et al.*,.) at ¶ 19.)

## B.  Metro's Policies and Relationship with the Venetian

14. Metro has failed to resolve issues regarding the sidewalk.

15. Despite being aware of prior litigation and the fact that there is confusion among street level officers about how First Amendment issues apply along the Strip, Metro has also failed to ensure that street level officers knew the legal landscape until after litigation was filed by ACLU of Nevada clients.   (Deposition of Sheriff Douglas Gillespie ("Gillespie Depo. Tr."), Ex. 3, at 54:3-9, 56:4-8 and16:24-17:22; Hank Depo. Tr., Ex. 5, at 55:20-56:13; Deposition of Officer S. Schaier ("Schaier Depo. Tr."), Ex. 28, at 96:13-97:15.)  During his deposition, Officer Schaier, one of the Metro officers involved in the Incident, agreed that clarity is needed with regard to the Venetian sidewalk and that, if he had been given clear information, it would have helped him handle the January 15, 2010 events.  (Schaier Depo. Tr., Ex. 10, at 100:23-101:9.)  Metro has also failed to clarify or update its policies with regard to First Amendment issues and public forum sidewalks as a result of the prior litigation regarding the sidewalk in front of the Venetian.  (Gillespie Depo. Tr., Ex. 3, at 42:15-43:16; 52:2-13.)

16. There is frequent and close collaboration between Metro and the Venetian (and other casino security officials).  Whiddon (Executive Director of Venetian Security) attended regular law enforcement – casino security coordination meetings with Capt. Hank, and would also see him informally about the sidewalks and street performers.  (Whiddon Depo. Tr., Ex. 22, at 75:2-13; 77:25-78:5; 78:12-79:24.)  Whiddon characterized the relationship between Venetian Security and Metro as a formal partnership.  (*Id*. at 269:20-24.)  Captain Hank worked closely with casinos through the "Las Vegas Security Chiefs Association" to develop their policy with regard to street performers and with the county District Attorney to "control when and where smut peddlers or 'passsers' can distribute their literature," suggesting that at

the very least Metro and the Venetian shared the common goal of excluding speech they disagreed with.  (Ex. 18 ("Capt. Hank is determined to continue addressing issues with street peddlers…"); Ex. 19 ("Captain Hank informed members he has personally met with smut peddlers who are now involved with distributing narcotics as well as the annoying pamphlets."), Hank Depo. Tr., Ex. 5, at 83:15-17 ("We also had monthly meetings at the Convention Center Area Command, bimonthly meetings where that would be a topic as well.").)

17. Whiddon testified that Venetian security also works with Metro to create Venetian security policies. (Whiddon Depo. Tr., Ex. 22, at 266:19-267:5.)  He also testified that Metro instructed Venetian security to change its policies to search and handcuff all people before calling them and that the Venetian complied with this instruction.  Now, every time Metro is called, Venetian security must handcuff and search the target of the call. (Whiddon Depo. Tr., Ex. 22, at 261:23-262:25.)

18. With respect to the handling of incidents, Venetian security officials complete official Metro forms.  (Schaier Depo. Tr., Ex. 10, at 29:1-30:7; Gillespie Depo. Tr., Ex. 3, at 72:18-73:25.)

19. When responding to calls from Venetian Security, Metro supports Security's actions. (Whiddon Depo. Tr., Ex. 22, at 250:4-6 (Metro has never told Venetian security they "got it wrong.").)  During her deposition, Security Officer Hagenmaier testified that "[i]t's typical for police" to ask suspects held by the Venetian:  "Why are you back here[,] because security doesn't just bring anybody back here?  So you must have done something bad." (Hagenmaier Depo. Tr., Ex. 4, at 83:8-12.)  She also explained that the "general practice" is for Metro officers to speak only with the security manager about what a suspect did.  They rarely ask questions of security guards who were actually present during an incident (and the

January 15, 2010 incident was no exception).  (*Id.* at 83:18-84:15.)  Further, she could not recall a single instance in which a Metro officer expressed doubt regarding (or even a need to investigate the appropriateness of) Venetian security's decision to detain someone.  (*Id.* at 109:8-23.)

20. Police Officers receive free food from casinos, and have free entry to casino employee cafeterias, including the Venetian's.  (Schaier Depo. Tr., Ex. 10, at 128:19-129:6; 130:25-1:2; Whiddon Depo. Tr., Ex. 22, at 89:20-24.)

### C.  The Incident that Gave Rise to this Litigation

21. Jason Perez-Morciglio is an actor who portrays characters such as "Zorro" in public spaces.  (JPM Depo. Tr., Ex, 7, at 11:11-13:14 (explaining that in both Los Angeles and here, Jason portrays characters and entertains tourists and locals, relying on his acting and dancing skills); *id.* at 78:23-79:2 (" I welcome the people with a very fancy style of the 18th century of the times of Zorro and the Three Musketeers and invite them to join me into my adventure, and we pose together for a picture they like.  They pose for me for a picture.").)

22. Sebastian, Jason's brother and another plaintiff in this action, sometimes dresses as Darth Vader and engages in street performing, but he was not in costume during the Incident.  (Sebastian Decl., Ex. 23, at ¶ 1.)

23. Jason does not sell swords.  (JPM Depo. Tr., Ex. 7., at 80:20-22; 81:3-10 (explaining that they are props, not merchandise); 81:15-83:7; 124:19-125:3 (he carries multiple swords so people can hold them when he poses for pictures with them).)  Sebastian also testified that Jason does not sell swords. (SPM Depo. Tr., Ex. 8, at 49:2-4.)  People do, however, give the brothers tips.  (SPM Depo. Tr., Ex. 8, at 62:4-16.; JPM Depo. Tr., Ex. 7, at 15:1-14.)

24. Sebastian and Jason consider portraying characters and being street performers expressive. (*See, e.g.,* SPM Depo. Tr., Ex. 8, at 94:13-19 ("…at the moment that you put on the costume, you have to get into the mental state that you are that character. And when one is wearing a costume, one has to be acting all the time, and it's very difficult, and actors do that and performers do it as well;"); JPM Depo. Tr., Ex. 7, at 13:17-23 ("I use the character's personality, the one I'm portraying, and I represent this with my whole being because I want to, you know, make it the most believable possible, and I use my -- I call it artistic charm in order to welcome everybody.").)

25. Jason and his brother Sebastian were planning to go to the Bellagio, where Jason was planning to put on several shows (Jason Decl., Ex. 23, at ¶ 4).

26. Jason was in costume.  (Jason Decl., Ex. 23, at ¶ 4; JPM Depo. Tr., Ex. 7, at 103:8-12; *see also* Exhibit 2 to Venetian Defendants' MSJ, copies of three security videos).  He was wearing a mask and cape during the evening hour…."  (Defendants Las Vegas Sands Corp. & Venetian Casino Resort, LLC's Responses to Plaintiffs' First Set of Interrogatories, "Response to Interrogatory No. 7," Ex. 27; Ex. 12, Narrative Report by E. Castro) at Bates No. LVS 000006; Ex. 13 (Voluntary Statement by William Lovegren) at Bates No. LVS 000009-10.)

27. Sebastian was not in costume on the date of the incident; he was accompanying his brother. (Sebastian Decl., Ex. 23, at ¶ 3.)

28. The brothers stopped in front of the Venetian, and Sebastian stopped to watch the Mirage volcano show.  (Sebastian Decl., Ex. 23, at ¶ 3.)  While Jason waited for his brother, he was performing by portraying a character, Zorro.  Ex. 26 (Plaintiffs' Answers to LVMPD's First

Set of Interrogatories, Response to Interr. 1.)  He was standing on the public sidewalk, near the bottom of the escalators near Sephora's.  (Lovegren Depo. Tr., Ex. 6, 43:1-16.)

29. Officer Lovegren observed Jason Perez-Morciglio for a period and then approached him. (Lovegren Depo. Tr., Ex 6 at 42:12-14; 49:13-25.)  The report on the incident, prepared by Officer Castro, states that Plaintiffs were "loitering;" Castro explained that this meant that the brothers were not allowed to be on the public sidewalk. (Ex. 14 (Incident Report by E. Castro) at Bates No. LVS 000005; Castro Depo. Tr., Ex. 2, at 103:17-104:4.)

30. Lovegren testified that he believed Jason sold a sword to a family.   (Lovegren Depo. Tr., Ex. 6, at 42:12-14.)  Lovegren's basis for believing a "solicitation" occurred was only that he saw Jason give a sword to someone, and then receive a dollar.  (*Id.* at 44:21-45:2.)  When he observed the alleged transaction, Lovegren was standing far from where Jason was standing, about fifty to sixty feet away. (*Id.* at 42:15-19.)  Regardless of exactly where Lovegren was standing, he could not hear what was communicated between Jason and the tourist.  (*Id.* at 44:21-45:2.)  He was the only officer who observed Jason before the decision to approach him was made; he observed Jason for about ten minutes and only saw one alleged exchange of money for swords.  (*Id.* at 146:12-21; 45:4-5.)

31. Lovegren also noted on his Voluntary Statement regarding the incident that Jason was taking photos with tourists.  (Ex. 13, *discussed in* Lovegren Depo. Tr., Ex. 6, at 86:3-23.)  He testified that he saw Jason take photos with people, but he did not know whether money changed hands.  (*Id.* at 44:5-12.)  Officer Lovegren clarified at his deposition that while he included this information in a report, Jason was not doing anything wrong by taking photos with tourists.  Lovegren further testified that this was not a violation of either law or Venetian policy.  (*Id.* at 90:7-12.)

32. Lovegren conceded that he did not actually know whether Jason asked for money (*Id.* at 44:25-45:3) and that giving away a sword and getting a tip would not be "solicitation."   (*Id.* at 173:1-174:11.)  Whiddon agreed that Zorro might not have been soliciting. (Whiddon Depo. Tr., Ex. 22, at 219:19-23)   It is not against Venetian policy to accept tips.  (Castro Depo. Tr., Ex. 2, at 138:6-138:24.)   Officer Castro, who arrived on scene later, testified that he would have only call dispatch if he actually heard Zorro ask for tips.  *Id.*

33. Lovegren approached Jason.  (Lovegren Depo. Tr., Ex. 6, at 49:13-18.)

34. What Lovegren said to Jason is disputed.  Jason testified that Lovegren asked him to leave because he was in costume and that he told Jason that he "was not allowed to be on public – on private property of the Venetian Hotel performing or dressed – a mask or dressed like a character." (JPM Depo. Tr., Ex. 7, at 120:1-7; 120:17-24.)

35. Lovegren testified that Jason told him repeatedly that he has a right to be on the "public sidewalk," and that asking him to leave was a violation of his First Amendment rights. (Lovegren Depo. Tr., Ex. 6, at 56:7-15.)  He also testified that he told Jason that the Venetian owned the sidewalk up to the curb, although there was a public walk-though.  *Id.*

36. Other officers arrived on scene. (Ex. 23 (Jason Decl.) at ¶ 5.)

37. Whiddon, the head of Venetian Security, testified that Jason was trespassed for "refusing to leave the public sidewalk after being asked to leave by Venetian security personnel" and that was the crime Jason committed.  (Whiddon Depo. Tr., Ex. 22, at 169:20-170:1.)

38. It is unclear who made the decision to place Jason in handcuffs.   Lovegren testified that it was the security manager in charge (Bronson) or Hagenmaier.   (Lovegren Depo Tr., Ex. 6, at 61:2-10.)  Hagenmaier testified that "management" made the call, and that before the decision to place Jason in handcuffs was made, it looked like Jason was preparing to walk

away "in the direction of towards Treasure Island." (Hagenmaier Depo. Tr., Ex. 4, at 62:11-15.)  Bronson testified that Lovegren made the decision, and that he did not, at the time, even know why Lovegen decided to place Jason in handcuffs.  (Bronson Depo. Tr., Ex. 1, at 37:20-25.)

39. It is also unclear why Jason was put in handcuffs.  Bronson testified he did not have any knowledge that Jason was doing anything wrong besides "being loud and obnoxious." (Bronson Depo. Tr., Ex. 1, at 41:23-42:9.)  Lovegeren testified that Jason was "not happy," but that he did not know whether Jason was doing anything threatening and that he was not scared of Jason.  (Lovegren Depo. Tr., Ex. 6, at 50:13-24.)  Lovegren testified that all Jason did wrong besides engage in the alleged solicitation was assert his right to be present on the sidewalk and refuse to leave.  (Lovegren Depo. Tr., Ex. 6, at 57:12-22.)  Hagenmaier testified that Jason was "very compliant" when he was handcuffed.  (Hagenmaier Depo. Tr., Ex. 4, at 63:13-15.)

40. When Lovegren placed Jason in handcuffs and told him he had to go to the back with him, Jason "kept complaining -- or he kept stating his complaint that it was his 1st and 14th Amendment rights being violated."  (Lovegren Depo. Tr., Ex. 6, at 60:14-18.)

41. Jason asked Lovegren to call the police to resolve their dispute.  (Jason Decl., Ex. 23, at ¶ 5.)

42. Sebastian came up to where his brother was surrounded by guards and told Hagenmaier that his brother had not done anything wrong, and asked her to call the police.  (SPM Depo. Tr., Ex. 8, at 25:18-26:8.)  She told him to leave or he would be arrested.  *Id.*  He again asked her to call the police; she responded by handcuffing him.  *Id.*  Sebastian believes he was handcuffed just for asking questions.  (SPM Depo. Tr., Ex. 8, at 40:3-10.)  Sebastian contends he was not belligerent.  Ex. 23 (Sebastian Decl.) at ¶ 4.)

43. Lovegren testified that Sebastian, like Jason, asserted his right to be on the sidewalk. (Lovegren Depo. Tr., Ex. 6, at 100:16-101:1; *see also* Ex. 13 (Lovegren's Voluntary Statement) at Bates No. LVS 000011.)

44. Besides by asserting the right to be on the sidewalk , Lovegren could not identify how the brothers were being "belligerent."  (Lovegren Depo. Tr., Ex. 6, at 100:16-101:1.)  Castro testified that Jason and Sebastian were not dangerous and did not resist in any manner (Castro Depo. Tr., Ex. 2, at 60:6-16.)

45. Other than approaching the scene, asking questions, and having legal items in his hands (a drink and cigarette), the Venetian security officers involved in the incident could not identify any actual threat by Sebastian.  Sebastian just approached where his brother was being placed in handcuffs and started asking questions. (Sebastian Depo. Tr., Ex. 8, at 58:2-59:12; 59:16-59:2.)

46. Castro testified that Hagenmaier and Neanover pushed Sebastian.  (Castro Depo. Tr., Ex. 2, at 60:1-22.)

47. Sebastian was also placed in handcuffs.  (Ex. 23 (Sebastian Decl.) at ¶ 4.)

48. Jason was told numerous times that the sidewalk was private property.  (Castro Depo. Tr., Ex. 2, at 75:13-17.)  Both brothers were formally trespassed from the sidewalk.  (*See, e.g.*, Castro Depo. Tr., Ex. 2, at 100:16-21.)

49. Venetian Security Officers transported Jason and Sebastian through the parking garage and interior areas of Venetian property to the security holding room and office.  (Ex. 23 (Sebastian Decl.) at ¶ 5.)

50. Venetian Security Officers searched plaintiffs.  (Las Vegas Sands Corp. & Venetian Casino Resort, LLC's Responses to Plaintiffs' First Set of Requests For Admissions, Response to Request For Admissions No. 13").)

51. The Venetian Defendants detained Plaintiffs.  (Ex. 25 (Las Vegas Sands Corp. & Venetian Casino Resort, LLC's Responses to Plaintiffs' First Set of Requests For Admissions) at Response to RFA No. 15.)

52. The brothers were held until Metro arrived.  (*Id.* at Response to RFA No. 15.)

53. Anthony Bronson, assistant manager of the Venetian, testified that the Plaintiffs were "well-behaved" even when out of handcuffs.  (Bronson Depo. Tr., Ex. 1, at 68:14-18.)

54. Jason and Sebastian were not free to leave when Metro arrived.  (Ex. 23 (Sebastian Decl.) at ¶ 10; Ex. 23 (Jason Decl.) at ¶ 12) (the police officers put their own handcuffs on Jason and Sebastian).

55. Metro Officers T. Scott and S. Schaier, defendants in this action, arrived on the scene.  Their immediate supervisor, Kendall Bell, also a defendant, arrived sometime thereafter.  (Scott Depo. Tr., Ex. 9, at 92:13-93:1.)  Officers Scott and Schaier consulted with Kendall Bell about how they planned to handle the incident; he approved their actions.  (Scott Depo. Tr., Ex. 9, at 93:22-94:22.)

56. Scott and Schaier did not conduct any independent investigation before talking to Jason and Sebastian, and they had already decided what to do when they spoke with them.  (Scott Depo. Tr., Ex. 9, at 70:18-71:7; Schaier Depo. Tr, Ex. 10, at 51:14-51:22.)  Officer Scott testified that he decided to issue Plaintiffs misdemeanor warnings after speaking only to Venetian security, prior to interviewing Plaintiffs.  (Scott Depo. Tr., Ex. 9, 99:8-23; Ex. 11

(Transcription of the video titled "Venetian Holding Room Camera 1063" and dated January 15, 2010 ("Video Tr.").")) at 38:4-9.)

57. Schaier spoke to only one of the security officers present at the incident.  (Schaier Depo. Tr, Ex. 10, at 53:19-53:21; 73:2-73:21.)

58. The responding officers did not think that Jason and Sebastian had done anything wrong, or that a trespass had actually occurred.  (Schaier. Depo. Tr, Ex. 10, at 64:7-9, 69:11-12; Scott Depo. Tr., Ex. 9, at 100:11-101:7.)

59. Despite not being sure regarding where the incident had occurred, or whether the Venetian Defendants had the right to trespass people from the area, Officer Scott did not check where the incident occurred to determine whether the area was a public thoroughfare or ask anybody for clarification regarding the status of the property.  (Scott Depo. Tr., Ex. 9, at 66:14-68:3; 73:10-75:2.)

60. Scott and Schaier searched Jason and Sebastian, and continued their detention.  (Scott Depo. Tr., Ex. 9, at 79:1-80:5.)  Officer Scott testified that he put handcuffs on Plaintiffs without conducting an independent verification into whether doing so was warranted.  (Scott Depo. Tr., Ex. 9, at 76:12-21.)  As noted above, Scott and Schaier had already determined that Plaintiffs were not engaged in any wrongdoing.  Scott testified that when Metro showed up, Plaintiffs were not free to leave.  (Scott Depo. Tr., Ex. 9, at 80:2-5.)

61. One of the Metro officers told Jason that the security guards could do whatever they wanted because the brothers had been trespassing.  (Video Tr., Ex. 11 at 18:16-19:1.)  As Sebastian testified, the Metro officers supported the Venetian's position (SPM Depo. Tr., Ex. 8, at 31:11-32:24 (noting that the officers "were defending the aggressive stance that the Venetian security personnel had towards me by taking me into the Venetian Hotel" and that they didn't

take a neutral action. They simply heard what the security officers in the Venetian told them, their version, and they opted to go by what the security of Venetian personnel told them.).)

62. Scott testified that he explained to Plaintiffs that Venetian security could detain them because they were on private property, despite the fact that he was aware that they claimed to have been on public property and despite the fact that he never resolved the apparent confusion regarding whether Jason had a right to be on the sidewalk. (Scott Depo. Tr., Ex. 9, at 71:18-72:24.) When asked whether he provided any clarity as to whether Jason had a right to be on the sidewalk, he testified that he recalled stating: "You're not welcome back on Venetian Property." (*Id.* at 74:2-6.)

63. Scott and Schaier issued misdemeanor warnings. (Scott Depo. Tr., Ex. 9, at 123:11-25; 127:20-128:20 and Depo. Exs. 9 and 10.) Scott testified that he gave Plaintiffs a misdemeanor warning that they were "no longer allowed at Venetian in the future" despite being aware that Plaintiffs claimed to have been stopped on a public sidewalk. (Scott Depo. Tr., Ex. 9, at 88:16-89:10.) Scott testified that he had made up his mind to issue the misdemeanor warning despite the uncertainty over whether Plaintiffs were on public or private property and despite the fact that he did not actually think that there was evidence of any wrongdoing. (Scott Depo. Tr., Ex. 9, at 100:11-101:7.) He also testified that he decided to issue a misdemeanor warning to Plaintiffs, despite the fact that he thought Plaintiffs were not trespassing, but because Venetian security thought Plaintiffs were trespassing. (Scott Depo. Tr., Ex. 9, at 125:6-127:17.)

64. Sheriff Gillespie, a named defendant, testified that issuing a misdemeanor warning is inappropriate in the case of a trespass warning, because in that case no offense has been committed. (Gillespie Depo. Tr., Ex. 3, at 81:9-82:7**.**) Metro policy allows officers to issue

misdemeanor warnings when actual misdemeanor offenses have occurred in their presence instead of taking more extreme law enforcement action.  (Ex. 21 (Metro Police Department Manual) at Bates No. 008.))  Scott and Schaier testified that they issued a misdemeanor warning to Plaintiffs for an alleged offense that did not occur in his presence, despite the fact that Metro policy does not allow for issuance of warnings for offenses that don't occur in the officer's presence.  (Scott Depo. Tr., Ex. 9, at 163:4-164:2; Schaier Depo. Tr**.,** Ex. 10, at 55:24-56:1.)

65. While the LVMPD Defendants[7] have not characterized issuing misdemeanor warnings as "law enforcement action" in this litigation, the warning issued to Plaintiffs does in fact have legal consequences.  (Schaier Depo. Tr, Ex. 10, at 63:25-64:6.)  For example, Officer Scott acknowledged that when a Metro officer issues a misdemeanor warning, the warning is entered into Metro's "SCOPE" database. (Scott Depo. Tr., Ex. 9, at 53:25-54:8; Ex. 21 (Metro Police Department Manual) at Bates No. LVMPD 008.)  Sebastian felt forced to sign his misdemeanor warning.  (SPM Depo. Tr., Ex. 8, at 117:2-6.)

66. Scott testified that he told Jason that the Venetian could trespass him from their private property without conducting an independent investigation as to whether the incident actually occurred on Venetian private property.   (Scott Depo. Tr., Ex. 9, at 103:17-106:11; *see also* Video Tr., Ex. 11**,** at 34:9-13 (recording Scott telling Jason, in part, that "[b]ecause it's a private property entity, they can trespass anybody for anything.  Okay?  For anything they choose.").)

---

[7] Las Vegas Metropolitan Police Department Defendants are: Sheriff Douglas Gillespie (individually and in his official capacity as Sheriff of the Las Vegas Metropolitan Police Department); Las Vegas Metropolitan Police Department Officers T. Scott and S. Schaier, Sergeant Kendall Bell (in their individual capacities).

67. Scott testified that they stood by while Venetian security officers read the trespass warning to Plaintiffs.  (Scott Depo. Tr., Ex. 9, at 81:15-17.)

68. Based on their actions, it appeared to Sebastian that the police officers were acting in concert with the security guards on the day of the incident.  (SPM Depo. Tr., Ex. 8, at 117:20-25.)

69. Jason and Sebastian were detained for over an hour.  (JPM Depo. Tr., Ex. 7, at 151:3-5.)

70. Jason and Sebastian also could not exercise their rights and return to the sidewalk because of their fear of the police, who issued a misdemeanor warning to each of the brothers, in violation of Metro policy and despite the fact that no misdemeanor had occurred.  Jason and Sebastian left the area and did not return to the sidewalk in front of the Venetian for some time.  (See *supra* paragraph 65; Sebastian Decl., Ex. 23, at ¶ 19; Jason Decl., Ex. 23, at ¶ 17-21.)

## V.    Argument

### A.  Summary Judgment Can Be Issued in Favor of the Plaintiffs.

Plaintiffs file their Rule 56(f) Motion/Countermotion for Summary Judgment concurrently and in conjunction with their Opposition to the Venetian Defendants' Motion for Summary Judgment.

This court can consider Plaintiffs' arguments for granting summary judgment in their favor pursuant to Fed. R. Civ. P. 56(f).  Plaintiffs' arguments can also be considered as a countermotion.

Plaintiffs' countermotion can, in one sense, be considered untimely pursuant to the Third Scheduling Order, which set May 23, 2011 as the dispositive motion deadline.  (Dckt. No. 58).  However, this should not disqualify Plaintiffs' countermotion, for a variety of reasons.  First and

foremost, this Court has the ability to consider the arguments under Fed. R. Civ. P. 56(f).

Further, Plaintiffs have diligently prosecuted their case and are therefore able to show "good

cause for [an] extension" under Local Rule 26-4. *Voggenthaler v. Md. Square, LLC*, 2010 WL

1553417, at *6 (D. Nev. 2010) ("the good cause standard under LR 26-4 is the same as that for

modification of the scheduling order under Rule 16(b) of the Federal Rules of Civil Procedure"

and "the good cause standard primarily considers the diligence of the party seeking the

extension.") (citation omitted); *see also* Attached Good Cause Decl. of Margaret A. McLetchie

In Supp. of Countermotion at ¶ 2 (mentioning that Plaintiffs have taken ten depositions, in

addition to propounding and responding to written discovery). *Compare Matrix Motor Co., Inc.*

*v. Toyota Jidosha Kabushiki Kaisha,* 218 F.R.D. 667, 671 (C.D. Cal. 2003) ("No party seriously

disputes that Matrix has failed diligently to prosecute this action.")

       In *Matrix*, the party seeking an extension failed to produce discovery, "directed witnesses

not to appear for deposition without seeking a protective order or filing a motion to quash,"

"produced documents on the eve of depositions to thwart effective witness questioning," failed to

"initiate any affirmative discovery," and "at no time sought a continuance of the scheduled dates

until" the issue was raised by the other party. *Id.* at 673.  In contrast, Plaintiffs have diligently

conducted discovery.  McLetchie Good Cause Decl. at ¶ 2.  Indeed, reviewing and analyzing the

extensive discovery made the process of summary judgment briefing particularly intensive. *Id.*

at ¶¶ 3-4 (noting that Plaintiffs received 1,199 documents from LVS Defendants on May 2 and

May 6).  Plaintiffs' counsel has prioritized this matter above others to be able to diligently

prosecute the action. *Id.* at ¶ 6.  They have sought extensions of deadlines and promptly notified

opposing counsel of any delays. *Id.* at ¶ 7 (citing various stipulations and motions on the case

docket).  Most recently, they sought an extension in the hopes of exploring settlement with all

defendants before pursuing summary judgment, as well as to accommodate counsel's schedule and health issues. *Id.* at ¶ 8. Finally, Plaintiffs' Countermotion is filed less than a month after the dispositive motion deadline. *Compare Doe ex rel. Doe v. State of Hawaii Dept. of Educ.*, 351 F.Supp.2d 998, 1007-8 (D. Haw. 2004) (denying extension where Plaintiffs filed counter-motion for summary judgment six months after dispositive deadline with no explanation as to good cause). In short, Plaintiffs have diligently prosecuted this action in good faith, and there is thus good cause for an extension.

Further, there is no prejudice to opposing counsel and any inconvenience to the Court is slight. In *Angle v. Sky Chef, Inc.*, 535 F.2d 492 (9th Cir. 1976), the Ninth Circuit noted that modification of even a pretrial order should normally be allowed under such circumstances:

> In the exercise of sound judicial administration and the interest of justice, an amendment of a pre-trial order should be permitted where no substantial injury will be occasioned to the opposing party, the refusal to allow the amendment might result in injustice to the movant, and the inconvenience to the court is slight.

535 F.2d at 495 (citation and quotation marks omitted). Plaintiffs' countermotion, filed simultaneously with Plaintiffs' response to Defendants' Motion for Summary Judgment, leaves the Venetian Defendants with the normal time frame to file their response, as set forth in Local Rule 7-2—and, of course, Plaintiffs would be willing to stipulate to a reasonable extension. Moreover, Plaintiffs' countermotion involves both the same body of evidence and the same legal issues as does the motion by the Venetian Defendants. Considering Plaintiffs' countermotion, far from inconveniencing the Court, actually improves judicial efficiency by affording the Court the opportunity to (1) deal with all of the issues at once, (2) grant summary judgment where appropriate, and (3) winnow the matters for trial to those where there is an actual dispute concerning material facts.

The Ninth Circuit has noted that "a Pre-Trial Order is not an inexorable decree and may, under proper circumstances, be modified." *Jeffries v. United States*, 477 F.2d 52, 55 (9th Cir. 1973). In fact, such modification can be made "in a *de facto* fashion, without formal amendment, simply by entering findings." *Mechmetals, Corp. v. Telex Computer Products, Inc.*, 709 F.2d 1287, 1294 (9th Cir. 1983) (*citing American Pipe & Steel Corp. v. Firestone Tire & Rubber Co.*, 292 F.2d 640, 643 (9th Cir.1961)). This case has not even reached the pretrial order stage, making the countermotion even less problematic.

In any case, and more importantly, as noted above, no amendment of any order is necessary, as summary judgment can even be granted in favor of the nonmoving party whenever there are no issues of material fact in dispute. Fed. R. Civ. P. 56(f) provides that "[a]fter giving notice and a reasonable time to respond," the court may:

> (1) grant summary judgment for a nonmovant;
> (2) grant the motion on grounds not raised by a party; or
> (3) consider summary judgment on its own after identifying for the parties material facts that may not be genuinely in dispute.

The Ninth Circuit has also explained that "[a] federal court, on one party's motion for summary judgment, may *sua sponte* grant summary judgment for the nonmoving party where from the record there is no genuine dispute regarding material facts and the nonmoving party is entitled to judgment as a matter of law." *In re Marvin Properties, Inc.*, 76 B.R. 150, 152 (9th Cir. 1987) (citing *Portsmouth Square v. Shareholders' Protective Comm.*, 770 F.2d 866, 869 (9th Cir.1985)) (affirming bankruptcy court's grant of summary judgment against moving party).

With regard to the issues before this Court that can be resolved as a matter of law, it of course makes sense to resolve them at this juncture. Whether Plaintiffs' motion is considered as a permitted late filing or as a Rule 56(f) motion, considering all the issues at hand, it is worth noting that entertaining Plaintiffs' countermotion, or otherwise considering granting summary

judgment against Defendants, conserves judicial resources.  As the Venetian Defendants pointed out, "[t]he summary judgment device allows courts and litigants to avoid full-blown trials in unwinnable cases, thus conserving the parties' time and money, and permitting courts to husband scarce judicial resources."  (MSJ at p.9 (citing *McCarthy v. Nw. Airlines, Inc.*, 56 F.3d 323, 325 (1st Cir. 1995)).)

### B.  Legal Standard on Summary Judgment

Summary judgment is proper if the pleadings, depositions, answers to interrogatories, and admissions on file, together with any affidavits, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.  Fed. R. Civ. P. 56.  "[O]n a motion for summary judgment, the judge must view the evidence presented through the prism of the substantive evidentiary burden."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 254 (1986).  An issue is thus "genuine" if there is a sufficient evidentiary basis on which a reasonable fact-finder could find for the nonmoving party, and a dispute is "material" if it could affect the outcome of the suit under the governing law.  *Id.* at 248-49.  In evaluating a motion, a court views all facts and draws all inferences in the light most favorable to the nonmoving party.  *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970).

The party moving for summary judgment has the burden to show that it is entitled to judgment under established principles, and it does not discharge that burden then it is not entitled to judgment.  *Id.* at 161.  Rule 56(c)(1) requires that "[a] party asserting that a fact cannot be or is genuinely disputed must support the assertion by" either "(A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only),

admissions, interrogatory answers, or other materials;" or by "(B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact."  If the moving party does not meet this burden, summary judgment cannot be granted and the burden does not shift to the non-moving party.  *Adickes*, 398 U.S. at 157-160.

The central question on summary judgment is of course whether a case should be submitted to a jury.  *Id.* at 158.  "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, whether he is ruling on a motion for summary judgment or for a directed verdict."  *Liberty Lobby,* 477 U.S. at 255 (citing *Adickes,* 398 U.S. at 158-159).   Trial courts should accordingly act with caution when entering summary judgment.  *Id.* (citing *Kennedy v. Silas Mason Co.,* 334 U.S. 249 (1948)).

That there are cross motions before the Court does not change the required approach on summary judgment:

> It is well-settled in this circuit and others that the filing of cross-motions for summary judgment, both parties asserting that there are no uncontested issues of material fact, does not vitiate the court's responsibility to determine whether disputed issues of material fact are present.

*United States v. Fred A. Arnold, Inc*., 573 F.2d 605, 606 (9th Cir. 1978) (per curiam).  The court must evaluate each party's motion individually to apply the summary judgment test to each motion separately.  Cross motions are to be considered separately, "[h]owever, cross motions may be probative of the nonexistence of a factual dispute where they demonstrate a basic agreement concerning what legal theories and material facts are dispositive."  27A Fed. Proc. § 62:679 (2011).

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**C.  Plaintiffs Have Asserted Actionable Civil Rights Claims Against the Defendants, Who Acted Under Color of Law.**

**1.  The Venetian Defendants Acted Under Color of Law.**

Despite the fact that this Court has already deemed the Venetian to be engaging in an inherently public function with respect to the sidewalk, and despite their own claims of complete dominion over the public sidewalk, the Venetian Defendants argue that they are not liable under Section 1983 because they are not state actors.  (MSJ at p. 12.)  Section 1983's "color of law" requirement generally precludes actions against private actors, even if the private action was discriminatory or otherwise wrong.  *Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 50 (1999) (internal quotations omitted).  However, the Ninth Circuit recognizes four different possible scenarios under which a private entity's actions constitutes actions taken under color of law: (1) where the private actor engages in a public function; (2) where there is joint action between private and state actors; (3) where the state compels a private entity's action; and (4) the governmental nexus test.  *Kirtley v. Rainey*, 326 F.3d 1088, 1092 (9th Cir. 2003).  Satisfaction of any one of these tests is sufficient to find state action.  *Id*.  Here, as a matter of law, the Venetian Defendants are state actors because, as this Court has itself found, the Venetian's role with respect to the sidewalk constitutes an inherently public function.  Accordingly, summary judgment must be entered in favor of Plaintiffs, not the Venetian Defendants.  Further, there are facts also supporting a reasonable jury's finding that the Venetian Defendants engaged in joint action with the LVMPD Defendants.   Thus, even if the Court does not find that the Venetian Defendants are state actors as a matter of law, summary judgment in favor of Venetian Defendants on this issue still would be inappropriate, as the joint action test involves disputed and material questions of fact.

### a.   The Venetian Defendants' Activities with Respect to the Sidewalk Constitute a Public Function.

The sidewalk in front of the Venetian has already been declared to be a public forum by both this Court and by the Ninth Circuit.  *Venetian I*, 45 F. Supp. 2d 1027; *aff'd Venetian II*, 257 F.3d 937 (9th Cir. 2001).  In so doing, this Court made clear both that the Constitution's protections applied to the sidewalk, and that the Venetian performs a public function with respect to the public sidewalk:

> …if ever there was a case where the protections of the First Amendment to the United States Constitution should be applied to private property used for a particular public function, this is the case. Thoroughfare sidewalks parallel to the main public street in a city, that allow citizens to move from one part of the city to the next, have traditionally been exclusively owned and maintained by the government. **Consequently, by owning and maintaining the particular sidewalk at issue in this case, the Venetian is performing a public function**. *Id.* at 1035.

By performing a public function, the Venetian acts under color of law.  Courts have found that regulating a public forum is traditionally and exclusively a state function, and thus, a private actor that does so is acting under the color of law.  *Marsh v. Alabama*, 326 U.S. 501, 502-03 (1946); *Lee v. Katz*, 276 F.3d 550, 556 (9th Cir. 2002); *United Church of Christ v. Gateway Econ. Dev. Corp. of Greater Cleveland, Inc.*, 383 F.3d 449, 454-55 (6th Cir. 2004); *Citizens to End Animal Suffering and Exploitation, Inc. v. Faneuil Hall Marketplace, Inc.*, 745 F.Supp. 65, 71-72 (D. Mass. 1990).

While this Court did not explicitly address the question of whether the Venetian was acting "under color of law" in the prior Venetian case,  it is a necessary extension of the conclusions that the Venetian performs a public function, and that the First Amendment applies on the sidewalk, as *Marsh v. Alabama* and its progeny cited above make clear.  In *Marsh*, the Supreme Court explained that "[o]wnership does not always mean absolute dominion.... [Where] facilities are built and operated primarily to benefit the public ... their operation is essentially a

public function ... subject to state regulation." 326 U.S. at 506.  Thus, "the fact that the property is private 'is not sufficient to justify the State's permitting a corporation to govern a community of citizens so as to restrict their fundamental liberties.'"  *Lee v. Katz*, 276 F.3d at 555 (quoting from *Marsh*, 326 U.S. at 509).

Ignoring the law on point, the Venetian Defendants argue simultaneously that they have the ability to control the sidewalk and that they are immune from Section 1983 liability.  In their motion for summary judgment, they state that "[t]he fact that the Venetian's private property has been declared to be a 'traditional public forum' for labor union demonstrations does not mean that Venetian must tolerate purely commercial transactions. . . ."  (MSJ at p. 10.)  They also suggest that they can impose reasonable time, place, and manner restrictions.

> Moreover, free expression, including expressive conduct, is subject to reasonable time, place and manner restrictions in the interest of avoiding congestion, deception, duress, and threats to public safety in a public forum.  Such restriction may include prohibitions on soliciting and the immediate transfer of money on passageways dedicated to the orderly movement of significant number of people.

(*Id.* at 10-11.)  And, in asserting a total statutory defense to Plaintiffs' tort claims, the Venetian Defendants also claim that they have the right to eject anyone who "trespasses" on their sidewalk.  (MSJ at p. 13.)  The testimony of Defendant Eli Castro is illustrative of the Venetian's control of the sidewalk.

> 13 Q. But can you explain to me what the basis for
> 14 trespassing them from the property was?
> 15 A. To inform them that they are no longer welcome
> 16 back.
> 17 Q. And why weren't they welcome back?
> 18 A. Because their conduct was unacceptable.
> 19 Q. Do Venetian security officers have the
> 20 jurisdiction and authority to tell people they're not
> 21 welcome on the sidewalk in front of the Venetian?
> 22 A. At the direction of management, yes.

Castro Depo. Tr., Ex. 2, at 104:13-22.  In addition, Castro testified that the Plaintiffs are not the only ones he has asked to leave the sidewalk for violating Venetian policy.  (Castro Depo. Tr., Ex. 2, at 113:21-114:18.)    And as noted by this Court and the Ninth Circuit, the agreement that established the sidewalk in front of the Venetian requires the Venetian to maintain the sidewalk. *Venetian II,* 257 F.3d at 949-50.

Where a party asserts such control over a public forum, courts hold them to be state actors.  In *Lee*, a private corporation maintained its own policies regarding speech in an open-air plaza, which was a public forum.  *Lee,* 276 F.3d at 552-53.  The private corporation enforced its policies by using private security.  *Id.* at 553.  The Ninth Circuit overturned the District Court's finding that the private corporation was not a state actor, holding that in regulating a public forum, the defendant was performing a traditional and exclusive function of the state.  *Id*. at 557. In *United Church of Christ*, the Sixth Circuit first found that a privately owned sidewalk – which did not differ in appearance from a publicly owned one – was a public forum.  383 F.3d at 452. The Sixth Circuit then held that because the sidewalk was a public forum, the entity that regulated it must be treated as a state actor.  *Id*. at 454.  In *Citizens to End Animal Suffering*, a district court similarly found that because the defendant, a private actor, controlled who could use the public walkways, the defendant was performing a function traditionally and exclusively reserved for the State.  745 F.Supp. at 71-72.  Similarly, the United States Supreme Court found that the Constitution applied to activities in a town that was entirely owned by a company which performed all municipal functions.  *Marsh*, 326 U.S. at 506-08.  The Venetian is a private entity that asserts control over a public forum.  Thus, just as in these factually analogous cases, the Venetian Defendants are state actors.

The Venetian Defendants ignore this Court's binding ruling that it engages in a public function with respect to the sidewalk, as well as the other case law directly on point detailed above.  Instead, they erroneously assert that "the mere fact that the portion of Venetian's private property in question serves a public function sidewalk for pedestrian traffic does not make Venetian and its personnel state actors."  (MSJ at p. 12.)  In support, the Venetian Defendants mistakenly rely upon *Caviness v. Horizon Cmty. Learning Ctr*, 590 F.3d 806, 815 (9th Cir. 2010), and misrepresent its holding.  The Ninth Circuit did *not* hold that engaging in a public function does not make a private party a state actor.  Instead, the *Caviness* court found that the specific activities at issue in that case were not a public function.  *Id.* at 816 ("we conclude that Horizon's provision of educational services is not a function that is traditionally and exclusively the prerogative of the state, and therefore is not a basis for holding that Horizon acted under color of state law in taking the alleged actions relating to Caviness's employment").[8]  As noted supra, **regulation of a public forum does make a private entity act under the color of law**.  *Lee*, 276 F.3d at 556; *United Church of Christ*, 383 F.3d at 554-55; *Citizens to End Animal Suffering*, 745 F.Supp. at 71-72.  Because the Venetian Defendants are engaged in a public function with respect to the sidewalk, they are state actors and can be held accountable for

---

[8] The Venetian Defendants may be misinterpretingconfused by the Ninth Circuit's note that "merely because the defendant is 'a private entity perform [ing] a function which serves the public does not make its acts state action.'" *Caviness*, 590 F. 3d at 815.  But this does not mean that if an activity *is* a public function, Section 1983 liability does not attach.  It just means that serving the public not the same thing as engaging in a public function.  But, of course, controlling and maintain a public forum ISis a public function.  The Venetian Defendants also mistakenly rely on *Villegas v. Gilroy Garlic Festival Ass'n*, 541 F.3d 950 (9th Cir. 2008).  (MSJ at p.12.)  In *Villegas*, the Ninth Circuit found that the Gilroy Garlic Festival Association was not a state actor for Section 1983 purposes.  541 F.3d at 957.  However, *Villegas* did not involve a legally established public forum but rather a privately run festival.  *Id.* at 956.  Thus, the Ninth Circuit found that the Festival Association did not serve a public function.  *Id*. at 955-56.  Here, in contrast, this Court has already determined that the Venetian serves a public function.  Further, it is of note that the dissent in *Villegas* criticized the majority for failing to consider whether the Festival Association should have been considered whether it acted under the color of law under the joint action test rather than just the public function test.  *Id*. at 960.  Here, the Venetian Defendants also satisfy the joint action test, as detailed below.

violating the First Amendment.  To hold otherwise would entirely override prior holdings that

establish that the sidewalk is a public forum and establish that the First Amendment applies

despite its private ownership.  *See, e.g.., Venetian I*, 45 F.Supp. 2d at 1035.


### b.  The Venetian Defendants' Joint Action with Metro Also Constitutes State Action.

A reasonable jury could also find that the Venetian Defendants acted under color of law

because of the joint action with Metro that is the focus of this case.  Under the joint action test, a

private individual may act under the color of state law if he conspires with the State or its agent

as a willful participant in joint action.  *Kirtley v. Rainey*, 326 F.3d 1088, 1092 (9th Cir. 2003).

As a general matter, whether a private actor qualifies as acting under color of law is a fact-

intensive inquiry.  *Lee*, 276 F.3d at 554.  There is no exact formula for determining whether there

is joint action; rather, the inquiry is a fact intensive one.  *Howerton v. Gabica*, 708 F.2d 380, 383

(9th Cir. 1983) ("[T]he extent of state involvement remains a factual inquiry.  Only by sifting

facts and weighing circumstances can the nonobvious involvement of the State in private

conduct be attributed its true significance") (internal quotations omitted).  Even if the Venetian

Defendants were not state actors as a matter of law under the public function test, it would be

appropriate for a jury to weigh the facts of this case and determine whether the Venetian

Defendants acted under color of law under a joint action theory.  *Liberty Lobby*, 477 U.S. at 255.


### i.  The Police Gave Support to the Venetian Defendants' Actions, and Thus, the Requisite Joint Action Is Present.

"Joint action . . . exists where a private party is a willful participant in joint action with

the State or its agents.  Private persons, jointly engaged with state officials in the challenged

action, are acting under color of law for purposes of § 1983 actions." *Collins v. Womancare*, 878 F.2d 1145, 1154 (9th Cir. 1989).  While mere acquiescence on the part of the police is not enough, the Ninth Circuit has found joint action where the police lend support to the private actor and thereby create the appearance that the state sanctions the private conduct. *Howerton*, 708 F.2d at 384-85.  The Ninth Circuit in *Howerton* reversed the district court's dismissal of the complaint. *Id.*  The Ninth Circuit found joint action where a police officer accompanied the plaintiff's landlord to serve an allegedly unlawful eviction notice, returned again alone to advise the plaintiffs to leave, and later accompanied the landlord when she disconnected the power from the residence. *Id.* at 381-82.  The plaintiff in *Howerton* testified that she did not object to the termination of her utilities because she did not want to argue with the police. *Id.* at 381.  Thus, there was joint action because the police officer acted in a way that gave the appearance that the State sanctioned the landlord's alleged illegal conduct.

The Ninth Circuit has also found that joint action between the police and a private party can exist where police presence prevents the plaintiff from asserting his legal rights against the private party. *Harris v. City of Roseburg*, 664 F.2d 1121, 1127 (9th Cir. 1981); *see also Pourny v. Maui Police Department, County of Maui* 127 F.Supp.2d 1129, 1150-51 (Dist. Hawai'I 2000).  In *Harris*, a police officer accompanied a creditor to repossess a truck because the plaintiff had allegedly defaulted in his payments.  664 F.2d at 1124.  When the plaintiff protested the repossession, the police told him to "stand back or get away." *Id.*  Relevant case law indicated that during a repossession, if the debtor begins to physically protest, the creditor must resort to a legal process to repossess the item. *Id.* at 1126.  Thus, because the police officer in *Harris* stopped the plaintiff from protesting, there were factual issues as to whether the  plaintiff was prevented from exercising a legal right. *Id.* at 1127.  Therefore, the Ninth Circuit found that the

district court had incorrectly granted summary judgment to the defendants in this case on the Section 1983 issue but affirmed because the officer had qualified immunity.  *Id*. at 1123.

In the case at hand, there are facts that would allow a jury to find joint action: Metro created the appearance that the state sanctioned the Venetian's conduct and gave support to the Venetian Defendants' actions.  On January 15, 2010, the Venetian Defendants interfered with Plaintiffs' First Amendment rights, improperly arrested them and seized them from a public sidewalk, and searched and detained them.  (S*ee* Plaintiffs' Statement of Undisputed Facts, ("SUF"), *supra*, at ¶¶ 25-51.)  The brothers were held captive until Metro arrived.  (*Id*. at ¶ 52.)  Then, like the police officer in *Harris*, Metro officers appeared on the scene only to reinforce the Venetian Defendants' illegal actions.  They supported the Venetian Defendants' position with respect to the sidewalk, continued the illegal detention, searched Plaintiffs, and issued "misdemeanor warnings" in violation of Metro policy and despite the fact that no misdemeanor had ever occurred, except by the Venetian Defendants.  (*Id*. at ¶¶ 54-65, ¶ 71.)  Metro did all of this without doing an independent investigation and despite having determined that the Plaintiffs had committed no legal wrong.  (*Id*. at ¶ 55.)  One of the Metro officers also told Jason that the security guards could do whatever they want because the brothers had been trespassing, even though this was false.  (*Id*. at ¶ 67.)

Additionally, just as the police officer's presence in *Harris* could have prevented a plaintiff from exercising his legal right to repossess his truck, here Plaintiffs were afraid to return to the sidewalk that day, and for weeks to come.  (Declaration of Sebastian Perez-Morciglio, Ex. 8, at ¶ 19; Declaration of Jason Perez-Morciglio, Ex. 7, at ¶ 20, ¶ 21).  The Plaintiffs could not exercise their rights and return to the sidewalk because of their fear of the police, who, in violation of Metro policy, also issued a misdemeanor warning to each of the brothers and despite

the fact that no misdemeanor had occurred.  (*See* Plaintiffs' SUF at ¶ 58.)  The Venetian

Defendants' arguments that they cannot be considered state actors are unavailing.  The Venetian

Defendants argue that the fact that Metro approved or acquiesced to the Venetian's actions does

not make it into a state actor, citing *Caviness*, 590 F.3d 806; (MSJ at p. 12.)  It is true that mere

acquiescence or approval by police to a private party's actions do not make that private actor a

state actor.  *Caviness*, 590 F.3d at 817.  However, here Metro went far beyond mere

acquiescence or approval, but essentially cloaked the Venetian in state authority by actions such

as failing to conduct an independent investigation.  The facts of *Caviness* are far, far different

from the situation at hand.  There, the Ninth Circuit merely held that, in addition to the fact that a

charter school was not engaged in a public function, there was no joint action although the State

retained the right to review and approve of the school's charter and policy, where the State had

no hand in creating the policies itself.  *Id.* at 817-18.  The nexus in this case is far closer, and the

facts of this case are much more similar to the ones noted in *Howerton*, where the police

supported the landlord without conducting an independent investigation and where joint action

was found.  *Howerton*, 708 F.2d at 381.  Contrary to the Venetian Defendants' suggestion (MSJ

at p. 12), Metro did *not* conduct an independent investigation, as noted above. (*See* Plaintiff's

SOF at ¶¶ 57-60.)

There is enough evidence of joint action to support a jury finding of color of law under

the joint action test because of the support Metro gave to the Venetian Defendants.  This

constitutes another reason that summary judgment on the color of law issue thus cannot be

granted to the Venetian Defendants.

### ii.   There Is Also Evidence of a Conspiracy.

Another way to satisfy the joint action test is to show a conspiracy between the state and private actors.  *Howerton*, 708 F.2d at 383.  Because there is enough evidence for a jury to find that there was a conspiracy, this is yet another reason summary judgment should not be entered in favor of the Venetian Defendants on the color of law issue.

Under the conspiracy test, "[t]o be liable under § 1983, each participant need not know the exact details of the plan, but each participant must at least share the common objective of the conspiracy."  *Mazzeo v. Gibbons*, No. 2:08-cv-01387 RLH-PAL, 2010 WL 4384207 at *10 (D. Nev. Oct. 28, 2010) (citing *Franklin v. Fox*, 312 F.3d 423, 441 (9th Cir. 2002) (internal quotations omitted).  "Whether defendants were involved in an unlawful conspiracy is generally a factual issue and should be resolved by the jury so long as there is the possibility that the jury can infer from the circumstances that the alleged conspirators had a meeting of the minds and, thus, reached as understanding to achieve the conspirator's objectives."  *Mazzeo*, 2010 WL 4384207 at *10 (citing *Adickes*, 398 U.S. at 158-59).  The facts of this case indicate that the Venetian Defendants and Metro acted jointly to deprive Plaintiffs their First Amendment right to free speech in a public forum and violate their Fourth Amendment rights.

This Court recently found that, where there is evidence of a common objective with law enforcement, Section 1983 claims against a private actor survive summary judgment.  *Mazzeo*, 2010 WL 4384207 at *10-11.  In *Mazzeo*, the Plaintiff filed a complaint for sexual assault against former-governor Gibbons, who was then campaigning for governorship.  *Id*. at *1.  Members of Metro communicated with Gibbons and members of his campaign frequently after the incident, and made statements such as we will "get this thing figured out."  *Id*. at *10.  This

Court concluded that the facts supported an inference that the defendants shared the common objective of minimizing Gibbons' political harm.  *Id.* at *11.

Similarly, the record here supports an inference that on the night of the incident, the Metro and Venetian Defendants shared a common objective of excluding Plaintiffs from the sidewalk.  Despite the fact that Plaintiffs informed the responding officers that they had been on a public sidewalk when the Venetian Defendants seized them, the officers issued misdemeanor warnings.  (S*ee* Plaintiff's SOF at ¶ 63.)  More generally, despite being aware of the fact that there is confusion on the street level regarding the sidewalk and being aware of prior litigation, Metro has failed to ensure that street level knew the legal landscape until after this litigation was filed. (*Id.* at ¶ 15.)  Especially when considered in light of the frequent and close collaboration between Metro and the Venetian (and other casino security officials) (*id.* at ¶ 16), there are sufficient facts for a reasonable jury to find that there was joint action under a conspiracy theory as well.   There is "the possibility that the jury can infer from the circumstances" that the Venetian and LVMPD Defendants had a meeting of the minds, and thus Plaintiffs' color of law claim must survive summary judgment.   *Mazzeo* at *11.

For all these reasons, summary judgment cannot be entered in favor of the Venetian Defendants on the color of law issue.  As detailed above, as a matter of law, the Venetian Defendants are engaging in a public function and can thus be sued as state actors pursuant to the public function color of law test.  Even if this was not the case, there is enough evidence to allow a reasonable jury to find that the Venetian Defendants acted under color of law under another test – the joint action test.  There is evidence that Metro both gave support to the Venetian Defendants' actions and conspired with them.

### 2.   The Claims Against the Venetian Are Actionable Civil Rights Claims.

In addition to arguing that they cannot be sued because they do not act under color of law, the Venetian Defendants try to avoid liability for constitutional claims altogether by arguing that  argument that Plaintiffs' civil rights should be dismissed because they are really just torts. Specifically, the Venetian Defendants claim "[w]hatever state law tort claims Plaintiffs believe arise from these circumstances, they do not encompass constitutional violations sufficient to sustain plaintiffs' civil rights claims."   (MSJ at p. 13.)  This argument is presented in conclusory and summary form – indeed, the Venetian Defendants dedicate no more than a paragraph to arguing that all of Plaintiffs' constitutional claims should be dismissed for this reason.  They in no way met their burden on summary judgment.  As the United States Supreme Court has pointed out:

> "… the party moving for summary judgment has the burden to show that he is entitled to judgment under established principles; and if he does not discharge that burden then he is not entitled to judgment.  **No defense to an insufficient showing is required**."

*Adickes*, 398 U.S. at  161 (emphasis added)  (quoting from 6 J.Moore, Federal Practice 56.22(2), pp. 2824-2825 (2d ed. 1966)).

While Plaintiffs are not required to respond to the Venetian Defendants' insufficient showing that Plaintiffs' constitutional claims are not actionable, there is ample evidence for each and every one.  Indeed, as detailed below, Plaintiffs are entitled to partial summary judgment on their First Amendment claims.

### D.  Plaintiffs Have Valid First Amendment Claims.

Summary judgment should be granted in favor of Plaintiffs on their First Amendment claims, not the other way around.  The Venetian Defendants contend that there are no First Amendment rights at stake in this case, relying on two misleading red herrings.  First, they argue that Jason was passing by and thus there is no expressive activity at issue.  Second, they point to portions of Jason's deposition testimony where he said he was not "performing."  But, of course, First Amendment protections are not limited to engaging in performances and, while it was not his favored "performance" site, Jason, who was dressed up as Zorro at the time, **was** interacting with tourists and performing while he stopped in front of the Venetian on the date of the incident. Indeed, Jason testified that the Security Officer who first approached him complained about him being in costume and performing.   The Security Officer claimed that Jason was selling swords, but there is little evidence that he actually was and Jason disputes the Security Officer's testimony.  In any case, even if Jason were selling swords, that would not change the fact that he was also performing.  Finally, there is additional expressive activity at issue here: Jason and Sebastian both asserted their rights to present and perform on the sidewalk.  This is also protected expression under the First Amendment.  Indeed, they were handcuffed and taken to security precisely because they asserted their rights to be on the sidewalk and refused to leave.

It is clear that expressive activity is at issue here, and the Venetian Defendants' attempt to dispose of Plaintiffs' First Amendment claims must be rejected.  Instead summary judgment should be entered in favor of Plaintiff.

### 1. Jason Was Engaged in Expressive Activity when Officer Lovegren Accosted Him.

The Venetian Defendants are wrong that Jason was not engaged in expressive activity in front of the Venetian for three reasons.  First, the vocabulary Jason uses to describe his activities in front of the Venetian, and whether he considered those activities to constitute the act of "performing" does not determine whether they are protected by the First Amendment.[9]  Second, the evidence indisputably shows that Jason was dressed up and playing the role of the character "Zorro."  (*See* Plaintiffs' SUF at ¶ 26.)  As the Venetian Defendants have themselves pointed out, he was, in fact, "performing":

> LVS's security footage … shows that Plaintiffs were not walking by the Venetian. Instead, Plaintiffs were relatively stationary when they were approached by LVS security. **Jason was engaging tourists, "performing" as Zorro**…

Venetian Defendants' Motion to Compel (Dckt # 6) at p. 7 (emphasis added).[10]

Third, and more fundamentally, the First Amendment protects more than just putting on "performances," as elastic as that term is.  The First Amendment states that "Congress shall make no law ... abridging the freedom of speech, ... or the right of people peaceably to assemble...." U.S. CONST., AMEND. I; *see also Lovell v. City of Griffin ,*303 U.S. 444, 450 (1938) (holding that the First Amendment's prohibitions also apply to state and local government rule-makers).  The First Amendment's protection of "freedom of speech" has been interpreted broadly to protect "expression."  *See, e.g.*, *Cinevision Corp. v. City of Burbank,* 745

---

[9] On this point, it is worth noting that English is not the first language of either brother.  (Declaration of Sebastian Jason Perez-Morciglio, Ex. 23, at ¶9.)

[10] Further, the Venetian Defendants argued in its Motion to Compel a narrative regarding the incident that there was a factual discrepancy between Plaintiffs' testimony and video footage, and that it was therefore "critical" that the Venetian receive a copy of the narrative.  *Id.*

F.2d 560, 567 (9th Cir. 1984) ("The Supreme Court has consistently held that expression beyond that of pure speech is protected by the First Amendment.")

Indeed, the scope of the First Amendment's protections is as broad as the scope of human expression is. Its breadth has been noted in many cases. See e.g., *Schad v. Borough of Mt. Ephraim*, 452 U.S. 61, 65 (1981) (holding that nude dancing is protected and noting that "[e]ntertainment, as well as political and ideological speech, is protected; motion pictures, programs broadcast by radio and television, and live entertainment, such as musical and dramatic works, fall within the First Amendment guarantee." ); *Ward v. Rock Against Racism,* 491 U.S. 781,790 (1989) (music, including rock music, is protected); *Schacht v. U.S.,* 398 U.S. 58, 63 (1970) (acting is protected); *Cinevision,* 745 F.2d at 569 (finding that music promoters are protected by the First Amendment and noting that "constitutional safeguards are not applicable only to musical expression that implicates some sort of ideological content. Rather, all-political and non-political-musical expression, like other forms of entertainment, is a matter of first amendment concern.").

That an art form is informal or takes place on the streets does not lessen the protections to which it is entitled. In *Schacht*, 398 U.S. at 61-62 the Supreme Court held that an actor putting on a street skit criticizing the Vietnam War was entitled to the protection of the First Amendment. In so doing, the Supreme Court rejected the government's argument that theater not put on in a traditional forum or performed by professional actors did not merit protection, noting:

> Certainly theatrical productions need not always be performed in buildings or even on a defined area and as a conventional stage. Nor need they be performed by professional actors or be heavily financed or elaborately produced. Since time immemorial, outdoor theatrical performances, often performed by amateurs, have played an important part in the entertainment and the education of the people of the world.

*Id.*, at 61.  Also addressing less traditional "performances," the Ninth Circuit recently issued a decision specifically addressing protections for street performers.  *Berger*, 569 F.3d at 1034 (invalidating restrictions on street performers in a challenge brought by a balloon artist).  The Ninth Circuit held that street performers like Jason have protected rights and that time, place, and manner restrictions placed on those rights must be carefully scrutinized.  *Id.*

Ignoring this case law, the Venetian Defendants mistakenly rely on semantics to obscure the fact that Jason was engaged in First Amendment expression.  But Jason was engaged in protected activity.  He is an entertainer who plays characters.  Playing Zorro and interacting with tourists in character is a craft and an art form.  JPM. Tr. 11:11-13:14 (explaining that in both Los Angeles and here, Jason portrays characters and entertains tourists and locals, relying on his acting and dancing skills); 12:5-22 (noting that he applies all of his "knowledge of theater …and dancing, theater and acting skills" and uses his "artistic charm" when he interacts with tourists and involves them with "the role or character [he is] portraying"); 14:20-15:14.)

On the date of the incident, Jason was engaged in his craft in front of the Venetian: he was imitating Zorro, in the character of a Spanish "caballero," and entertaining tourists.[11]  Not only is interacting with tourists in this way protected, but just going out into the world in character as Zorro is a form of expression.  Jason described the process of his own transformation into the character "Zorro:"

---

[11] Just as they distort the fact that Jason said he was not "performing," the Venetian Defendants have focused in on testimony reflecting that Jason and Sebastian were "just passing by" the Venetian on the date of the incident in order to support their position that there is no valid First Amendment claim (*see* MSJ at 10:6-8).  It is true that the Venetian was not Plaintiffs' intended destination: they usually performed in front of the Bellagio and Jason planned to give a full performance there that day.  (*See* Plaintiffs' SOF at ¶ 25.)  However, to get there from the bus stop, Jason and Sebastian had to pass by the Venetian and they ended up stopping for what they intended to be a brief time.  (*See id.* at ¶ 28.)  While in front of the Venetian, Jason was in character and interacted with tourists, as described above.  His activities constitute protected expression and are no less protected because the Venetian was not his intended destination.

Q. [MR. LIONEL:] You were not performing?
23 MS. McLETCHIE: Objection, asked and answered.
24 BY MR. LIONEL:
25 Q. Is that correct?
1 A. Well, I cannot give you a short answer because
2 once you put the costume on, the performance starts from
3 the moment you put the costume on.

(JPM Depo. Tr., Ex. 7, at 125:23-126:3.)  This testimony shows that, while Jason earlier said that he was "not performing" in front of the Venetian, he corrected himself and explained that he was performing because he was in character.  More importantly, this testimony illustrates the inherently expressive nature of wearing a costume and playing a character for Jason.[12]

While the Venetian Defendants now contend that Jason was not engaged in expressive activity, there is evidence that they first targeted him for harassment **because** he was a street performer and in costume.  Jason testified that Officer Lovegren asked him to leave because he was in costume.  (JPM Depo. Tr., Ex. 7, at 120:1-7; 17-24).[13]

In sum, Jason's activities were expressive and merit First Amendment protection, regardless of what label is applied to them and regardless of whether the Venetian sidewalk was Jason's intended stage that day.  To use an analogy, the actors who play characters at Disneyland and Disneyworld – from the classic Mickey Mouse to the more modern Little Mermaid – put on shows that might be called "performances."  They also wander around the amusement park grounds in character, interacting with guests.  This activity constitutes expression and is no less

---

[12] It is noteworthy that what one chooses to wear, especially a costume, can be non-verbal protected expression if it is part of an artistic endeavor, or intended to convey a "particularized message" and if the likelihood is great that the message will be understood by those who view it.  _Tinker v. Des Moines Indep. Comm. Sch. Dist._, 393 U.S. 503, 505-06 (1969) (wearing black armband to express students' opposition to Vietnam War was symbolic act protected by the free speech clause of the First Amendment); _Dunn v. Carroll_, 40 F.3d 287, 291-92 (8th Cir.1994) (wearing patch bearing American flag during months preceding the Persian Gulf War was nonverbal conduct protected under the free speech clause).

[13] Similarly, while he later claimed it was not relevant to his actions, Officer Lovegren noted on his paperwork that Jason was in costume and taking pictures with tourists.  (_See_ Plaintiffs' SUF ¶ 31.)

protected than putting on shows just because it may not technically be called a "performance" by some.

Just like the Disney characters who roam around Disney and fulfill childhood fantasies, just like the street performers who juggle and make balloon creatures for tourists at the Seattle Center (whose rights were protected in *Berger*), and just like the street actor who engaged in anti-government skits  (whose rights were vindicated in *Schacht*), Jason, who portrays Zorro in front of the Venetian, is entitled to the protections of the First Amendment.

### 2.   Jason's Zorro Role-Playing Cannot Be Reduced to a Commercial Transaction.

The Venetian Defendants attempt to obscure the First Amendment rights at stake by suggesting that this case does not involve free speech but rather just the selling of swords.  They argue:

> The mere fact that the portion of Venetian's private property in question has been declared to be a traditional public forum in the context of labor union demonstrators does not license Plaintiffs to engage in purely commercial transactions and otherwise threaten to disrupt the safe and orderly movement of pedestrians on the private walkway on question…

(MSJ at p. 11.)[14]

As a preliminary matter, whether Jason was selling swords is at best a disputed fact – as other Venetian security officers testified, there really is not any actual evidence that he was.  (S*ee* Plaintiffs' SUF at ¶ 30.)  Officer Lovegren never heard Jason ask for money, and conceded that what he saw – Jason giving someone a sword and then receiving money – could just as easily been Jason voluntarily giving a sword to someone and then accepting a tip.  (*Id.* at ¶¶ 30-32.)

---

[14] This statement is rife with problems.  In addition to the fact that Plaintiffs were not engaged in a purely commercial transaction, which is addressed above, it is important to note that: (1) it is not only labor union activity that constitutes protected activity on the sidewalk; and (2) there is *no* evidence that Plaintiffs were disrupting pedestrian movement.

Thus, Officer Lovegren did not even have enough information to believe that Jason was selling swords and should not have intercepted him to begin with.

In any case, even if Jason were selling swords, that would not change the fact that he was also performing and was entitled to First Amendment protection for that activity.  Because Jason was performing, this case cannot involve a "purely commercial transaction."  The cases that the Venetian Defendants rely upon are inapposite because they address a different question: how the First Amendment applies when the *same activity* may be both commercial and expressive.[15] Here, there are different activities at issue – Jason was performing, and even if he really was selling swords, it would have been an ancillary part of his activities.  Arguably, the sword that Jason gave away in front of the Venetian carries a message in that it represents "Zorro." *Gaudiya Vaishnava Soc. v. City and County of San Francisco*, 952 F.2d 1059, 1063 (9th Cir. 1990).  But the question is irrelevant because, whatever else Jason was doing, his portrayal of Zorro is undeniably expressive.  Even if he did also give someone a sword in exchange for a dollar, that would not negate the expressive nature of playing Zorro.  For example, just because beer and soda is sold at a theater during a play's intermission does not place the play outside the ambit of First Amendment protection.

Finally, while the **government** may require licenses or permits for certain kinds of activities that are both commercial and expressive in nature (for example, filing a commercial movie), that does not give the Venetian Defendants the ability to do so.  The Venetian Defendants rightly point out that First Amendment activity in a public forum may be subject to

---

[15] *Village of Schaumburg v. Citizens for a Better Environment,* 444 U.S. 620, 622 (1980) (affirming decision that ban on door to door solicitation was overbroad and unconstitutional); *Gaudiya*, 952 F.2d at 1060 (affirming finding that "ordinance which regulates the sale of merchandise on public sidewalks by nonprofit groups" was unconstitutional); *White v. City of Sparks*, 500 F.3d 953, 957 (9th Cir. 2007) ("an artist's sale of his original paintings is entitled to First Amendment protection".)

reasonable time, place, and manner restrictions (MSJ at pp.10-11), yet they fail to point to any

such applicable restrictions and instead have taken the position in this case that Jason broke a

Venetian rule that is applicable everywhere "on property" from the casino floor to the sidewalk.

(*See* Plaintiffs' SUF at ¶¶ 1-5.)  Surely, the Venetian's position cannot be that all its rules, rules

which do not differentiate between the sidewalk and other portions of the Venetian Resort Hotel

& Casino property, constitute "time, place, and manner restrictions."[16]

In sum, Jason's activities on the sidewalk cannot be reduced to a commercial transaction,

and the Venetian Defendants cannot escape the fact that he had First Amendment rights to

portray Zorro on the sidewalk in front of the Venetian.

### 3.         There Is Additional Protected Speech and Expression at Issue.

Further, while it is Officer Lovegren's testimony that he approached Jason because he

was selling swords, it was not until Jason disputed the Venetian's contention that they had

dominion over the sidewalk and until Jason refused to obey Officer Lovegren's demand that he

leave the public sidewalk, that Venetian Security Officers took actual punitive action against him

and used force.  (*See* Plaintiffs' SUF at ¶¶  29-30; 33-39.)

Indeed, Jason and his brother Sebastian both asserted the right to be on the public forum

sidewalk, and this assertion in and of itself is protected.  (*Id.* at ¶ 35.)  Additionally, the brothers

asserted their rights to be there in a peaceful manner.  In their depositions, Venetian Security

Officers could not identify any real way in which the brothers' behavior was dangerous or

threatening – while they considered the brothers "belligerent," that was because they asserted

---

[16] Further, even assuming that a set of reasonable time, place and manner restrictions were in place, there would be an open factual questions as to whether Jason actually violated it.  It appears that the Venetian believes it has unfettered discretion to eject people from the sidewalk – such a policy would not survive constitutional scrutiny.

their rights over and over.  (*Id.* at ¶ 44.)  Of course, you have a First Amendment right to say you

have rights under the First Amendment.

In its recent opinion  *United States v. Stevens*, 130 S.Ct. 1577, 2010 WL 1540082 (U.S.,

April 20, 2010) the United States Supreme Court narrowly defined five types of content that the

First Amendment does not cover.  Obviously the instant case does not involve any allegations of

defamation, obscenity, or fraud.  *Id.*  Therefore, the only possible categories of unprotected

speech that the act of asserting your right to be on the sidewalk or asking questions of security

officers could even remotely fall under would be incitement.  *Id.* at 1579.  But neither category

applies here.  In *Stevens*, the Supreme Court noted that the incitement standard was set forth in

*Branderburg v. Ohio*, 395 U.S. 444 (1969). In analyzing the standard set forth in *Branderburg*,

the Ninth Circuit in *White v. Lee*, 227 F.3d 1214 (9th Cir. 2000), noted that "[a]dvocacy is

unprotected only if it is "intended to produce, and likely to produce, imminent disorder";

"advocacy of illegal action at some indefinite future time" is not actionable." *Id.* at 1227 (citing

*Hess v. Indiana*, 414 U.S. 105, 108-09 (1973).)

Here, Plaintiffs were engaged in lawful behavior, and were not engaged in any advocacy

directed to incite or produce imminent lawless action.  Indeed, they were never charged with any

crime. "  Under  *Giboney v. Empire Storage & Ice Co.,* 336 U.S. 490, 498 (1949), "it rarely has

been suggested that the constitutional freedom for speech and press extends its immunity to

speech or writing used as an integral part of conduct in violation of a valid criminal  statute."

And, while of course casino officers are not police officers, even if they were, Plaintiffs' speech

on the sidewalk – asserting they had the right to be there and asserting the right to engage in First

Amendment activities, and questioning and disagreeing with the officers – would be protected.

In *City of Houston v. Hill*, 482 U.S. 451, 460-61 (1987), the United States Supreme Court ruled

that an ordinance that made it a crime for any person to "…in any manner oppose, molest, abuse or interrupt any policeman in the execution of his duty" was constitutionally invalid.  The *City of Houston* Court even noted constitutional protection for speech aimed at police officers that went far beyond mere interruption, but extended to cursing or otherwise speaking in an offensive manner to police officers.  *Id.* at 461-462; *see also United States v. Poocha*, 259 F.3d 1077, 1080-81 (9th Cir. 2001) (even statements such as "fuck you" or "fuck off" said to a police officer does not strip those statements of constitutional protection as either obscenity or fighting words); *United States v. Schaffer*, 2010 WL 347982 (E.D.Cal, January 29, 2010); *Duran v. City of Douglas, Arizona*, 904 F.2d 1372, 1374-5 (9th Cir.1990).

*Gulliford v. Pierce County*, 136 F.3d 1345 (9th Cir. 1998), addressed these principles in a somewhat analogous factual circumstance.  There, police ordered attendees at a beach party after to disperse, but the crowd remained.  *Id.* at 1347.  After a deputy officer said, "I'm tired of this. This is a waste of government,"  Gulliford, one of the attendees said, "[t]hen why don't you get the fuck off the island." *Id.* at 1350.  The Ninth Circuit found Guilfurd's statements to be protected, as they did not constitute fighting words.

If one can verbally challenge a police officer – and even swear at them – while they are conducting their duties, it is certainly protected speech to tell a Venetian security officer that you can remain on the sidewalk and that they are violating your First and Fourteenth Amendment rights as Jason did.  Further, asking them questions when they have your brother in handcuffs and also asserting that they are doing something wrong, as Sebastian did, must also be protected. As a district court from another jurisdiction recently held, you have the right to advise someone being arrested of their constitutional rights.

> It logically follows that a citizen may advise another of his constitutional rights in an orderly and peaceable manner while the officer is performing his duty without necessarily obstructing or delaying the officer in the performance of his duty.

*Brooks v. North Carolina Department of Correction*, 984 F.Supp. 940, 955  (E.D.N.C. 1997); *see also, Burton v. City of Durham*,  457 S.E.2d 329, 332 (N.C. App. 1995) (holding that the law prohibiting obstruction does not reach "[c]ommunications simply intended to assert rights, seek clarification or obtain information in a peaceful way").

In sum, the Supreme Court has made clear that it is not illegal to verbally assert your constitutional rights in a public forum, and Sebastian and Jason's speech is protected.  If it is not illegal to swear at a police officer, it certainly is not illegal to assert your fundamental First Amendment rights and tell a Venetian security officer that you have a right to be on the sidewalk.

### 4.   Plaintiffs Are Entitled to Partial Summary Judgment on their First Amendment Claims.

That the sidewalks in front of the Venetian are a public forum where First Amendment rights apply is not in dispute – it is a matter of established law.  The material facts in this case as to whether the Venetian Defendants violated Plaintiffs' rights are also not in dispute – only how to characterize those facts.  Plaintiffs were engaged in protected expression, despite the fact the Venetian Defendants characterize their acts as commercial and non-expressive.  As noted above, even the Venetian Defendants have argued that Jason was performing on the day in question.  As set forth above, Plaintiffs' were engaging in protected expression as a matter of law.

That the Venetian Defendants ejected Plaintiffs from the sidewalk is also not disputed – thus, given that Plaintiffs' were engaged in protected expression, ejecting them violated their rights.  And, as detailed above, the Venetian Defendants can be sued under Section 1983 for

actions taken with respect to the sidewalk as a matter of law.  Accordingly, Plaintiffs are entitled to partial summary judgment on their First Amendment claims against the Venetian Defendants – the only question remaining for a jury is what relief to provide and what the amount of damages and punitive damages to award.

### E.  Plaintiffs' Tort Claims Survive Summary Judgment.

The Venetian Defendants maintain that it has near complete dominion over the public sidewalk in front of its casino, a legal position that is not consistent with prior cases nor the nature of the throughfare.  While the Venetian Defendants seem to finally concede that it must allow First Amendment activity on the sidewalk, it bizarrely takes the position that the public forum sidewalk where the First Amendment applies is only that portion that is within eight feet of the curb.  And they also take the position that people are still subject to all Venetian policies whenever on any portion of the sidewalk in front of the Venetian – despite the fact that members of the public have no way of knowing of the special rules that apply.  Finally, now the Venetian Defendants argue that they are immune from all state torts they committed against Plaintiffs because they can use reasonable force to eject trespassers from the sidewalk, just as they could the from the interior of the Venetian: "operators of hotels are permitted to use reasonable force to eject a trespasser," they state.  (MSJ at p. 13.)

In the instant case, the Venetian Defendants contend that Jason violated Venetian rules.  Although he was even within the eight feet of the area the Venetian concedes is a public forum sidewalk, the Venetian Defendants' position is that Venetian rules still apply because the Venetian holds the formal title.  According to them, Jason was breaking a Venetian rule prohibiting sale of merchandise without prior authorization from the Venetian.  Thus, the

Venetian Defendants argue, it had a right to ask him to leave – and when he refused, he became a trespasser.  That, in turn, the Venetian Defendants say, gave them the right to use reasonable force to eject him pursuant to the Nevada Revised Statutes (MSJ at p. 13).

This argument contradicts the Ninth Circuit's 2001 decision, which found that the very alleged right the Venetian now claims – the right to exclude people from the sidewalk – was forfeited when the sidewalk was given over to the public use as a pedestrian thoroughfare.  Even if Plaintiffs were not engaged in protected expression, the Venetian still did not have the authority to enforce its casino policies on that public thoroughfare.   It is simply a legal impossibility to commit trespass on the public sidewalk.  Of course, due to the fact that the Venetian Defendants' actions were motivated by a desire to squelch expression – including Plaintiffs' expression of the very same sentiments that the Ninth Circuit articulated – the constitutional violation is that much more egregious.

The Court should not grant summary judgment endorsing the Venetian's theory that they control the sidewalk.  Instead, Plaintiffs are entitled to partial summary judgment that the Venetian Defendants do not have the legal right to exclude people from the public sidewalk in front of the Venetian nor the right to arbitrarily make and enforce rules there.

### 1. The Public Has Property Rights as well as First Amendment Rights with Respect to the Sidewalk.

Allowing the Venetian to treat the sidewalk as any other portion of the casino – to make and enforce its own rules and to trespass people from it – is entirely inconsistent with the sidewalk's function as a public thoroughfare as well as its function as a forum for free speech.

 "[S]eparation from acknowledged public areas may serve to indicate that the separated property is a special enclave, subject to greater restriction."  *Int'l Soc. for Krishna*

*Consciousness, Inc. v. Lee*, 505 U.S. 672, 680 (1992) (citing *United States v. Grace,* 461 U.S. 171, 179-180 (1983).  Here, there is nothing indicating to the public that the sidewalk in front of the Venetian is subject to greater restrictions of any sort.  The sidewalk that runs along the Las Vegas Strip, including the Venetian, is a continuous public sidewalk.  This fact was a central piece of the Ninth Circuit's analysis in determining that it is a public forum:

> Although the paving and landscaping along the Venetian's stretch of sidewalk are somewhat different, **there are no barriers or other physical boundaries to indicate to the steady stream of pedestrians making their way up and down the Las Vegas Strip that the sidewalk in front of the Venetian enjoys a different legal status than public sidewalks to which it is seamlessly connected to the north and south…**

*Venetian II*, 257 F.3d at 945 (emphasis added); *see also* Plaintiffs' Statement of Facts ¶ 9.

Because the sidewalk in front of the Venetian is not a separate area but rather is dedicated to public use, it no longer operates as exclusively private property – regardless of title ownership, it is a public forum.  *Id.*  The 1999 Agreement, as noted above and as the Venetian conceded in the prior litigation, imposes a duty on the Venetian "not to restrict public access to and passage along the sidewalk."  *Id.* at 946.  "Read together, these provisions [of the 1999 Agreement] constitute a dedication of the sidewalk to public use.  They require the Venetian to provide a sidewalk for general public use, and they deprive the Venetian of its private property right to block or otherwise impede public access to the sidewalk."  *Id.*

In other words, some of the bundle of property rights associated with the sidewalk belong to the Venetian and others belong to the State and the public.  "[A]s a result of the 1999 Agreement, the State of Nevada possesses a property interest in a portion of the Venetian's land, the purpose of which is to guarantee unrestricted public passage along Las Vegas Boulevard."  *Venetian II* 257 F.3d at 946-947 (emphasis added) (citing *Meredith v. Washoe County School District,* 84 Nev. 15, 435 P.2d 750, 752 (1968) (explaining that "a restrictive

covenant is an easement or a servitude in the nature of an easement") and RESTATEMENT

(THIRD) OF PROP.: SERVITUDES § 2.18 ("[T]he right to control a servitude for the benefit of the

public is located in the state and the right to use the servitude benefit extends to the public at

large.").

   While the Ninth Circuit has characterized the public rights vis-à-vis the sidewalk as a

"servitude," *Venetian II*, 257 F.3d at 942, they are best characterized as the more specific

"easement."  A servitude is a nonpossessory legal right that "runs with the land," such as an

easement, a covenant, or a profit.  RESTATEMENT (THIRD) OF PROP.: SERVITUDES § 1.1(1).  An

easement is a servitude that "creates a nonpossessory right to enter and use land in the possession

of another and obligates the possessor not to interfere with the uses authorized by the easement."

*Id.* § 1.2(1).

   The extent of the public's rights to use the sidewalk and the extent of the inversely related

rights of the Venetian to exclude pedestrians depend on the easement's interpretation.  *Brooks v.*

*Bonnet*, 185 P.3d 346, 348 (Nev. 2008) (stating that an easement can be created expressly, by

prescription, or by implication, and that the terms of the agreement as well as extrinsic evidence

can be used in its interpretation); RESTATEMENT (THIRD) OF PROP.: SERVITUDES § 4.1 ("A

servitude should be interpreted to give effect to the intention of the parties ascertained from the

language used in the instrument, or the circumstances surrounding creation of the servitude, and

to carry out the purpose for which it was created.").  Furthermore, an easement should be

interpreted in favor of public policy.  *Id.* § 4.1(2) ("Among reasonable interpretations, that which

is more consonant with public policy should be preferred.")

In addition to the rights granted, the public thus also holds all rights that are reasonably necessary to the convenient enjoyment of the easement so long as they do not unreasonably damage the sidewalk or unreasonably interfere with its enjoyment.  *Id.* § 4.10.

### 2.    The Venetian Does Not Have the Legal Right to Exclude from the Sidewalk.

Allowing the Venetian to treat the sidewalk as its exclusive property is as incompatible with the public's property rights as it with the First Amendment.  Stopping, remaining on the sidewalk, and enjoying the views of the Strip – even without an explicit First Amendment purpose – are activities that go hand-in-hand with the Ninth Circuit's finding that the 1999 Agreement provides unfettered public access.  Even if allowing the public to engage in such activities were not express purposes of the easement, they are at least reasonably necessary to comfortably enjoy public access to the sidewalk, they further a public policy by allowing pedestrians to enjoy the Las Vegas Boulevard, and they do not unreasonably interfere with others' enjoyment of the sidewalk or damage it.

But free public access **was** an express purpose of the easement.  The Venetian, as a matter of law, does not have the right to exclude people from the sidewalk.  As noted above:

> …**property that is dedicated to public use is no longer truly private**. Although the owner of the property retains title, **by dedicating the property to public use, the owner has given over to the State or to the public generally "one of the most essential sticks in the bundle of rights that are commonly characterized as property," the right to exclude others.**

*Venetian II* at 945-46 (emphasis added); *see also* 946 (noting that the terms of the 1999 Agreement "deprive the Venetian of its private property right to block or otherwise impede public access to the sidewalk.")

Further, as the Restatement provision cited by the Ninth Circuit makes clear, the ultimate right to control the servitude is located in the County, not in the Venetian because "the right to control a servitude for the benefit of the public is located in the state and the right to use the servitude benefit extends to the public at large." RESTATEMENT (THIRD) OF PROP.: SERVITUDES § 2.18.  The Restatement further explains that "'[c]ontrol as used in this section includes rights to transfer, terminate, and otherwise dispose of the servitude benefit, **as well as rights to manage the servitude**."  *Id.*, cmt b (emphasis added) (further noting that "States frequently delegate their control rights over servitudes held for public use to state agencies, county or local governments, and other governmental bodies.")

The right to control access to the public sidewalk in front of the Venetian belongs to the government and not the Venetian.  Allowing the Venetian to make rules with respect to the sidewalk that give it the ability to exclude people is at odds with the express and implied contours of the easement as well as public policy.  Therefore, Nev. Rev. Stat. § 651.020, relied upon by the Venetian Defendants to support their claim of a statutory defense to Plaintiffs' tort claims, is inapplicable.  The language of the statute limits the right to evict provided to "[e]very owner or keeper of any hotel, inn, motel, motor court, or boardinghouse or lodging house" to the "right to evict from such premises."  Nev. Rev. Stat. § 651.020.  The "premises" the Venetian has the right to evict trespassers from cannot include the public sidewalk because the Venetian does not control access to it: the government does.

The criminal trespass provision that the Venetian Defendants contend Plaintiffs violated by remaining on the public sidewalk after the Venetian instructed them to depart is likewise inapplicable.  It provides, in pertinent part, that any person who  "[w]illfully goes or remains upon any land or in any building after having been warned by the owner or occupant thereof not

to trespass, is guilty of a misdemeanor."  Nev. Rev. Stat. § 207.200(1)(b).  In other words, if someone is warned by the owner or occupant to leave private property, that person is guilty of misdemeanor trespass.  This criminal trespass provision presupposes that the enforcer has the legal authority to do so.  The Venetian Defendants do not have that legal authority because, under the 1999 Agreement, it cannot "restrict public access to and passage along the sidewalk." *Venetian I*, 45 F. Supp at 946.[17]

> ### 3. Even if the Venetian Defendants Were Entitled to Trespass People from the Public Sidewalk, There Would Be Disputed Issues of Material Fact.

Even if the Venetian can eject trespassers from the sidewalk, and had the right to eject Jason and Sebastian, the Venetian Defendants did not "evict" them from the premises as Nev. Rev. Stat. § 651.020 permits – they forcibly kidnapped them and detained them, and they improperly used force.  (S*ee* Plaintiffs' SUF ¶¶ 38-52.)  Thus, even assuming that the Venetian Defendants were entitled to use force to remove Jason and Sebastian because they have the right to control the sidewalk, Plaintiffs' claims would involve disputed issues of material facts as to whether force was properly used.  Therefore, dismissing all of Plaintiffs' tort claims as requested by the Venetian Defendants or entering summary judgment in favor of the Venetian Defendants would be inappropriate.[18]

---

[17] Accepting the Venetian Defendants' position would essentially defeat the public forum status of the sidewalk.  This is especially so in light of their additional argument that they are not state actors.  If they are both free to eject people from the sidewalk and also not reachable under Section 1983, there would be nothing to stop Venetian employees from ejecting people from the sidewalk for exercise of their First Amendment rights, as happened in this case.

[18] For example, Sebastian contends that Venetian Security Officers injured him by failing to properly place handcuffs on him. (S*ee* Plaintiff's Statement of Facts, *supra¸* at ¶ 5.)

### 4.   This Court Should Enter Partial Summary Judgment in favor of Plaintiffs.

But the Venetian cannot kick people off the sidewalk.  The sidewalk is a public forum which the Venetian is barred from excluding the public from.  Thus, when the Venetian Defendants seized Plaintiffs from the public sidewalk they acted without legal authority.  They had no right to eject Plaintiffs, let alone use force to do so.  Accordingly, rather than grant summary judgment to the Venetian Defendants on the basis of their claimed statutory defense, summary judgment should be granted in favor of Plaintiffs that the Venetian does not have the right to trespass people or otherwise exclude them from the public sidewalk.

Arguably, because the Venetian Defendants acted outside the law when handcuffing Plaintiffs, forcing them onto Venetian property, detaining them, and searching them, partial summary judgment should be granted to Plaintiffs on their unlawful arrest unreasonable search and seizure, unlawful detention, battery, and false imprisonment claims.  There are no disputed issues of material fact – the Venetian Defendants do not deny what occurred, the video of the incident captures much of it, and deposition testimony is likewise clear.  All the parties disagree about is whether the Venetian Defendants were *legally* allowed to do what they did.  They are not and thus, as a matter of law, the Venetian Defendants are liable.

### VI.   Conclusion

For all these reasons, the Venetian Defendants' Motion for Summary Judgment must be denied.  Instead, summary judgment should be entered against the Venetian Defendants and in favor of Plaintiffs as follows:

1.   The Venetian Defendants act "under color of law" with respect to the sidewalks, and thus Plaintiffs' constitutional claims brought pursuant to 42 U.S.C. § 1983 should not be dismissed.

2.   The Venetian Defendants violated Plaintiffs' First Amendment rights by ejecting them from the sidewalk.  Judgment should be entered in favor of Plaintiffs and against the Venetian Defendants on Plaintiffs' First Cause of Action (right to free speech and expression).  Plaintiffs are entitled to nominal damages, and a jury may consider Plaintiffs' requests for compensatory and punitive damages.

3.   The Venetian Defendants do not have an absolute defense with respect to actions taken on the public sidewalk in front of the Venetian; nor do the Venetian Defendants have the right to seize people from the public sidewalk and imprison them.  Accordingly, judgment should be entered in favor of Plaintiffs and against the Venetian Defendants on Plaintiffs' second cause of action (right to be free from unlawful arrest); third cause of action (right to be free from unreasonable search and seizure); fourth cause of action (right to be free from unlawful detention); fifth cause of action (civil conspiracy to violate plaintiff's civil rights); sixth cause of action (violation of the Fourteenth Amendment, substantive due process); seventh cause of action (violation of the Fourteenth Amendment, procedural due process); eighth cause of action (false imprisonment); and ninth cause of action (battery).

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Plaintiffs have voluntarily dismissed their tenth and eleventh causes of action.
Accordingly, the Court need not address the Venetian Defendants' motion for summary
judgment with respect to those claims.

ACLU OF NEVADA

By:

  */s/ Margaret A. McLetchie*
Margaret A. McLetchie, Bar. No. 10931
Allen Lichtenstein, Bar. No. 3992

*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that I am an employee of the ACLU of Nevada, and that on the 16th day of June, 2011, I caused to be served a true and correct copy of the following through the Court's Case Management and Electronic Case Filing (CM/ECF) system, pursuant to Fed. R. Civ. P. 5(b)(3) and LR 5-4:

1. Plaintiffs' Opposition to the Defendant Las Vegas Sands Corporation's Motion for Summary Judgment, and Countermotion for Summary Judgment;

2. Declaration of Maggie McLetchie in Support of Plaintiffs' Opposition and Countermotion;

3. Declaration of Maggie McLetchie to Demonstrate Good Cause for Rule 56(f) Motion and Countermotion for Summary Judgment; and

4. Motion to Increase Page Limit for Plaintiffs' Opposition and Countermotion.

I also certify that on the 17th day of June, 2011, I caused to be served a true and correct copy of *Plaintiffs' Amended Opposition to the Defendant Las Vegas Sands Corporation's Motion for Summary Judgment, and Countermotion for Summary Judgment* through the CM/ECF system. All of the documents named in this Certificate were served upon the parties listed below, with a courtesy copy also sent to the United States District Court of Nevada.

Samuel S. Lionel                          Nicholas Crosby
Robert Hernquist                          Marquis Aurbach Coffing
David N. Frederick                        10001 Park Run Drive
Lionel Sawyer & Collins                   Las Vegas, NV 89145
1700 Bank of America Plaza
Las Vegas, NV 89101

*Attorneys for Las Vegas Sands*          *Attorney for Las Vegas Metropolitan*
*Corporation Defendants*                 *Police Department Defendants*

                                         */s/ Rahul K. Sharma*
                                         Rahul K. Sharma