Allen Lichtenstein, Bar No. 3992
lichtenstein@aclunv.org
Margaret A. McLetchie, Bar No. 10931
mcletchie@aclunv.org
ACLU OF NEVADA
601 South Rancho Dr. Suite B-11
Las Vegas, NV 89106

*Attorneys for Plaintiffs*
*Jason and Sebastian Perez-Morciglio*

UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

| | |
|---|---|
| Jason A. Perez-Morciglio and Sebastian Perez-Morciglio,<br><br>          Plaintiffs,<br><br>     vs.<br><br>Las Vegas Metropolitan Police Department; Sheriff Douglas Gillespie (individually and in his official capacity as Sheriff of the Las Vegas Metropolitan Police Department); Las Vegas Metropolitan Police Department Officers T. Scott and S. Schaier, Sergeant Kendall Bell (in their individual capacities); Las Vegas Sands Corp., a Nevada Corporation; Venetian Casino Resort, LLC, a Nevada Limited Liability Company; Venetian Security Guard Eli Castro; Venetian Security Guard Linda Hagenmaier; Venetian Security Guard Ron Hicks; Venetian Security Guard William Lovegren; Venetian Security Guard Anthony Bronson; and Venetian Security Guard Kevin Neanover; Venetian Security Guard Kim Gorman; Venetian Security Guard Paul Tanner; and Executive Director of Security Tony Whiddon,<br>          Defendants. | Case No.:        2:10-CV-00899-PMP-RJJ<br><br><br><br>**OPPOSITION TO LVMPD DEFENDANTS' MOTION FOR SUMMARY JUDGMENT, COUNTERMOTION FOR SUMMARY JUDGMENT, AND RULE 56(f) MOTION** |

Plaintiffs Jason Perez-Morciglio and Sebastian Perez-Morciglio, by and through their counsel, hereby file the following Opposition to the Summary Judgment Motion filed by the Las Vegas Metropolitan Police Department (LVMPD), Sheriff Gillespie, and Officers Scott and Schaier (collectively, the "LVMPD Defendants"). The LVMPD Defendants' request for summary judgment must be denied in its entirety.

<u>**MEMORANDUM OF POINTS AND AUTHORITIES**</u>

## I.    INTRODUCTION

While the LVMPD Defendants have contended that the legal status of the sidewalk in front of the Venetian is a "gray area," (Schaier Depo. Tr., Ex. 8 at 79:18-80:6), this Court and then the Ninth Circuit have made crystal clear that the sidewalk is a public forum, and the public has First Amendment rights there. *Venetian Casino Resort v. Local Joint Exec. Bd. of Las Vegas ("Venetian I")*, 45 F.Supp.2d 1027, 1036 (D. Nev. 1999); *Venetian Casino Resort v. Local Joint Exec. Bd. of Las Vegas ("Venetian II")*, 257 F.3d 937, 946 (9th Cir. 2001), *cert. denied*, 535 U.S. 905 (2002)). Despite those rulings, and others establishing that the sidewalks along the Strip are a public forum, the LVMPD has failed to take appropriate measures to protect free speech rights on the Strip.

As a result, the LVMPD Defendants are liable for what took place on January 15, 2010. When Venetian Security Officers seized Plaintiffs from the public sidewalk in front of the Venetian Resort & Casino that day, Plaintiffs asked Security to call the LVMPD to help protect their rights. When they arrived, the LVMPD Officers did not protect Plaintiffs. Despite the fact that it was Venetian Security that had engaged in wrongdoing, the LVMPD Officers supported Venetian Security's actions and erroneous assertion of control of the sidewalk, continued the detention of Plaintiffs, and deterred Plaintiffs from exercising their free speech rights and returning to the sidewalk by issuing a bogus misdemeanor warning and placing Plaintiffs in fear of arrest.

The LVMPD Defendants admit that Plaintiffs' rights were violated, but try to evade culpability by arguing, among other things, that they were not physically present on the sidewalk when the brothers were first stopped and then taken into custody by the Venetian security staff. (LVMPD Defendants' Motion for Summary Judgment ("MSJ") at 4.) While they were not present when Plaintiffs were initially seized from the sidewalk, that is irrelevant. After they arrived, they continued the detention of

Plaintiffs, searched them, and, in violation of LVMPD policy, issued a misdemeanor warning.  The responding police officers chilled Plaintiffs' rights and deterred them from returning to the sidewalk, despite the fact that Plaintiffs had the legal right to be there.  Thus, they violated Plaintiffs' First Amendment rights. They also violated Plaintiffs' due process rights by improperly denying them of their right to be on the sidewalk without due process of law.  Furthermore, the LVMPD Officers violated Plaintiffs' Fourth Amendment rights by arresting and searching them, despite the fact that they knew Plaintiffs had not engaged in wrongdoing.  Finally, there is also substantial evidence that the LVMPD conspired with the Venetian Defendants to violate Plaintiffs' rights.

The LVMPD officers who responded to the incident are not entitled to qualified immunity because, as noted above, the law regarding First Amendment rights and the rights of persons to access the sidewalk without illegal interference from either casino personnel or LVMPD officers is clearly established, and a reasonable officer would know "trespassing" people from a public sidewalk and limiting their free speech rights is illegal.  *S.O.C., Inc. v. County of Clark,* 152 F.3d 1136, 1144 (9th Cir. 1998); *Venetian I*, 45 F.Supp.2d at 1036; *Venetian II,* 257 F.3d at 939-43.  A reasonable officer would also know that, under the Fourth Amendment, it is improper to arrest and search citizens when the officers know the citizens have broken no laws.  *Schneckloth v. Bustamonte*, 412 U.S. 218, 222 (1973); *Meredith v. Erath*, 342 F.3d 1057, 1062 (9th Cir. 2003); *Winterrowd v. Nelson*, 480 F.3d 1181 (9th Cir. 2007). Further, the LVMPD and Sheriff Gillespie are legally responsible for the LVMPD's unconstitutional customs and failing to train officers.  *See Collins v. City of Harker Heights*, 503 U.S. 115, 123 (1992).

Indeed, the incident and this lawsuit could have been avoided if the LVMPD stopped its practice of rubber-stamping casino actions and instead adequately trained its officers to enforce the laws and protect free speech.  Despite the long history regarding the Strip and problems the public has faced asserting their First Amendment rights there, the LVMPD and Sheriff Gillespie have to date failed to sufficiently train its officers.  Indeed, Officer Schaier, one of the officers involved in the incident that gave rise to this litigation testified that if he had received appropriate training, the events of January 15, 2010 would have unfolded differently:

> 23 Q. Would you like clarification about the sidewalk
> 24 in front of the Venetian? Would that assist you in
> 25 doing your job?
> 4 A. It would help, definitely

Schaier Depo. Tr. at 100:23-101:4.  Despite an obvious need to do so, the LVMPD Defendants have failed to ensure that First Amendment rights are respected on the sidewalk.  Instead, they have allowed, and in fact empowered the Venetian's efforts to trample the public's First Amendment rights.

## II.  RESPONSE TO STATEMENT OF UNDISPUTED FACTS

The LVMPD Defendants' Statement of Undisputed Facts is misleading in two respects.  First, they write that "[b]ased upon the differing stories as to where the Plaintiffs were actually located at the time of the detention, the Officers determined the Plaintiffs would not be cited or arrested."  (LVMPD MSJ at p. 6:1-3.)  However, as detailed below, the Officers determined that Plaintiffs had not engaged in wrongdoing before speaking to them, yet they continued to detain them, as detailed below.  Second, they also mischaracterize the misdemeanor warning, which is a form of law enforcement action, as detailed below at "The LVMPD Officers' Conduct Chilled Plaintiffs' Expressive Speech", deterred Plaintiffs from exercising their rights, and was improperly issued.

## III.  PLAINTIFFS' STATEMENT OF UNDISPUTED FACTS
### A.  The Long History of Disputes Over the Sidewalk

1. That the sidewalks along the Strip are public *fora* and public thoroughfares was first established thirteen years ago.  *See, e.g. S.O.C., Inc. v. County of Clark,* 152 F.3d 1136, 1144 (9th Cir. 1998).  And, this Court and then the Ninth Circuit, held that the very sidewalk at issue in this case was a public forum in addressing very similar issues in *Venetian I*, 45 F. Supp. 2d at 1036 and *Venetian II),* 257 F.3d at 939-43.

2. And, there have been numerous lawsuits addressing free speech on the Strip including suits about the rights of street performers.  *See*, e.g. *Webber et al. v. Clark County et al*., Case No. 2:06-CV-181-RLH-RJJ (D. Nev. 2008) (case filed in 2008 addressing rights of street preachers along the Strip; resolved to limit Clark County code to prohibiting obstruction, rather than allowing for, among other things, citing people for having signs); *Banasik v. Clark County*, Case No. 2:09-cv-01242-LDG-GWF (D. Nev. filed July 21, 2009)*; see also* LVMPD 01133 (noting that there was also similar

litigation regarding Bally's).  The Ninth Circuit explicitly held that street performers had First Amendment rights in *Berger v. City of Seattle*, 569 F.3d 1029, 1034 (9th Cir. 2009).

3.   As these lawsuits reflect, there is great historical tension between, on the one hand, casino officials, who solicit the LVMPD's assistance in keeping certain activities off the sidewalks in front of their casino and, on the other, various members of the public – from protesting union members to street preachers, handbillers, and even street performers – who wish to engage in First Amendment activity on the public sidewalks, free from harassment.

4.   Indeed, there is a record of both LVMPD and casino officials harassing people engaged in First Amendment activities, including by trying to impose inapplicable laws on them.  *See* verified *Weber* Compl. ¶ 19; Declaration of William Jablonksi, Ex. 13, at ¶ 6, 23 (Elvis impersonator has been harassed by LVMPD); Declaration of Suzette M. Banasik, Ex. 12, at ¶ 18-26, 34 (musician that has been harassed by LVMPD); Ex. 21, Carri Geer Thevenot, *Buskers sue to keep space on Strip*, Las Vegas Review-Journal (July 10, 2009) at Bates No. 000909-000913 ("…before heading out with her guitar, [Banasik] stops to ask herself, "Do I feel like going to jail today?"); Ex. 22, Rick Lax, *It's hard out there for a man-whore,* Las Vegas Weekly, Las Vegas Weekly (April 14, 2010) at Bates No. 00915-00918 (reporting that, despite litigation, "some casinos are still trying to get buskers off the strip."); Ex. 15, Declaration of Claudio Meloni at ¶ 4 (Venetian harassing street performer.); *see also* Ex. 17, at LVMPD 01134-35 (forwarded 5/21/10 email from Sergeant Kendall Bell regarding request from Bally's to eject people from sidewalk).  More generally, there is a general history of harassment by casino officials.  Liz Benston, *Lawsuits Pile Up As Alleged Casino Assaults Continue*, Vegas Inc, June 15, 2011, 2:00 a.m., Ex. 23, available at http://www.vegasinc.com/news/2011/jun/15/lawsuits-pile-alleged-casino-assaults-continue/ (describing some of the more than 50 current lawsuits against casinos for torts such as assault, battery, and false imprisonment by security).

5.   The LVMPD has long had knowledge that the Venetian in particular detained and trespassed people who were on the public sidewalk in front of the Venetian Resort & Casino, even after the *Venetian* litigation was decided.  For example, Captain Charles Hank was in charge of the Convention Center Area Command, the LVMPD command center which covers much of the Strip, from November of

2008 to January of 2011, which includes the date of the incident that gave rise to this ligation. (4/7/11 Hank Depo. Tr., Ex. 5, at 5:9-13; 6:8-9).  On May 21, 2010, Captain Hank sent an email stating that the Venetian has long believed it could control access to the public sidewalk.  (Ex. 17 at Bates No. LVMPD 01131-32 (Ex. 63 to Hank Depo.; 4/7/11 Hank Depo. Tr., Ex. 5 at 36:4-37:18.)  Hank also testified that the Venetian would often assert control over the sidewalk.  (Hank Depo. Tr., Ex. 5, at 42:18-43:3.)  Similarly, Deputy Chief Gary Schofield acknowledged that the Venetian believes it can control the public sidewalk.   (Ex. 17 at Bates No. LVMPD 01131 (Ex. 62 to Hank Depo. Tr.)

6.  At some point, but not until after this litigation was filed, a directive was given to LVMPD officers to refrain from harassing street performers on the sidewalk.  In an email dated June 14, 2010, six months after the incident, Deputy Chief Schofield instructed Captain Hank: "Please ensure that our officers are re briefed on the issues surrounding public sidewalks and the enforcement of trespassing in and around them.  If the sidewalk is one that has been a subject of dispute the best course of action is to not make arrests or cite for the charge of trespass."  (Ex. 18, LVMPD 01142.)  Regardless of these instructions, the police officers still were not trained.  (Gillespie Depo. Tr., Ex. 3 at 54:3-12.)  As detailed below, no training or policy changes have been implemented.

7.  And, despite the directive, LMPD Officers continue to harass street performers.  Very recently, LVMPD Sergeant Tom Jenkins publicly expressed the LVMPD's animus towards street performers:

> "I hate this [the presence of street performers] more than anyone," he says. "I've watched the Strip really decline from where it was three or four years ago. These guys are freaks and felons."

David G. Schwartz, *Freaks and Felons*, LAS VEGAS SEVEN, June 2, 2011, Ex. 3.

Sergeant Jenkins explained that he does what he can to keep performers off the sidewalk:

> "Because they hide behind the First Amendment, we can't do much," he says. Fear of lawsuits, he says, has brought pressure to "back off" on running in costumed performers for panhandling.  So far, Jenkins has used another law against the masked minstrels: While it might be legal to perform on a public sidewalk, it isn't legal to store things there. So the second that performers set up an amplifier or put down a cooler, they're fair game"

*Id.*  Notably, what is actually illegal is citing performers for placing objects on the sidewalk that are integral to their performances.  As a result of the *Banasik* litigation, the prohibition on storing and unloading materials on public sidewalks has been changed to explicitly forbid what Sergeant Jenkins is doing:

> (a) No equipment, materials, parcels, containers, packages, bundles or other property may be stored, placed or abandoned in or on the public sidewalk. **This provision shall not apply to materials or property held or stored in a carry bag or pack which is actually carried by a pedestrian or items such as a musical instrument case or a backpack which is temporarily placed next to a street performer for that street performer's use unless said musical instrument case or backpack actually obstructs the sidewalk in violation of this chapter.**

Clark County Code Ord. 16.11.070 (a)(emphasis added).  Yet, it appears that LVMPD officers have not been told about the changes to the law resulting from *Banasik*, in which the LVMPD and the Sheriff are parties.  Illegally, they still attempt to take police action, even if the performers are acting within their First Amendment rights.

8.  Similarly, On February 2, 2011, Captain Fasulo sent an email regarding public access right of way, and states that the police cannot arrest for trespass on the sidewalks in front of the hotel, even though the hotels want them to.  (Ex. 19, LVMPD 01279-81.)  He states that if there is another violation that can be enforced, then they attempt to enforce that one.  (*Id.*). Therefore, even though the police know that street performers are acting legally, in a coordinated and conscious effort to appease Casinos like the Venetian, they still attempt to take police action, even if the performers are acting within their First Amendment rights.

9.  In Captain Hank's May 21, 2010 email cited above, Captain Hank forwarded an email from Kendall Bell regarding a request from Bally's to eject people from the sidewalk to the police department's legal team.  (Ex. 17, at LVMPD 01134-35.)  In his email, he said, "I need you to weigh in on this ASAP."  *Id.* at LVMPD 01134.  Notably, while guidance is suddenly being requested "ASAP," the email was sent over a decade after the status of the Venetian sidewalk was made clear, and roughly five months after the date of the incident that gave rise to this litigation.  In Captain Hank's request for guidance, he also noted that "[t]his came up again yesterday during our RIFA/Culinary protest planning discussion with the Venetian.  They also expressed that there was a property line on the

sidewalk where they can legally restrict access." *Id.* at 01134.  It is clear that the LVMPD has changed its act because of lawsuits brought by the ACLU, including the instant litigation.  Hank further notes that "It was my understanding based on the resent [sic] law suit from the ACLU reference [sic] the street performers, that we would not enforce the private property line when subjects are exercising their 1st Amendment right without violating a law…" *Id.*  Curiously, the Deputy Chief of Patrol Services responded to the email to legal, on which she was copied, stating "you have made them aware that the purpose of the union being out there is not to picket against the venetian…" *See* Ex. 17, at LVMPD 01131 (another version of the email chain regarding Captain Hank's request for clarity).

### B.  The Incident That Gave Rise To This Litigation

***In front of the Venetian***

10. This incident is yet another example of a dispute regarding the sidewalks along the Strip.  On January 15, 2010, two street performers, Plaintiffs Jason and Sebastian Perez-Morciglio were in front of the Venetian Casino & Resort.

11. Jason is an actor who portrays the character "Zorro" in public spaces. (Ex. 6, Transcript of Deposition of Jason Perez-Morciglio ("JPM Depo. Tr.") at 11:11-13:14.   Sebastian, Jason's brother, sometimes dresses as Darth Vader and engages in street performing, though he was not in costume or performing during the incident. ( Ex. 16, Sebastian Decl., at ¶ 1.)  Sebastian and Jason consider portraying characters and being street performers expressive.  (*See, e.g.,* SPM Depo. Tr., Ex. 10, at 94:13-19, JPM Depo. Tr., Ex. 6, at 13:17-23.)

12. On January 15, 2010, Jason and his brother Sebastian took the bus to the Strip, which stopped south of the Venetian.  (JPM Depo. Tr., Ex. 6 at 90:4-16) Jason was in costume and was actively portraying Zorro.  (Jason Decl., Ex. 14, at ¶ 4; JPM Depo. Tr., Ex. 6, at 103:8-12; *see also* Exhibit 2 to Venetian Defendants' MSJ, copies of three security videos).

13. The brothers were planning to go to the Bellagio, where Jason was planning to put on several shows (Jason Decl., Ex. 14, at ¶ 4).  However, they stopped in front of the Venetian, and Sebastian stopped to watch the Mirage volcano show.  (Sebastian Decl., Ex. 14, at ¶ 3.)  Both Jason and Sebastian were

on the public sidewalk.  (Lovegren Depo. Tr., Ex. 7, 43:1-1; JPM Depo. Tr., Ex. 6 at 106:23-107:4; SPM Depo. Tr., Ex. 10 at 52:17-21.)

14. At that point, Venetian Security Officer William Lovegren, an investigator for the Venetian, alleges that he observed Jason Perez-Morciglio sell a sword to a family.  (Lovegren Depo. Tr., Ex. 6 at 42:12-14; 49:13-25.)  Lovegren conceded that he did not actually know whether Jason asked for money (*Id.* at 44:25-45:3) and that giving away a sword and getting a tip would not be "solicitation." (*Id.* at 173:1-174:11.)

15. Lovegren then approached Jason, "advised" him that he could not solicit on the sidewalk, and called the manager of Venetian security when Jason asserted his right to be on the sidewalk.  (Lovegren Depo., Tr., Ex. 7, at 52: 5-14.)  Other officers arrived on scene. (Ex. 14 (Jason Decl.) at ¶ 5.)  Jason told the guards he was on public property and that if they were trespassing the guards should call the police.  (JPM Depo. Tr., Ex. 6 at 106:18-22.)

16. Venetian Security Officers trespassed Jason for "refusing to leave the public sidewalk after being asked to leave by Venetian security personnel."  (Whiddon Depo. Tr., Ex. 11, at 169:20-170:1.)

17. Venetian Security Officers handcuffed Jason and Sebastian.  Lovegren Depo. Tr., Ex. 7, at 61: 8-12, 68:6-10; JPM Depo. Tr., Ex. 6, at 145:16-146:  They then transported the brothers to the Venetian Security holding room and office.  (Ex. 16 (Sebastian Decl.) at ¶ 5.)

18. In the holding room, Venetian Security Officers searched Plaintiffs and strapped Jason to a chair while a security camera recorded his detention.  (Las Vegas Sands Corp. & Venetian Casino Resort, LLC's Responses to Plaintiffs' First Set of Requests For Admissions, Response to Request For Admissions No. 13; JPM Depo. Tr., Ex. 6, at 145:16-146:5.)

19. Plaintiffs were then detained.  ((Las Vegas Sands Corp. & Venetian Casino Resort, LLC's Responses to Plaintiffs' First Set of Requests For Admissions) at Response to RFA No. 15.)  Jason was in pain during his detention.  (JPM Depo. Tr., Ex. 6, at 166:4-18.)  Plaintiffs were "well-behaved" even when out of handcuffs.  (Bronson Depo. Tr., Ex. 1, at 68:14-18.)

20. Venetian Security held Jason and Sebastian in handcuffs for approximately 20 minutes until LVMPD Officers Scott and Schaier arrived.  (*Id.* at Response to RFA No. 15, Scott Depo. Tr., Ex. 9, at 92:13-93:1.)

Opposition to LVMPD Defendants' Motion for Summary Judgment,
Countermotion for Summary Judgment, and Rule 56(f) Motion

***The LVMPD Officers' One-Sided Investigation***

21. Upon arrival, and before speaking to Jason and Sebastian, Officers Scott and Schaier talked to Venetian Security to get the Casino's side of the story.  (Scott. Depo. Tr., Ex. 9 at 91:22-92:1.)  The Officers only spoke to one of the security officers present at the incident.  (Schaier Depo. Tr., Ex. 8, at 53:19-53:21; 73:2-73:21.)

22. Sergeant Kendall Bell, immediate supervisor of Officers Scott and Schaier, arrived sometime after the officers did.  He conferred with the responding officers before the officers spoke to Plaintiffs and announced what they were going to do.  (Scott Depo. Tr., Ex. 9 at 92:5-94:2.)  Sergeant Bell approved of the responding officers' plans regarding how to handle the incident.  (Scott Depo. Tr., Ex. 9, at 93:22-94:22.)

23. Before deciding what to do, the LVMPD Officers never checked where the incident occurred to determine whether the sidewalk was a public thoroughfare, and whether it was the Venetian that should be investigated for wrongdoing.  (Scott Depo. Tr., Ex. 9, at 66:14-68:3; 73:10-75:2.)  They also never checked whether the Venetian actually had the right to control the sidewalk.  *Id.*

24. The LVMPD Officers did not take any law enforcement action against the Venetian, and did not even consider doing so.

25. While they ended up issuing a misdemeanor trespass warning, the LVMPD Officers knew that Jason and Sebastian had not done anything wrong, and that no trespass had actually occurred.  (Schaier. Depo. Tr., Ex. 8, at 64:7-9, 69:11-12 ("no trespass had occurred"); Scott Depo. Tr., Ex. 9, at 100:11-101:7 (he just gave a "warning" because he did not think Jason had done anything wrong.)).  The LVMPD Officers determined that Jason and Sebastian had not engaged in any wrongdoing before speaking to Plaintiffs.  (Scott Depo. Tr., Ex. 9 (he spoke with Venetian security before approaching Plaintiffs)).   Nevertheless, they decided to issue Plaintiffs misdemeanor trespass warnings after speaking only to Venetian security and prior to interviewing Plaintiffs; 70:18-71:7, 99:8-23 (Scott testifies that he decided what to do before approaching  Plaintiffs; (Schaier Depo. Tr., Ex. 8, at 51:14-51:22.)  Officer Scott also testified that when he was speaking with Jason, that he believes he had "already decided not to take law enforcement action.  (Scott Depo. Tr., Ex. 9 at 100:11-20.)

***The LVMPD Handcuff and Search Plaintiffs, and Announce Their Decision to Plaintiffs***

26. The police officers searched the brothers, removed the Venetian handcuffs and replaced them with LVMPD handcuffs.  The officers did not question Plaintiffs at that time.  (Jason Decl., Ex. 14, at ¶ 12; Sebastian Decl., Ex. 16, at ¶ 10; Scott Depo. Tr., Ex. 9, at 79:1-80:5.)

27. Jason consented to his search, but stated he was under duress.  (JPM Depo. Tr., Ex. 6, at 193:12-15; 225:21-226:7.)  He was strapped to a bench and handcuffed when he was asked for consent and searched.  (SUF ¶¶ 17-18.)

28. Plaintiffs were not free to leave when the LVMPD showed up.  (Scott Depo. Tr., Ex. 9, at 80:2-5.).  By placing the brothers in LVMPD handcuffs, as opposed to freeing them, the police made clear to the brothers that they were still not free to leave and go about their business.  When the LVMPD Officers, after speaking with Venetian Secuirty, walked into where Jason and Sebastian were held, and spoke to the brothers for the first time, they did not ask any questions of Jason or Sebastian before Officer Scott announced "I want to explain to you what's going to – what we're going to do here today."  Scott Depo at 97:17-99:14; Video Tr., Ex. 26 at 32:20-22.

29. One of the LVMPD officers told Jason that the security guards could do whatever they wanted because the brothers had been trespassing.  (Video Tr., Ex. 26 at 18:16-19:1.)  As Sebastian testified, the LVMPD officers supported the Venetian's position.  (SPM Depo. Tr., Ex. 10, at 31:11-32:24.)

30. Scott erroneously explained to Jason and Sebastian that Venetian Security could detain them because they were on private property, despite the fact that he was now aware that the brothers claimed to have been on public property, and despite the fact that he never resolved the apparent confusion regarding whether Jason had a right to be on the sidewalk.  (Scott Depo. Tr., Ex. 9, at 71:18-72:24, 88:16-89:9.)  When asked whether he provided any clarity as to whether Jason had a right to be on the sidewalk, he testified that he recalled stating: "You're not welcome back on Venetian Property." (*Id.* at 74:2-6.)  Scott told Jason that the Venetian could trespass him from their private property. Scott Depo. Tr., Ex. 9, at 103:17-106:11; *see also* Transcription of the video titled "Venetian Holding Room Camera 1063" and dated January 15, 2010 ("Video Tr.").")) at 34:9-13 (recording Scott telling Jason, in part, that "[b]ecause it's a private property entity, they can trespass anybody for anything.  Okay?  For anything they choose."); *id.* at 38:4-9. (one of the officers explained that Jason was not welcome back.)

*The LVMPD Officers Issue Misdemeanor Warnings to Plaintiffs, In Violation of Policy.*

31. The LVMPD Officers issued misdemeanor warnings to the brothers.  (Scott Depo. Tr., Ex. 9, at 123:11-25; 127:20-128:20 and Depo. Exs. 9 and 10.)  Scott had made up his mind to issue the misdemeanor warning, despite the fact that he did not actually think that there was evidence of wrongdoing.  (Scott Depo. Tr., Ex. 9, at 100:11-101:7.)  He decided to issue a misdemeanor warning to Plaintiffs only because Venetian security thought Plaintiffs were trespassing.  (Scott Depo. Tr., Ex. 9, at 125:6-127:17.)

32. Sheriff Gillespie, a named Defendant, testified that issuing a misdemeanor warning is inappropriate in the case of a trespass warning, because in that case no offense has been committed.  (Gillespie Depo. Tr., Ex. 3, at 81:9-82:7.)  The LVMPD policy allows officers to issue misdemeanor warnings when actual misdemeanor offenses have occurred in their presence instead of taking more extreme law enforcement action.  (Ex. 27 (LVMPD Police Department Manual) at Bates No. PRM 00562-00563.)  Scott and Schaier testified that they issued a misdemeanor warning to Plaintiffs for an alleged offense that did not occur in either of their presence, despite the fact that LVMPD policy does not allow for issuance of warnings for offenses that don't occur before the officer.  (Scott Depo. Tr., Ex. 9, at 163:4-164:2; Schaier Depo. Tr,, Ex. 8, at 55:24-56:1.)

33. While the LVMPD Defendants have not characterized issuing misdemeanor warnings as "law enforcement action" in this litigation, the warnings issued to Jason and Sebastian do in fact have legal consequences.  (Schaier Depo. Tr., Ex. 8, at 63:25-64:6.)  The trespass warning states: "[t]he undersigned certifies and says that in the state of Nevada [Plaintiffs] did then and there commit each of the following offenses/infractions: . . . [t]respass . . . Subsequent violations will result in citation or arrest."  (Ex. 25 (Misdemeanor Warnings) at Bates No. LVMPD 001.)  Also, Scott acknowledged that when a LVMPD officer issues a misdemeanor warning, the warning is entered into LVMPD's "SCOPE" database.  (Scott Depo. Tr., Ex. 9, at 53:25-54:8; Ex. 21).  Officers use the database when confronting people already registered in the database to determine what law enforcement actions to take.  (Ex. 25 (Clark County Misdemeanor Warning) at Bates No. LVMPD 001.)  Being registered in the database will probably cause officers to be less lenient with Jason and Sebastian should either

brother encounter an officer in the future. *Id.* Sebastian felt forced to sign his misdemeanor warning. (SPM Depo. Tr., Ex. 10, at 117:2-6.)

34. Scott and Schaier also stood by while Venetian security officers read the trespass warning to Plaintiffs. Scott Depo. Tr., Ex. 9, at 81:15-17.

35. Based on their actions, it appeared to Sebastian that the police officers were acting in concert with the Venetian security guards on the day of the incident. (SPM Depo. Tr., Ex. 10, at 117:20-25.)

36. Jason and Sebastian were detained for over an hour. (JPM Depo. Tr., Ex. 6, at 151:3-5.) The LVMPD was present for approximately 40 minutes of the detention.

**The Chilling Effect of the LVMPD's Support for the Venetian and the LVMPD's Arrest**

37. Jason and Sebastian could not exercise their rights and return to the sidewalk because of their fear of the police. The Officers' support for the Venetian as well as their own actions chilled Plaintiffs' speech. Sebastain Decl, Ex. 16.at ¶¶ 18-19; Jason Decl., Ex. 14 at ¶¶ 20-21. The Officers threatened to arrest Plaintiffs if they stopped on the sidewalk in front of the Venetian. (Sebastian Decl., Ex. 16 at ¶ 18; Jason Decl., Ex. 14 at ¶ 20.) After they were released, Jason and Sebastian left the area and did not return that day. (Sebastian Decl., Ex. 16, at ¶ 18; Jason Decl., Ex. 14, at ¶ 20.) Further, they did not return to the sidewalk in front of the Venetian for at least four months. (Sebastian Decl., Ex. 16, at ¶ 19; Jason Decl., Ex. 14, at ¶ 17- 21.). They had to buy a van so they could get to the Strip without having to walk by the Venetian. JPM Depo. Tr., Ex. 6 at 226:20-227:8 (testifying that arriving by bus would require them to cross the sidewalk in front of the Venetian).

**C. LVMPD's Close Collaboration With Casino Security, Including Venetian Security**

38. There is frequent and close collaboration between LVMPD and the Venetian (and other casino security officials). Tony Whiddon, the Executive Director of Venetian Security, attended regular law enforcement – casino security coordination meetings with Captain Hank, and would also see him informally about the sidewalks and street performers. (Whiddon Depo. Tr., Ex. 11, at 75:2-13; 77:25-78:5; 78:12-79:24.) Whiddon characterized the relationship between Venetian Security and LVMPD as a formal partnership. (*Id.* at 269:20-24.) Hank and other LVMPD officials work closely with casinos through the "Las Vegas Security Chiefs Association" to develop their policy with

regard to street performers and with the county District Attorney to "control when and where smut peddlers or 'passers' can distribute their literature," suggesting that at the very least LVMPD and the Venetian shared the common goal of excluding speech they found undesireable.  (Hank Depo Tr., Ex. 5, at 160-161).  ("Capt. Hank is determined to continue addressing issues with street peddlers…"); ("Captain Hank informed members he has personally met with smut peddlers who are now involved with distributing narcotics as well as the annoying pamphlets."); Hank Depo. Tr., Ex. 5, at 83:15-17 ("We also had monthly meetings at the Convention Center Area Command, bimonthly meetings where that would be a topic as well.")  *See, e.g.,* Gillespie Depo. Tr., Ex. 3 at 90:2-94:17 (discussing various meetings that regularly occur between him and casino personnel); LVSCA 000005 (Las Vegas Security Chiefs' Ass'n Meeting Minutes, Ex. 30.)

39. Whiddon testified that Venetian security also works with LVMPD to create Venetian security policies: the LVMPD instructed Venetian security to change its policies to search and handcuff all people before calling them and that the Venetian complied with this instruction.  (Whiddon Depo. Tr., Ex. 11, at 266:19-267:5.)  Now, every time LVMPD is called, Venetian security must handcuff and search the target of the call. (Whiddon Depo. Tr., Ex. 11, at 261:23-262:25.)

40. With respect to the handling of incidents where the LVMPD is called Venetian security officials complete official LVMPD forms.  (Schaier Depo. Tr., Ex. 8, at 29:1-30:7; Gillespie Depo. Tr., Ex. 3, at 72:18-73:25.)

41. While the Venetian is not one of them, some casinos participate in a program where businesses are in essence deputized to process in-custody low risk misdemeanor incidents, with support in prosecution by the LVMPD.  (Ex. 27 (LVMPD Policy and Department Manual) at LVMPD 000561-563. Ex 27.

42. When responding to calls from Venetian Security, the LVMPD supports the Casino's actions.  (*See, e.g,* Whiddon Depo. Tr., Ex. 11, at 250:4-6 (LVMPD has never told Venetian security they "got it wrong.").)  During her deposition, Venetian Security Officer Hagenmaier testified that "[i]t's typical for police" to ask suspects held by the Venetian:  "Why are you back here[,] because security doesn't just bring anybody back here?  So you must have done something bad."  (Hagenmaier Depo. Tr., Ex. 4, at 83:8-12.)  She also explained that the "general practice" is for LVMPD officers to speak only

with the security manager about what a suspect did.  They rarely ask questions of security guards who were actually present during an incident (and the January 15, 2010 incident was no exception).  (*Id.* at 83:18-84:15.)  Further, she could not recall a single instance in which a LVMPD officer expressed doubt regarding (or even a need to investigate the appropriateness of) the Venetian security's decision to detain someone.  (*Id.* at 109:8-23.)

43. Police officers receive free food from casinos, and have free entry to casino employee cafeterias, including the Venetian's.  (Ex. 8 Schaier Depo. Tr., at 128:19-129:6; 130:25-1:2; Whiddon Depo. Tr., Ex. 11, at 89:20-24; Castro Depo. Tr., Ex. 2 at 181:81-20.

## D.  LVMPD's Failure To Protect First Amendment Rights

44. The incident on January 15, 2010 was a result of a practice of rubber stamping the actions of casino personnel as well as failure to develop appropriate policies and training at the LVMPD to protect First Amendment rights.

45. The LVMPD is responsible for protecting the public's constitutional rights.  (Gillespie Depo Tr., Ex. 3, p. 98:21-99:5; Ex. 27 (LVMPD Police Department Manual) at Bates No. PRM 000124). Sheriff Gillespie is responsible for establishing policies at the LVMPD.  (Gillespie Depo. Tr., Ex. 3 at 12:9-13:13.)  He is also ultimately responsible for ensuring that adequate training for the force is in place. (Gillespie Depo Tr., Ex. 3 at 13:8-13).

46. As detailed above, there is a long history of litigation regarding free speech issues on the Strip as well as an underlying tension between casinos and the proponents of free speech.  For example, the LVMPD was on notice that casinos on the Strip were illegally trespassing and harassing people for exercising their freedom of speech.  (Ex.17 at Bates No. LVMPD 01131-32 (2/8/11 internal LVMPD email chain); Hank Depo Tr., Ex. 5, at 42:18-43:3; Declaration of Claudio Meloni at ¶ 4.

47. The LVMPD was also aware, or should have been aware, that the Venetian had no authority to trespass people from the sidewalk in front of the Venetian, despite its assertions.  Hank and Gillespie testified that they knew that the area in front of the Venetian was a public area where free speech was protected.  (Hank Depo. Tr., Ex. 5 at 114:4-22; Gillespie Depo. Tr., Ex. 3. at 42:15-43:16, 57:16-58:1, 34:3-8.).

48. The LVMPD also knew that casinos frequently called officers to assist with trespass procedures. The LVMPD assists the Venetian in trespassing patrons roughly twice a week.  (*See, e.g.,* Deposition of Anthony Whiddon ("Whiddon Depo. Tr."), Ex. 11, at 246: 9-25; LVMPD 01279-81 (2/8/11 internal LVMPD email chain).

49. Despite the need, the LVMPD has also failed to clarify or update its policies with regard to First Amendment issues and public forum sidewalks as a result of the prior litigation regarding the sidewalk in front of the Venetian.  (Gillespie Depo. Tr., Ex. 3, at 42:15-43:16; 52:2-13.)

50. Despite being aware of prior litigation regarding the Strip and the fact that there is confusion among street level officers about how First Amendment issues apply along the Strip, the LVMPD has failed to ensure that street level officers knew the legal landscape until after litigation was filed by ACLU of Nevada clients.  (*Id.,* at 54:3-9, 56:4-8 and16:24-17:22; Hank Depo. Tr., Ex. 5, at 55:20-56:13; Schaier Depo. Tr., Ex. 8, at 96:13-97:15.)

51. The LVMPD officers were inadequately trained to serve casinos without infringing on individuals' civil rights.  Officers were confused about whether to enforce businesses' complaints against patrons on the Las Vegas Boulevard.  (Gillespie Depo. Tr., Ex. 3, at 16:24-17:22.)  While an email was sent after the onset of this litigation (Gillespie Depo. Tr., Ex. 3, at 42:15-43:16, 52:2-13; Ex. 17 at Bates No. LVMPD 00136 (email instructing officers to not trespass or cite pedestrians on the sidewalk along the Strip unless they receive a court order – dated May 21, 2010 (after the incident)) and a draft training is in development (Ex. 18 at Bates No. LVMPD 01142-45; Ex. 19 at Bates No. LVMPD 01173-81 (Email from Wade Zimmerman to Charles Hank and attachment) , that training has not been completed.

52. The LVMPD and Gillespie have failed to properly instruct the LVMPD to train its officers regarding First Amendment rights on the Las Vegas Strip.  (Gillespie Depo. Tr., Ex. 3 at 54:3-9, 56:4-8, 52:2-13.)  During his deposition, Officer Schaier, agreed that clarity is needed with regard to the Venetian sidewalk and that, if he had been given clear information, it would have helped him handle the January 15, 2010 events.  (Schaier Depo. Tr., Ex. 8, at 100:23-101:9.)  He would have acted differently.  (*Id.* at 72:2-14.)

**IV.     ARGUMENT**

    **A.  This Court Can Grant Summary Judgment for Plaintiffs.**

    Plaintiffs file their Rule 56(f) Motion for Summary Judgment concurrent and in conjunction with their Opposition to the LVMPD Defendants' Motion for Summary Judgment.  Summary judgment can be properly granted in favor of the nonmoving party where there are no issues of material fact in dispute pursuant to Rule 56 of the Federal Rules of Civil Procedure, which provides:

    (f) Judgment Independent of the Motion. After giving notice and a reasonable time to respond, the court may:
        (1) grant summary judgment for a nonmovant;
        (2) grant the motion on grounds not raised by a party; or
        (3) consider summary judgment on its own after identifying for the parties
        material facts that may not be genuinely in dispute.

The Ninth Circuit has explained that "[a]federal court, on one party's motion for summary judgment, may *sua sponte* grant summary judgment for the nonmoving party where from the record there is no genuine dispute regarding material facts and the nonmoving party is entitled to judgment as a matter of law." *In re Marvin Properties, Inc.*, 76 B.R. 150, 152 (9th Cir. 1987) (citing *Portsmouth Square v. Shareholders' Protective Comm.*, 770 F.2d 866, 869 (9th Cir. 1985) and affirming bankruptcy court's granting of summary judgment against moving party).

    **B.  Legal Standard on Summary Judgment**

    Summary judgment is proper if the pleadings, depositions, answers to interrogatories, and admissions on file, together with any affidavits, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.  Fed. R. Civ. P. 56.  An issue is "genuine" if there is a sufficient evidentiary basis on which a reasonable fact-finder could find for the nonmoving party; a dispute is "material" if it could affect the outcome of the suit under the governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-249 (1986).  *Id.* at 248-49.

    A court views all facts and draws all inferences in the light most favorable to the nonmoving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970).  The central question on summary judgment is whether a case should be submitted to a jury. *Id.* at 158.  "Credibility determinations, the

weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, whether he is ruling on a motion for summary judgment or for a directed verdict." *Liberty Lobby,* 477 U.S. at 255.   Trial courts should thus act with caution when entering summary judgment.  *Id.*

## C.  PLAINTIFFS' CLAIMS SURVIVE SUMMARY JUDGMENT

### 1.  The LVMPD Defendants Are Not Entitled to Summary Judgment on Plaintiffs' First Amendment Claim.

Plaintiffs' First Amendment rights were violated by the LVMPD Defendants.  In order to demonstrate a First Amendment violation, a plaintiff must show that the defendant "deterred or chilled " the plaintiff's speech and that chilling speech substantially motivated the defendant's conduct. *Mendocino Envtl. Ctr. v. Mendocino County.*, 192 F.3d 1283, 1300 (9th Cir. 1999) (quoting *Sloman v. Tadlock*, 21 F.3d 1462, 1469 (9th Cir.1994) (internal quotations omitted).[1] Here, summary judgment is inappropriate because there is sufficient evidence from which a jury could reasonably conclude that the officers' conduct deterred or chilled Plaintiffs' expressive speech, and that such deterrence was a substantial or motivating factor in their conduct.  *See Liberty Lobby, Inc.*, 477 U.S. at 248-49.

Relying on the facts that the LVMPD Defendants were not present during the initial confrontation between Venetian security and Plaintiffs, and that the Officers (Scott and Schaier) issued a warning rather than a formal citation or arrest, the LVMPD Defendants contend that Plaintiffs' First Amendment claims against them are a red herring.  (LVMPD Defendants' MSJ at p. 9, Dckt. No. 81) However, it is the LVMPD Defendants' arguments that are misplaced – it is irrelevant that LVMPD Defendants were not present during the initial confrontation because once they did arrive, they took actions that chilled Plaintiffs' First Amendment rights.  A reasonable jury could find that the actions of: (1) continuing a detention; (2) searching Plaintiffs and handcuffing them; (3) backing up the Venetian Defendants' contention that the sidewalk was private and that they had the right to eject Plaintiffs, and (4) issuing a trespass warning not to return had significant chilling effects on Plaintiffs.  LVMPD Defendants claim they did not arrest Plaintiffs or issue a citation (MSJ at pp. 9-10). Those claims are

---

[1] While the speech at issue in *Mendocino* was political speech, the First Amendment also protects expressive speech.  *Yahoo! Inc. v. La Ligue Contre Le Racisme Et L'Antisemitisme*, 433 F.3d 1199, 1220 (9th Cir. 2006).

hotly contested, but even if LVMPD were correct, that does not change the fact that the actions the officers took had an unconstitutional chilling effect on Plaintiffs.

### a)  The LVMPD Officers' Conduct Chilled Plaintiffs' Expressive Speech.

Plaintiffs were engaged in expressive activity on the sidewalk.[2]  Despite their clear legal entitlement to express themselves on the sidewalk and also to simply be present there, the LVMPD acted to deter Plaintiffs' First Amendment rights.  Plaintiffs brothers refrained from returning to the sidewalk in front of the Venetian to perform for some time due to fear of the police.  (*See* Plaintiffs' Statement of Undisputed Facts ("SUF") at ¶ 37.)

The conduct of the LVMPD Officers who responded to the call from the Venetian on January 15, 2010 caused this fear. When the LVMPD Officers arrived on the scene, Plaintiffs were being held against their will by Venetian security.  (SUF at ¶ 20)  Plaintiffs were in handcuffs; Jason was strapped to a bench.  (SUF at ¶ 18-20). Upon arrival, the LVMPD Officers searched Plaintiffs and then put their own handcuffs on Plaintiffs.  (SUF at ¶ 26.)  Later, they made a number of statements to Plaintiffs, reinforcing the Venetian security officers' position that the sidewalk was private property.  For example, one of the LVMPD officers told Jason that the security guards could do whatever they wanted because the brothers had been trespassing.  (SUF at ¶ 29)  Officer Scott explained to them that Venetian security could detain them because they were on private property, despite the fact that he was aware that they claimed to have been on public property.  (*Id.* at ¶ 30.)  Officer Scott then told them "[y]ou're not welcome back on Venetian Property" and that they were "no longer allowed at Venetian in the future" despite being aware that Plaintiffs claimed to have been stopped on a public sidewalk (SUF at ¶ 30) Finally, the officers issued misdemeanor warning to each of the brothers  in violation of LVMPD policy, which only allows officers to issue misdemeanor warnings when actual misdemeanor offenses have occurred.  (SUF at ¶ 31-32)  Here no misdemeanor had occurred, in or outside of the

---

[2] Costumed portrayals of Zorro and Darth Vader are a form of expressive speech protected by the First Amendment.  That an art form is informal or takes place on the streets does not lessen the protections to which it is entitled.  *Schacht v. U.S.*, 398 U.S. 58, 61-62 (1970) (actor putting on a street skit criticizing the Vietnam War was entitled to First Amendment protection).  Also addressing less traditional "performances," the Ninth Circuit recently issued a decision specifically addressing protections for street performers.  *Berger v. City of Seattle*, 569 F.3d 1029, 1034 (9th Cir. 2009) (invalidating restrictions on street performers in a challenge brought by a balloon artist).  Stating disagreement with casino security is also protected by the First Amendment.  *See* Plaintiffs' Opposition to Venetian Defendants' Motion for Summary Judgment.

officers' presence.  As these warnings make clear, Plaintiffs feared arrest if they returned to perform on the sidewalk in front of the Venetian.  (SUF at ¶ 33.) Jason and Sebastian have both testified that because of their fear of the police, they left the area and did not return to the sidewalk in front of the Venetian that day and for some time thereafter—at least four months. (SUF at ¶ 37). They even had to buy a vehicle in order to avoid walking past the Venetian , since in order to walk from their bus stop to some of their favorite destinations at which to perform on the Strip, the brothers had to walk on the sidewalk in front of the Venetian, and they felt unable to do so after this incident.  *Id.*  Thus, Plaintiffs were prevented from performing on the sidewalk in front of the Venetian: *i.e*., from engaging in free speech on a public forum.

Thus, the LVMPD Officers' actions violated Plaintiffs' free speech rights.  The LVMPD Defendants argue that this is not the case because the officers did not arrest or cite Plaintiffs (MSJ at 9-10), but arrest and citation are not necessary for a jury to reasonably conclude that police conduct chilled Plaintiffs' expressive speech.  For example, in *White v. Lee*, 227 F.3d 1214, 1226–29 (9th Cir. 2000), the Ninth Circuit held that an intrusive investigation by law enforcement, even if conducted with proper legal authority, that did not lead to an arrest could chill the exercise of First Amendment rights.  Here, Plaintiffs were subjected to an intrusive investigation which chilled their speech

While the LVMPD Defendants argue that issuing a misdemeanor warning is not law enforcement action (MSJ at 14), the warning also had a chilling effect.  Issuing a misdemeanor warning is a lesser form of action that can be taken at an officer's discretion, but only for certain misdemeanor offenses that occur in an officer's presence.  LVMPD Police Department Manual, at Bates No. LVMPD 000554.  However, it is a form of law enforcement action nonetheless.   It requires that the offense actually occurred.  Also, it is entered into LVMPD's "SCOPE" database.  (SUF at ¶ 33).  Notably, Officers Scott and Schaier violated LVMPD policy to issue a warning despite the fact that one was not warranted because no offense had occurred, let alone in their presence and despite the fact that doing so violates LVMPD policy.  *(*SUF at ¶ 33)

"An official violates a Plaintiff's First Amendment rights if by his conduct the official deters or chills Plaintiff's political speech and the deterrence is a substantial or motivating factor in the official's conduct in issuing citations and **warnings** to the Plaintiffs."   *See, e.g., Tate v. Lau*, 865

F.Supp. 681, 690 (D. Nev. 1994) (emphasis added) (citing *Sloman v. Tadlock,* 21 F.3d 1462, 1469 (9th Cir. 1994)).[3]  The LVMPD Defendants' arguments that they protected Plaintiffs' rights because they did not issue a warning or arrest (MSJ at p. 9-10) are absurd and fall flat.  That they could have done worse does not change the fact that the actions they did take were chilling.

As noted, the Ninth Circuit has held that a warning can chill First Amendment protected speech. *Sloman*, 21 F.3d at 1469-70.  In *Sloman*, a police officer routinely singled out Sloman, one of the leaders of an advocacy group, for warnings and other discussions.  *Id.* at 1465-70.  The court held that, in the context of evidence that Sloman had stopped carrying a sign and had lowered his level of campaigning overall, a jury could reasonably find that these warnings (among other actions by the officer) chilled his political expression.  *Id.* at 1470.  Here, in the context of the fact that Plaintiffs did not return to perform on the sidewalk in front of the Venetian for some time, it would similarly be reasonable for a jury to conclude that the misdemeanor warnings which Plaintiffs received from LVMPD Officers chilled their expressive speech.

The LVMPD Defendants also argue that they are not liable because they were not present during the initial detention (MSJ at 9).  But it is immaterial that the LVMPD Officers were not there the entire time.  Once they arrived, the LVMPD Officers ratified the Venetian Security Officers' actions by telling Plaintiffs that the Venetian had the right to eject them and issuing a misdemeanor warning threatening arrest should Plaintiffs return.

A reasonable jury could conclude that the LVMPD Officers' actions would cause Plaintiffs to be fearful of future interactions with the police on the sidewalk in front of the Venetian, and thus chill the exercise of Plaintiffs' First Amendment rights, even though Plaintiffs were not arrested.  (MSJ at pp. 9-10.)  Similarly, since it was their statements that the Venetian was entitled to eject Plaintiffs and the issuance of the misdemeanor warnings that caused Plaintiffs to be fearful of the police and thereby chilled their First Amendment rights, it is immaterial that the Officers did not expressly tell Plaintiffs

---

[3] A police warning or citation can chill First Amendment protected speech.  *Tate*, 865 F.Supp. at 690.  This Court found that despite the fact that the plaintiffs were issued a citation by LVMPD officers, there was no evidence presented that this citation actually chilled the plaintiffs' speech.  *Id.* at 690-91.  Here, however, Plaintiffs have presented evidence that their speech was chilled in that they did not return to perform on the sidewalk in front of the Venetian for some time.

Opposition to LVMPD Defendants' Motion for Summary Judgment,
Countermotion for Summary Judgment, and Rule 56(f) Motion

that they could not engage in free speech (MSJ at p. 9). *See, e.g. White*, 227 F.3d at 1226–29; *Sloman*, 21 F.3d at 1469; *Tate*, 865 F.Supp. at 690.

### b)   There Is Evidence That Deterrence of Plaintiffs' Expressive Speech Was a Motivating Factor in Defendants' Conduct.

Intent to inhibit speech may be demonstrated "either through direct or circumstantial evidence." *Mendocino Envtl. Ctr.*, 192 F.3d at 1301; *see also Magana v. Commonwealth of N. Mariana Islands*, 107 F.3d 1436, 1448 (9th Cir. 1997) (circumstantial evidence of intent is sufficient to survive summary judgment motion). The Ninth Circuit held that "in this type of action the defendant's motive is relevant, and that plaintiff's burden of proof is similar to that set out in cases where an employer's adverse employment action is alleged to be due to plaintiff's First Amendment activities." *Sloman*, 21 F.3d at 1469, n.10. In the employment context, a plaintiff need only prove that the protected activity was "a motivating factor" in the adverse employment action and that the same decision would not have been reached in the absence of such activity; it is not necessary to demonstrate that the dismissal was based solely on these activities. *Peacock v. Duval*, 694 F.2d 644, 646 (9th Cir. 1982); *see also McKinley v. City of Eloy*, 705 F.2d 1110, 1115 (9th Cir. 1983).

In *Peacock*, a professor was dismissed as department head and ultimately suspended after vigorously opposing certain changes in university policy. *Id.* at 646-47. The court held that a jury should consider the evidence to determine whether his First Amendment rights had been violated, and therefore summary judgment was inappropriate. *Id.* at 647. The court explained that such actions involve questions which are generally appropriate for jury resolution:

> Peacock's first amendment causes of action necessarily involve complicated questions of motive and intent. A fair resolution of these difficult issues requires a full trial on the merits. Indeed, we have recently reiterated that "the decision as to an employer's true motivation plainly is one reserved to the trier of fact." . . . For this reason, courts have traditionally held that summary judgment is inappropriate when "questions of motive predominate in the inquiry about how big a role the protected behavior played in" the employment decision. . . . Without a searching inquiry into these motives, those intent on punishing the exercise of constitutional rights could easily mask their behavior behind a complex web of post hoc rationalizations.

*Id.* at 646 (citation omitted); *Mabey v. Reagan*, 537 F.2d 1036, 1045 (9th Cir. 1976)).  Similarly, the inquiry here is into the motives behind the Officers' actions, and therefore summary judgment is inappropriate because there is sufficient evidence from which a jury could conclude that intent to chill Plaintiffs' exercise of First Amendment rights was a motivating factor in the Officers' conduct.

For example, the LVMPD has a history of intentionally applying inapplicable laws to street performers in order to keep them off the sidewalks of the Strip upon the request of, or in order to appease, the various security officials of the Strip hotel and casino properties.  (SUF at ¶ 4); *See also Banasik et al. vs. Clark County et al.,* Case No. 2:09-cv-01242-LDG-GWF.   Just recently, a LVMPD Sergeant recently made a public statement to the press which illustrates LVMPD's animus toward street performers and lack of regard for street performers' First Amendment rights. (SUF at  ¶ 7).  ("I hate this more than anyone," he says.  "I've watched the Strip really decline from where it was three or four years ago.  [Street performers] are freaks and felons. . . . Because they hide behind the First Amendment, we can't do much[.]").

> Sergeant Jenkins explained that he does what he can to keep performers off the sidewalk: "Because they hide behind the First Amendment, we can't do much," he says. Fear of lawsuits, he says, has brought pressure to "back off" on running in costumed performers for panhandling.  So far, Jenkins has used another law against the masked minstrels: While it might be legal to perform on a public sidewalk, it isn't legal to store things there. So the second that performers set up an amplifier or put down a cooler, they're fair game"

*Id.*  Notably, what is actually illegal is issuing citations to performers for placing objects on the sidewalk that are integral to their performances.  As a result of the *Banasik* litigation, the prohibition on storing and unloading materials on public sidewalks has been changed to explicitly forbid what Sergeant Jenkins is doing:

> (a) No equipment, materials, parcels, containers, packages, bundles or other property may be stored, placed or abandoned in or on the public sidewalk. **This provision shall not apply to materials or property held or stored in a carry bag or pack which is actually carried by a pedestrian or items such as a musical instrument case or a backpack which is temporarily placed next to a street performer for that street performer's use unless said musical instrument case or backpack actually obstructs the sidewalk in violation of this chapter.**

Clark County Code. Ord. 16.11.070(a) (emphasis added).  This illustrates the fact that, despite being a party in the *Banasik* litigation, the LVMPD does not even comply with the changed provision – and even the *sergeants* either do not know or do not care what the law says.  As a result, the LVMPD uses laws to harass performers.

A jury could reasonably conclude that inhibition of Plaintiffs' protected activity was a motivating factor in Defendants' decision to issue misdemeanor warnings to Plaintiffs.  Therefore, even if other motivating factors may have been present, summary judgment is inappropriate.  In sum, Plaintiffs have provided evidence from which a reasonable jury could find that Defendants' conduct chilled the exercise of their First Amendment rights, and that such inhibition of speech was a motivating factor in that conduct.  For all these reasons, summary judgment cannot be entered in favor of LVMPD on the First Amendment claim.

### 2.   The LVMPD Defendants Violated Plaintiffs' Fourth Amendment Rights.

The LVMPD Officers illegally searched and seized Plaintiffs, and the LVMPD Defendants are not entitled to summary judgment on Plaintiffs' Fourth Amendment claims.  Under the Fourth Amendment, a person has the right to be free from unreasonable searches and seizures.  U.S. CONST. Amend. IV.  A cause of action exists for violation of the Fourth Amendment under 42 U.S.C. § 1983 where a "person's right to be free from illegal searches and seizures of himself and his property have been violated."  *Skrocki v. Caltabiano*, 511 F.Supp 651, 653 (D.C. Pa. 1981) (citing *Monroe v. Pape*, 365 U.S. 167 (1961) (overruled on other grounds)).  Searches and seizures must both be effectuated reasonably.  *Florida v. Jimeno*, 500 U.S. 248, 250 (1991); *Kaupp v. Texas*, 538 U.S. 626, 629 (2003). Here, it is not possible that the LVMPD's search of Plaintiffs and their arrest and continued detention of Plaintiffs were reasonable under any evaluation because the LVMPD Officers were aware that no wrongdoing had occurred before ever searching Plaintiffs and continuing their detention.  SUF ¶ 25. Indeed, for this reason, it is Plaintiffs, not the LVMPD Officers, who are entitled to summary judgment on this claim.

It is true that a police officer may detain a subject for the purpose of investigating possible criminal behavior (MSJ at p. 12), but first, this case involved an arrest and, thus, probable cause, which

was not present, is required.  *Kaupp*, 538 U.S. at 629.  Second, even if the Officers just effectuated a *Terry* stop, they can only detain and search a subject for a brief period of time as part of an investigation of *possible* criminal behavior.  *Terry v. Ohio*, 392 U.S. 1, 30 (1968).  The inverse is also true: if police officers do not suspect *any criminal behavior and do not reasonably believe that they or others are in danger*, they of course cannot detain an innocent subject.  At its core, the Fourth Amendment stands for the principle that people have a right to be left alone by the government.  Thus, police officers are forbidden from harassing and detaining citizens whom they know are innocent of wrongdoing.

### a)  The LVMPD Defendants Are Not Entitled to Summary Judgment on Plaintiffs' Unlawful Seizure Claims.

The LVMPD Officers handcuffed Plaintiffs and detained them.  This is an arrest.  *See Kaupp*, 538 U.S. at 629.  However, even if it was a "Terry" stop, not even the lesser standard applicable to investigatory stops was met.

**This case involved an arrest.**

An arrest "within the meaning of the Fourth and Fourteenth Amendments occurs when, taking into account all of the circumstances surrounding the encounter, the police conduct would have communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business."  *Id.* (internal quotations and internal citations omitted).  Probable cause is needed to seize someone under the Fourth Amendment.  *Id*. at 630.  This case was clearly an arrest and not a *Terry* stop as defendants allege (MSJ at p. 12), and there was no probable cause.  In *Kaupp* the petitioner was woken up in his own home at 3:00 a.m. by two police officers with a flashlight and was told that the police needed to speak with him.  *Id*. at 628.  Kaupp said "Okay," and the police handcuffed him and led him out of his house into a squad car.  *Id*.  The court held that this was an arrest under the Fourth Amendment, since the conduct indicated to Kaupp that he was not free to leave.  *Id*. at 631.  Here, Plaintiffs were likewise not free to leave.  They were in handcuffs, and Jason was strapped to a bench when the LVMPD officers arrived.  (SUF at ¶¶ 18-20.)  The LVMPD Officers then spoke with Venetian security, placed their own handcuffs on Plaintiffs, and continued detaining Plaintiffs while they explained that the Venetian had the right to trespass them and issued a bogus misdemeanor warning to

them to scare them off the sidewalk.  SUF ¶¶ 21, 26, 31-32.  A reasonable person in this situation would not have felt free to leave, just as Plaintiffs did not.  SUF ¶ 37.

In *United States v. Beck*, 598 F.2d 497 (9th Cir. 1979), police pulled over a taxi and arrested its occupants because they suspected it of containing illegal immigrants.  The court held that the behavior that the police observed was "innocuous" and "[a]ny inferences drawn from their observed activities would be contrived at best." *Id*. at 502.  Furthermore, the court stated that "[t]he stop and detention of appellants did not occur under the usual exigent circumstances and was not motivated by the need to secure information." *Id*.  The court found that this was an arrest and not a *Terry* stop, and since the arrest was not motivated by probable cause, it was illegal. *Id*.  In *Beck*, the police failed to meet both the *Terry* standard of reasonable suspicion and the arrest standard of probable cause.  Likewise here, the police did not observe any behavior that indicated that any wrongdoing was taking place. (Schaier Depo. Tr., Ex. 8, at 51:14-22.)  Furthermore, there was no need to secure information from Plaintiffs as no investigation into possible criminal activity was taking place. (*Id.*)

The LVMPD Officers had no indication to believe that Jason and Sebastian had committed, were committing, or were about to commit a crime, or even that they had any information about any crime.  Indeed, they had already ascertained that no crime had occurred.  Therefore, there was no probable cause, and the arrest was improper.

### <u>This case does not even meet the lesser standard set forth in *Terry v. Ohio*.</u>

Defendants allege that this was a "Terry," investigative stop rather than an arrest, and therefore a lesser standard applies.  As detailed above, this case involved an arrest and thus probable cause was required – but the facts do not even warrant the type of less intrusive, investigative stop permitted by *Terry*.  In *Terry*, the police stopped and patted down the plaintiff because he had "reasonable grounds to belief that petitioner was armed and dangerous, and it was necessary for the protection of himself and others to take swift measures."  392 U.S. at 30.  Similarly, in *Stuart v. State*, 94 Nev. 721 (1978), the officer had observed a missing trunk lock and inferred that the vehicle might be stolen, and stopped the vehicle for questioning and an investigation. And, in *Jackson v. State*, 90 Nev. 266 (1974), the police observed the petitioner dropping a plastic bag on the side of a building, and approached him to do a further investigation.  In *Rusling v. State*, 96 Nev. 778 (1980), the police saw a man leave a car

unattended with a hose coming out of it leading into a metal container, and then ran away after spotting the police. The police searched for the man and patted him down because they were investigating possible criminal behavior. *Id*. at 780. Finally, in *Ramirez v. City of Reno*, 925 F. Supp 681 (D. Nev. 1996), the police stopped and searched two men in a field where a recent knife stabbing had taken place. The police were investigating possible criminal behavior, and they had reasonable grounds to believe that the petitioner was involved. *Id*. at 687.

In each of these cases where an investigative stop was permitted, the officers were in the process of investigating criminal behavior. But the instant case is entirely lacking of any suspicious behavior whatsoever. Instead, Plaintiffs had requested the LVMPD's assistance when the Venetian engaged in wrongdoing towards them, and when they arrived, the LVMPD officers determined no crime was at issue.[4] There were no specific and articulable facts that reasonably warrant that intrusion. SUF ¶ 25; *see Terry*, 392 U.S. at 21. A reasonable person would not have detained Plaintiffs, and the actions by the police were not reasonably taken for safety and security purposes. *Terry*, 392 U.S at 30. The LVMPD Officers admitted that no crime had been committed, and therefore, they were not conducting an investigation of possible criminal behavior. SUF ¶ 25.

Defendants cite to Nevada Revised Statute 171.123, arguing that under the statute, Officers Schaier and Scott were justified in seizing the plaintiffs (MSJ at 11-12). The provision, which codifies *Terry*¸ provides:

> 1. Any peace officer may detain any person whom the officer encounters under circumstances which reasonably indicate that the person has committed, is committing or is about to commit a crime.

Nev. Rev. Stat. 171.123. Since the LVMPD Officers did not have a reasonable indication that Plaintiffs had committed, were committing, or were about to commit a crime, the Officers were in violation of Nev. Rev. Stat. 171.123 as well as the Fourth Amendment.

Therefore, because the threshold legal requirements for action by law enforcement were not present, Plaintiffs are entitled to summary judgment on their Fourth Amendment search claims.

---

[4] They failed to even consider investigating the actual wrongdoers, Venetian security.

Opposition to LVMPD Defendants' Motion for Summary Judgment,
Countermotion for Summary Judgment, and Rule 56(f) Motion

**b)  The LVMPD Defendants Are Not Entitled to Summary Judgment on Plaintiffs' Unlawful Search Claims.**

Just as no stop of any kind was warranted, no search should ever have been conducted because the LVMPD Officers knew that Plaintiffs were not engaged in any wrongdoing.  The need for a search was non-existent.  Further, Plaintiffs were in handcuffs when searched and thus posed no risk. Ignoring this, the LVMPD Defendants argue that the search was legal because Plaintiffs consented.  However, there are at least genuine issues of material fact as to whether Plaintiffs gave consent.  Thus, the LVMPD Defendants are not entitled to summary judgment.

The test for the Fourth Amendment right to be free from illegal searches is reasonableness. *Jimeno*, 500 U.S. at 250.  It has long been held that "searches conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment subject only to a few specifically established and well-delineated exceptions." *Katz v. United States*, 389 U.S. 347, 357 (1967). As Defendants point out, one exception to the search warrant requirement is consent. *Schneckloth v. Bustamonte*, 412 U.S. 218, 222 (1973) (discussing if a search of a closed container inside a vehicle after obtaining consent is constitutional).  However, there is an exception to the exception: consent cannot be given under coercion or duress. *Id*. at 248.  Instead, it must be "freely and voluntarily given." *Id*. at 222.

The established test in considering whether consent was freely given is the test of voluntariness, and if the defendant's "will has been overborne," it offends due process.  *Id*. at 225 (*quoting Culombe v. Connecticut*, 367 U.S. 568, 602 (1961)).  To establish consent, the LVMPD Defendants rely on several disputed issues of material fact in their brief: they state Plaintiffs consented to the search, never revoked consent, and that the officers nonetheless had a reasonable suspicion to search the Plaintiffs. (MSJ at 10-11.)  However, consent to a search is a question of fact to be determined by the totality of the circumstances.  *Schneckloth*, 412 U.S. at 227.  In terms of police questioning, "two competing concerns must be accommodated in determining the meaning of a 'voluntary' consent - the legitimate need for such searches and the equally important requirement of assuring the absence of coercion." *Id*. at 227.  If, when all circumstances have been considered and it appears that consent was not given voluntarily, that

it was granted only in submission to a claim of lawful authority, then the "consent [is] invalid and the search unreasonable." *Id.* at 233.

The LVMPD Defendants argue that Jason consented to the search, and that Sebastian does not remember whether or not he gave consent. (MSJ at p. 10-11.) At the very least, whether or not Sebastian consented to the search as a triable issue of material fact which should be submitted to a jury. And, while Jason did consent to the search, his statements were made under duress and coercion. SUF ¶ 27. Defendants argue that Jason never withdrew his consent to be searched. (MSJ at p. 10.) However, Jason had been handcuffed and searched already by Venetian Security Guards. SUF ¶ 18. He had been strapped to a chair, already searched, and had his picture taken. *Id.* He was in pain. *Id.* ¶ 19. When the police officers showed up, and asked if they could search him, Jason responded in the affirmative because his will was overborne and because the police officers had a claim of lawful authority. At his deposition Jason stated:

> 21  Q. Let me see.  Mr. Crosby asked you whether or
> 22  not you consented to the search.  Did you feel free to
> 23  consent or not give consent?
> 24  A. Absolutely not.
> 25  Q. Why not?
> 1  A. Because in the situation I was, I felt that I
> 2  was a prisoner and that everything like convenient or
> 3  making them angry could go against me.  So I knew
> 4  that -- I didn't know that I had the right to say no.  I
> 5  learned that afterwards, but I did knew that -- I did
> 6  like that they asked me, but I still had the pressure
> 7  of, okay, yes, because the other ones did it so --

(JPM Depo. Tr., Ex. 6, at 225:21-226:7.) Jason consented under coercion, and therefore, the search was illegal. There are, at the very least, genuine issues of material fact that are not resolved here, and the LVMPD Defendants' motion for summary judgment on this claim should be denied.

3.   **Plaintiffs' Due Process Claims Survive Summary Judgment.**

a)   **Plaintiffs Are Entitled to Summary Judgment on their Substantive Due Process Claim.**

To show a substantive due process violation, a plaintiff must establish governmental deprivation of some life, liberty, or property interest and constitutionally arbitrary, conscience-shocking action. *Brittain v. Hansen,* 451 F.3d 982, 991 (9th Cir. 2006); *see also County of Sacramento v. Lewis,* 523 U.S. 833, 846 (1998). The LVMPD Defendants assert that "[t]he Court need not address the Plaintiffs' substantive due process claims, as those claims are adequately covered by the Plaintiffs' First Amendment claims."  (MSJ at 13:16-18.)  However, this ignores the fact that Plaintiffs' substantive due process claim revolves around a right different from Plaintiffs' First Amendment claims: their right to free movement.

The constitutional right to free movement has long been recognized as protected by the Fourteenth Amendment.  *See, e.g., Williams v. Fears*, 179 U.S. 270, 274 (1990) ("Undoubtedly the right of locomotion, the right to remove from one place to another according to inclination, is an attribute of personal liberty, and the right, ordinarily, of free transit from or through the territory of any state is a right secured by the 14th Amendment and by other provisions of the Constitution.") The Supreme Court, in the context of discussing a gang ordinance, articulated the nature of  the liberty interest in free movement:

> [T]he freedom to loiter for innocent purposes is part of the "liberty" protected by the Due Process Clause of the Fourteenth Amendment.We have expressly identified this "right to remove from one place to another according to inclination" as "an attribute of personal liberty" protected by the Constitution. *Williams v. Fears,* 179 U.S. 270, 274, 21 S.Ct. 128, 45 L.Ed. 186 (1900); see also *Papachristou v. Jacksonville,* 405 U.S. 156, 164, 92 S.Ct. 839, 31 L.Ed.2d 110 (1972). Indeed, it is apparent that **an individual's decision to remain in a public place of his choice is as much a part of his liberty as the freedom of movement inside frontiers that is "a part of our heritage"** *Kent v. Dulles,* 357 U.S. 116, 126, 78 S.Ct. 1113, 2 L.Ed.2d 1204 (1958), or the right to move "to whatsoever place one's own inclination may direct" identified in Blackstone's Commentaries. 1 W. Blackstone, Commentaries on the Laws of England 130 (1765).

1   *City of Chicago v. Morales*, 527 U.S. 41, 53-54 (1999) (emphasis added) (footnotes omitted).[5]

2           That the public specifically has a right to engage in free movement on the sidewalk in front of

3   the Venetian is beyond dispute.  As this Court held, "as a result of the 1999 Agreement, the State of

4   Nevada possesses a property interest in a portion of the Venetian's land, the purpose of which is to

5   guarantee unrestricted public passage along Las Vegas Boulevard."  *Venetian II,* 257 F.3d at 946-947

6   (citations omitted).

7           There is also no dispute as to whether Plaintiffs' right to free movement was infringed: they were

8   placed in handcuffs and detained.  Further, they were forbidden from returning to the sidewalk.

9            In addition to showing infringement, Plaintiffs, however, as noted above, have to show that the

10  LVMPD Defendants acted in conscience-shocking and arbitrary fashion.  The Ninth Circuit has

11  specifically required that a plaintiff show police officers acted in a clearly arbitrary manner, having no

12  substantial relation to public health, safety, morals, or general welfare, the district court properly

13  dismissed Luna's substantive due process claim. *See Sinaloa Lake Owners Ass'n v. City of Simi*

14  *Valley,* 882 F.2d 1398, 1407 (9th Cir. 1989), overruled in part by *Armendariz v. Penman,* 75 F.3d 1311,

15  1326 (9th Cir. 1996) (en banc).

16          The facts of this case meet that test; the LVMPD Defendants' actions in depriving Plaintiffs'

17  rights were arbitrary and conscience-shocking.  First, they acted arbitrarily in effectuating a trespass

18  from a public sidewalk.  Second, taking a law enforcement action against, and endorsing a kidnapping

19  from a public sidewalk of, parties who engaged in no wrongdoing shocks the conscience.  Third, the fact

20  that the officers took the actions they did in violation of LVMPD policy and despite the fact that it is

21  well established that the sidewalk in front of the Venetian is a public one also shocks the conscience.

22  Finally, the officers' actions do not have a substantial relation to public health safety, morals, or general

23  welfare.

24          Accordingly, Plaintiffs are entitled to summary judgment on their substantive due process claim.

25

26

---

27  [5] *Id.* at 64, n.35. While the Court invalidated the gang ordinance at issue on other grounds and thus, found it unnecessary to
28  determine whether a substantive due process violation occurred, its language is instructive regarding the contours of the
    liberty interest in free movement.

1

2          **b)  Plaintiffs' Procedural Due Process Claims Survive Summary Judgment.**

3          The LVMPD Defendants are not entitled to summary judgment as to Plaintiffs' procedural due

4     process claim.  Liability for depravation of due process rights exists wherever a plaintiff can show "(1) a

5     liberty or property interest protected by the Constitution; (2) a deprivation of the interest by the

6     Government; [and] (3) lack of process."  *Shanks v. Dressel*, 540 F.3d 1082, 1090 (9th Cir. 2008)

7     (quoting *Portman v. County of Santa Clara*, 995 F.2d 898, 904 (9th Cir. 1993)).  Plaintiffs have a

8     property interest in accessing and using the sidewalk, as detailed in a Ninth Circuit decision finding a

9     "servitude" to the public.  *Venetian II*, 257 F.3d at 946-947.

10         Plaintiffs' rights to use the sidewalk were not adequately protected by LVMPD procedures.

11    Outlining what process is 'due' to a particular plaintiff requires a context-specific application of the

12    balancing test outlined in *Mathews v. Eldridge*, 424 U.S. 319 (1976).  *See also Brewster v. Board of*

13    *Educ. of Lynwood Unified School Dist.*, 149 F.3d 971, 983-85 (9th Cir. 1998).  The test consists of three

14    factors: "[f]irst, the private interest that will be affected by the official action; second, the risk of

15    erroneous deprivation of such interest through the procedures used, and the probable value, if any, of

16    additional or substitute procedural safeguards; and finally, the Government's interest, including the

17    function involved and the fiscal and administrative burdens that the additional or substitute procedural

18    requirements would entail."  *Mathews*, 424 U.S. at 321.

19         Here, the procedures are inadequate.  First, Plaintiffs' property interests are significant in this

20    case because they are inseparably entwined with the Plaintiffs' right to engage in protected speech on

21    the Las Vegas Strip, as well as their basic right to free movement.  By assisting casino security to

22    exclude Plaintiffs from the sidewalk in front of the Venetian, LVMPD officers also invaded Plaintiffs'

23    rights to express themselves on that property and submitted Plaintiffs to an unreasonable search and

24    seizure.

25         Second, here inadequate procedures such as issuing bogus misdemeanor warnings create a high

26    risk of erroneous deprivation of Plaintiffs' rights.  Although LVMPD Defendants' argue that Plaintiffs

27    were not denied adequate due process because they were given "an opportunity to explain their version

28    of the incident"  and LVMPD officers chose not  to "take any enforcement action" (MSJ at p. 14: 12-

14), LVMPD officers searched, detained, and cited Plaintiffs without independently assessing whether Plaintiffs had done anything wrong. (SUF ¶ 25.) In fact, LVMPD searched, detained, and cited Plaintiffs despite believing in Plaintiffs' innocence of any wrongdoing. *Id.* The current custom and policy in place does not adequately protect the rights of street performers because it leaves LVMPD officers ignorant of how to protect those rights because of inadequate training. (SUF ¶¶ 49-52.) It also allows LVMPD officers to engage in unreasonable searches and seizures of street performers.

Third and finally, fiscal and administrative burdens in correcting the current procedure are low. All that is required of the LVMPD is to develop appropriate policies and to inform officers of the legal nature of the sidewalks along the Strip, the rights of street performers to perform in front of the Venetian, and the need to independently assess whether to detain and search casino detainees.

Because factual questions remain about whether LVMPD policies are adequate to protect Plaintiffs' rights, this Court could not grant summary judgment for the LVMPD Defendants.

### 4.   Plaintiffs' Conspiracy Claims Survive Summary Judgment.

The LVMPD Defendants assert that Plaintiffs' conspiracy claim fails because there is no evidence that LVMPD Defendants had a "meeting of the minds" with Venetian Defendants to deprive Plaintiffs of their First Amendment rights, and because Plaintiffs failed to demonstrate any deprivation motivated by racial or class-based discriminatory animus. (MSJ at p. 15.) Their arguments fail for two reasons. First, there is no need to demonstrate a deprivation motivated by racial or class-based discriminatory animus for a civil conspiracy claim brought under Section 1983. Second, there is sufficient evidence of a "meeting of the minds" to overcome summary judgment. The LVMPD Defendants are not entitled to summary judgment on Plaintiffs' conspiracy claim.

### a)   There Is No Need to Demonstrate a Racial or Class-Based Discriminatory Animus.

Contrary to LVMPD's contention (MSJ at 15.), Plaintiffs' conspiracy claim does not require a showing of any deprivation motivated by racial or class-based discriminatory animus. Such a showing is required for a conspiracy to interfere with civil rights claim brought under Section 1985. *Griffin v. Breckenridge*, 403 U.S. 88, 102 (1971). However, for a conspiracy claim brought under Section 1983

(like Plaintiffs' claim), a plaintiff must simply "demonstrate the existence of an agreement or meeting of the minds" to violate the plaintiff's civil rights. *Crowe v. Cnty. of San Diego*, 608 F.3d 406, 440 (9th Cir. 2010) (citing *Mendocino Envtl. Ctr. v. Mendocino Cnty.*, 192 F.3d 1283, 1301 (9th Cir. 1999) (internal quotations omitted)).   For example, in *Crowe*, three juveniles and their families were allowed to proceed with a claim under Section 1983 that police officers, a psychologist, a prosecutor, a county, and cities conspired to violate their civil rights; the court did not require or even address the question of any showing of racial or class-based discriminatory animus.  608 F.3d at 417-26; *see also Franklin v. Fox*, 312 F.3d 423, 441 (9th Cir. 2002); *United Steelworkers of Am. v. Phelps Dodge Corp.*, 865 F.2d 1539, 1540-41 (9th Cir. 1989).  In sum, LVMPD Defendants misstate the requirements for a Section 1983 conspiracy claim: no showing of race or class discrimination is necessary.

### b)   There Is Sufficient Evidence of a Meeting of the Minds.

There is sufficient evidence of a "meeting of the minds" to overcome summary judgment.  The coordinated action between Officers Scott and Schaier and Venetian security officers, coupled with the Officers' failure to conduct an independent investigation, support an inference of conspiracy.  This inference is strengthened by LVMPD's failure to clarify the legal landscape regarding the sidewalk to its street level officers, and by LVMPD's history of harassing street performers and applying inapplicable laws against them.  (*See* Plaintiffs SUF ¶¶ 2, 8.)  The LVMPD Defendants' argument that, if a conspiracy to violate Plaintiffs' civil rights existed, Plaintiffs would have been arrested or cited (MSJ at 15) is not persuasive. Officers Scott and Schaier were able to chill Plaintiffs' exercise of First Amendment rights without arrest or citation.

 "To establish the defendants' liability for a conspiracy, a plaintiff must demonstrate the existence of an agreement or meeting of the minds to violate constitutional rights." *Mendocino Envtl. Ctr.*, 192 F.3d at 1301 (quoting *Phelps Dodge*, 865 F.2d at 1540-41) (internal quotations omitted)).  To be liable under § 1983 under a conspiracy theory, "each participant in the conspiracy need not know the exact details of the plan, but each participant must at least share the common objective of the conspiracy." *Phelps Dodge*, 865 F.2d at 1541 (citing *Fonda v. Gray*, 707 F.2d 435, 438 (9th Cir. 1983)).  Furthermore, since direct evidence of an agreement to violate a plaintiff's civil rights will rarely

be available, it is usually necessary to infer such an agreement from circumstantial evidence. *Mendocino Envtl. Ctr.*, 192 F.3d at 1302.

If the actions of the alleged conspirators are "unlikely to have been undertaken without an agreement[,]" a jury may infer that a conspiracy existed. *Id.* at 1301 (citing *Kunik v. Racine Cnty.*, 946 F.2d 1574, 1580 (7th Cir. 1991)). "The possibility that other inferences could be drawn that would provide an alternate explanation for the defendants' actions does not entitle them to summary judgment." *Radcliffe v. Rainbow Const. Co.*, 254 F.3d 772, 790 (9th Cir. 2001) (citing *Phelps Dodge*, 865 F.2d at 1542) (inference need not be most likely but merely a 'rational' or 'reasonable' one)).

This Court recently found that, where there is evidence of frequent communication and a common objective between law enforcement and a private party, a conspiracy claim brought under Section 1983 survives summary judgment. *Mazzeo v. Gibbons*, No. 2:08-cv-01387 RLH-PAL, 2010 WL 4384207 at *10-11 (D. Nev. Oct. 28, 2010); *see also United States v. Iriarte-Ortega*, 113 F.3d 1022, 1024 (9th Cir. 1997) (holding that "circumstantial evidence that the defendants acted with a common goal" is sufficient to prove agreement, and agreement may be inferred from conduct).

Moreover, "[w]hether defendants were involved in an unlawful conspiracy is generally a factual issue and should be resolved by the jury so long as there is a possibility that the jury can infer from the circumstances that the alleged conspirators had a meeting of the minds and, thus, reached an understanding to achieve the conspirator's objectives." *Mazzeo*, 2010 WL 4384207 at *10 (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158-59 (1970)). The facts of this case provide sufficient evidence from which a reasonable jury could conclude that LVMPD  Defendants had an agreement, with one another and with Venetian Defendants, to deprive Plaintiffs of their First Amendment right to free speech in a public forum and violate their Fourth Amendment rights.

Here, the coordinated action by and between Officers Scott and Schaier and Venetian security officers support an inference of conspiracy. *See Mendocino Envtl. Ctr.*, 192 F.3d at 1301-02 (finding circumstantial evidence of close cooperation between police officers and FBI agents sufficient to support inference of an agreement to inhibit First Amendment activities); *see also Phelps Dodge*, 865 F.2d at 1541; *Radcliffe*, 254 F.3d at 790 (holding unusual actions of District Attorney in prosecuting a trespass case sufficient to support inference of a conspiracy); *see also Mazzeo*, 2010 WL 4384207 at

*10-11; *Iriarte-Ortega*, 113 F.3d at 1022-25 (finding that a jury could reasonably infer a conspiratorial agreement to import, possess, and distribute marijuana from defendants' coordinated actions). The officers showed up, and spoke only with the Venetian security officials before deciding what to do. (*See* Plaintiffs' SUF ¶¶ 21, 25.) Plaintiffs informed the LVMPD Officers that they had been on a public sidewalk when the Venetian Defendants seized them, but the officers still issued misdemeanor warnings. (*Id.* ¶¶ 25,31.) The officers did so despite the fact that no misdemeanor had occurred. *Id.* ¶ 31. Further, they did so in violation of LVMPD policy. SUF ¶ 32. One of the LVMPD officers also told Jason that the security guards could do whatever they want because the brothers had been trespassing, even though this was false. (*Id.* ¶ 29.) The Plaintiffs could not exercise their rights and return to the sidewalk because of their fear of the police. (*Id.* ¶ 37.)

Such "[e]vidence that police failed to exercise independent judgment will support an inference of conspiracy with a private party." *Phelps Dodge*, 865 F.2d at 1541. In *Phelps Dodge*, the court found that because the police reviewed a list of striking workers whom they hoped to arrest with a representative of Phelps Dodge, instead of exercising independent judgment, summary judgment was inappropriate because a reasonable jury could infer the existence of a conspiracy. *Id.* at 1544-47. Here, LVMPD continued Plaintiffs' illegal detention, searched Plaintiffs, and issued misdemeanor warnings in violation of LVMPD policy. (*See* Plaintiff's SUF ¶ 31.) LVMPD did all of this without doing an independent investigation and despite having determined that the Plaintiffs had committed no legal wrong. (*Id.* at ¶ 21; *Id.* at ¶ 31.) This provides further evidence from which a reasonable jury could infer that there was a conspiracy between LVMPD and the Venetian Defendants to violate Plaintiffs' civil rights.

The LVMPD Defendants argue that, if a conspiracy existed, that Plaintiffs would have been arrested or cited. (MSJ at 15:27) This ignores the fact that, as noted above, the officers did issue misdemeanor warnings. (*See* Plaintiff's SUF at ¶ 33. Further, LVMPD's verbal support for the Venetian's position that they control the sidewalk deterred Plaintiffs from returning to the sidewalk – not only on the date in question but for some time to come. (*Id.* at ¶ 37.) Moreover, the Ninth Circuit has held that actions by law enforcement that did not lead to an arrest (even if conducted with proper legal authority) could chill the exercise of First Amendment rights. *White v. Lee*, 227 F.3d 1214, 1226–

29 (9th Cir. 2000) (holding an intrusive investigation by HUD officials chilled the exercise of plaintiffs' First Amendment rights despite the fact that plaintiffs were not arrested or cited).  The Ninth Circuit has also held that a police warning specifically can chill First Amendment protected speech.  *See, e.g., Tate v. Lau*, 865 F.supp. 681, 690 (D. Nev. 1994) (citing *Sloman v. Tadlock,* 21 F.3d 1462, 1469 (9th Cir.1994)).

Second, and more generally, despite being aware of the fact that there is confusion on the street level regarding the sidewalk and being aware of prior litigation, LVMPD has failed to ensure that street level officers knew the legal landscape until after this litigation was filed.  (SUF at ¶ 26).  Furthermore, there is evidence that LVMPD officers routinely harass street performers and apply inapplicable laws against them, as well as taking other actions which chill the First Amendment rights of people on the Strip.  *See Banasik et al. v. Clark County et al.,* Case No. 2:09-cv-01242-LDG-GWF (LVMPD officers chilled expressive speech by using inapplicable laws to exclude street performers from public sidewalk); *see also Webber et al. v. Clark County et al.*, Case No. CV-06-181-RLH-RJJ (LVMPD officers chilled religious speech by arresting street preachers for obstructive use of public sidewalk, then later dropping or suspending the charges).  William Jablonski, a street performer who dresses as Elvis, and a plaintiff in the *Banasik* litigation stated that he has been "repeatedly harassed by LVMPD officers" when he goes out on the Strip such that he is afraid to perform for tourists.  (Declaration of William Jablonksi, Ex. 13, at ¶ 6, 23.)  Suzette Banasik, another street performer and a plaintiff in the, stated that a LVMPD officer told her that she could not play her guitar while she was on a public sidewalk, that she needed a permit to perform, and issued her citations, which caused her to be afraid to play her guitar on a portion of the Strip.  (Declaration of Suzette M. Banasik, Ex. 12, at ¶ 18-26.)  She also stated that she has been told by LVMPD officers to leave the sidewalk while performing several times, and that "many other street performers who like to perform on the Strip have been told by LVMPD that they cannot play and sing on the sidewalks."  (*Id.* at ¶ 26, 34.)  When this is considered in light of the frequent and close collaboration between LVMPD and the Venetian (and other casino security officials) (*id.* at ¶ Para. 10), there are sufficient facts for a reasonable jury to find that there was an agreement between the Venetian and LVMPD Defendants to exclude Plaintiffs from the sidewalk.  There is "the possibility that the jury can infer from the circumstances" that the Venetian and LVMPD Defendants had a meeting of the

minds, and thus Plaintiffs' conspiracy claim must survive summary judgment.  *Mazzeo*, 2010 WL 4384207 at *11.

The fact that LVMPD issued an opinion to CCAC officers noting that it will not take any enforcement action for claims of trespassing or other violations on the sidewalk unless it receives a court order does not preclude a reasonable jury finding that there was an agreement between LVMPD and Venetian Defendants to violate Plaintiffs' civil rights.  (MSJ at 15: 14-16.)  As noted, the officers issued Plaintiffs misdemeanor warnings.  (*Id.* at ¶ 39.)  Although LVMPD has not characterized issuing misdemeanor warnings as "law enforcement action" in this litigation, the warning issued to Plaintiffs does in fact have legal consequences.  (SUF ¶ 33.)  For example, Officer Scott acknowledged that when a LVMPD officer issues a misdemeanor warning, the warning is entered into LVMPD's "SCOPE" database.  (SUF at ¶ 33.)  As a result of these warnings, plaintiffs were afraid to return to the the sidewalk in front of the Venetian, and police thus chilled Plaintiffs' First Amendment right to expressive conduct in a public forum.  If a police action not characterized as a law enforcement action can have this effect, an LVMPD policy regarding when officers may take law enforcement action is irrelevant.[6] Furthermore, the opinion was not issued until May 21, 2010, after the incident.  (*See* SUF ¶ 10.)  And, as Sheriff Gillespie testified, no training or policy changes have been implemented to ensure that First Amendment rights are protected.  (*Id.* at ¶ 6.)

At least one LVMPD sergeant has publicly stated that he dislikes street performers, and indicated that he resents their ability to "hide behind the first amendment."  (SUF ¶ 6.)  The LVMPD has both itself violated First Amendment rights on the sidewalk, and has failed to protect peoples' rights from infringement by casino officials.  There have been no updates to LVMPD training despite the Ninth Circuit's ruling establishing that the area in front of the Venetian is a public forum.  (SUF ¶ 52.)

For all these reasons, summary judgment cannot be entered in favor of LVMPD on the conspiracy issue.  Plaintiffs have provided evidence from which a reasonable jury could infer a meeting of the minds between LVMPD and the Venetian Defendants, including evidence that LVMPD and

---

[6] Similarly, the fact that Plaintiffs were not arrested or cited is irrelevant to the conspiracy claim. (MSJ at p. 15.)  As discussed, the chilling of Plaintiffs' First Amendment right to free speech in a public forum and violation of Plaintiffs' Fourth Amendment rights can and did occur without arrest or citation.

Venetian Defendants shared a common objective of excluding Plaintiffs from the sidewalk, and evidence that LVMPD failed to exercise independent judgment.

### 5.   The Officers Are Not Entitled to Qualified Immunity.

Officers Schaier and Scott are not entitled to qualified immunity in this matter, despite their contention that they are.  (MSJ at pp. 17-18.)  "The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'"  *Pearson v. Callahan*, 129 S.Ct. 808, 815 (2009) (citing *Harlow,* 457 U.S. at 818). The doctrine ensures that an officer defendant have fair warning that his actions give rise to liability.  *Anderson v. Creighton*, 483 U.S. 635, 646 (1987).  "The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful."  *Id*. 640.

Courts must look at the question of whether qualified immunity should be granted in the light most favorable to the plaintiff.  *Saucier v. Katz*, 533 U.S. 194, 213 (2001).[7]  Determining whether a reasonable officer should have known an act is unlawful, is by nature, a fact-intensive inquiry.  *Id.* at 201.  Thus, if there are triable issues of fact as to whether a defendant is entitled to qualified immunity, the question must go to a jury.  Here, Officers Scott and Schaier are not entitled to qualified immunity.

### a)  Plaintiffs' First Amendment Rights and Rights to Use the Sidewalk Are Clearly Established.

This circuit has held that "[t]he public streets and sidewalks located within the Las Vegas Resort District" are public fora.  *S.O.C., Inc. v. County of Clark,* 152 F.3d 1136, 1144 (9th Cir.1998).  The sidewalk in front of the Venetian is no exception.  *Venetian II*, 257 F.3d at 946; *Venetian I*, 45 Supp.2d at 1036.  Furthermore, changes have been made to Clark County Code to protect street performers' First

---

[7] *Pearson v. Callahan*, 129 S. Ct. 808 (2009) overruled *Saucier's* holding that the two-step inquiry of determining: (1) whether the defendant's conduct violated a constitutional right; and (2) if so, whether the right was clearly established must be conducted in that order, and the second step is reached only if the court first finds a constitutional violation.  Otherwise, *Saucier* is good law.

Amendment rights.  (Ex. 28 (LVMPD 01142-45:email attaching Memorandum of Understanding in another ACLU of Nevada case, *Banasik et al. vs. Clark County et al.,* Case No. 2:09-cv-01242-LDG-GWF, which resulted in a number of changes to Clark County Code.  *See, e.g.*, Clark County Code of Ordinances 16.11.070 (prohibiting storing and unloading materials on public sidewalks but providing an exception to the prohibition on placing things on public sidewalks for street performers).  As a result of negotiations in *Webber, et al v. Clark County, et al.*,  Case No.2:06-cv-18-RLH-RJJ, prior code provisions banning signs over a certain size and providing for obstruction *per se* were revised to ban only actual obstruction of the sidewalk.  On a less local level, the Ninth Circuit recently expressly protected the rights of street performers in *Berger v. City of Seattle*, 569 F.3d 1029, 1034-35 (9th Cir. 2009).

These lawsuits have held that the sidewalks around the Strip, including the one in front of the Venetian, were public fora.  *See, e.g. S.O.C., Inc. v. County of Clark,* 152 F.3d 1136, 1144 (9th Cir.1998); *Venetian I*, 45 F.Supp. 2d at 1036; *Venetian II,* 257 F.3d at 939-43.  Another Ninth Circuit decision has protected the First Amendment rights of street performers.  *See Berger v. City of Seattle*, 569 F.3d 1029, 1034-35 (9th Cir. 2009).  Sheriff Gillespie and Captain Hank both testified that they were aware that the sidewalk in front of the Venetian was a public sidewalk where the First Amendment applies.  (SUF ¶ 47.)  These lawsuits have also put the Sheriff and the Department on notice that officers are confused about First Amendment issues on the Strip, and have violated peoples' rights.  (SUF ¶ 4.)

### b)  Persons Officers Know Have Not Engaged in Any Wrongdoing Cannot Be Detained and Searched Is a Clearly Established Right.

As detailed above, the LVMPD Defendants violated Plaintiffs' rights to be free from unreasonable searches seizure.  The LVMPD Defendants allege that "there is no question the officers had a reasonable suspicion that the Plaintiffs committed the crime of trespass." (MSJ at p. 18).  This is not the case.  According to the officers themselves, they had already ascertained that no crime whatsoever was committed.  (SUF ¶ 25)  Nonetheless, they left Plaintiffs strapped to benches (SUF ¶ 27), handcuffed them (SUF at ¶ 26), continued the detention (SUF ¶ 28), and searched them (SUF ¶ 26).

Accordingly, Plaintiffs have met one of the two aspects of defeating qualified immunity – that there was a violation.  *Pearson,* at 818.  The inquiry into qualified immunity includes two questions: (1)

whether "taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?" And (2) "whether the right was clearly established" at the time of the violation. *Saucier*, 533 U.S. at 201, 203.

Here, qualified immunity is abrogated because Plaintiffs' rights were in fact clearly established. *Id.* Officers Schaier and Scott violated Plaintiffs' constitutional rights to be free from unreasonable search and seizure by searching and seizing them despite the fact that they knew that Plaintiffs had not engaged in any wrongdoing. A reasonable person would know that the officers' actions were impermissible. The right to not be subjected to unreasonable searches and seizures is explicitly protected in the Constitution, and is well developed in case law. *See* U.S. CONST., AMEND. IV; *Bustamonte*, 412 U.S. at 222. There is also precedent showing that this right has been clearly established. For example, the Ninth Circuit has held that handcuffing a plaintiff while searching her home for IRS infractions was an unreasonable use of force and that a reasonable agent in the defendant's "would have known that such conduct violated the Fourth Amendment." *Meredith v. Erath*, 342 F.3d 1057, 1061 (2003). In *Meredith*, the IRS agent

> was investigating income tax related crimes, which (although felonies) are nonviolent offenses. [The Defendant objected vociferously to the search and she 'passively resisted' the handcuffing, but the need for force, if any, was minimal at best. In these circumstances, it was objectively unreasonable and a violation of the Fourth Amendment for Erath to grab Bybee by the arms, throw her to the ground, and twist her arms while handcuffing her.

*Id.* Here, as in *Meredith*, the excessive use of force was not necessary. Furthermore, also like in Meredith, trespassing is a nonviolent offense. In *Winterrowd v. Nelson*, 480 F.3d 1181, 1186 (9th Cir. 2007), this circuit held:

> No reasonable officer would believe he could constitutionally force a harmless motorist against the hood of a car and cause him unnecessary pain. That the suspect claims he is unable to comply with instructions to put his arm behind his back provides no further justification. No reasonable officer could have thought otherwise.

(citation omitted). This case is very similar. A reasonable person would know that this law is clearly established. A reasonable person would know that an officer cannot use unnecessary force against an

unarmed, cooperative person. A reasonable officer in Officer Scott or Officer Schaier's position would have known that it is clearly unconstitutional to handcuff plaintiffs and detain them.

### c)  The Due Process Rights In This Case Have Also Been Clearly Established.

As detailed in section V(B)(3), supra, a constitutional violation occurred when LVMPD officers infringed on Plaintiffs' property and liberty rights without due process.  Defendant Officers Schaier and Scott are also liable, despite their claim of qualified immunity, because clearly established law requires police officers to at least act reasonably when taking police actions such as detaining, searching, and citing civilians. *See* section ['unreasonable search and seizure'], supra; *Terry v. Ohio*, 392 U.S. 1 (1968). Instead, officers Schaier and Scott decided to detain, search, and cite Plaintiffs with an official warning after only speaking with casino security.  They did so in order to assist casino security in violating Plaintiffs' rights to access the sidewalk in front of the Venetian for self expression.  (see 'conspiracy' section; Scott Depo. Tr., Ex. 9, at 70:18-71:7; Schaier Depo. Tr, Ex. 10, at 51:14-51:22.)  In addition, according to both officers Schaier and Scott, they had already determined that they had no cause to detain, search, and cite Plaintiffs, but did so anyway at the request of casino security, and in doing so, failed to act reasonably.  Scott Depo. Tr., Ex. 9, at 70:18-71:7; Schaier Depo. Tr, Ex. 10, at 51:14-51:22.

### 6.  Plaintiffs' Claims Against Sheriff Gillespie Survive Summary Judgment.

While he does not argue that he is entitled to summary judgment based on qualified immunity,[8] Sheriff Gillespie contends that he is not liable because he did not "personally participate" in the events giving rise to the litigation.  (MSJ at 16.)  But while it is true that he was not physically present on the date of the incident, a fact heavily relied upon by the LVMPD Defendants (*see, e.g.,* MSJ at p. 17:1-2.), Sheriff Gillespie is liable for failure to enact policies and training in order to correct the constitutionally inadequate procedures that led to the civil rights violations at issue in this case. *See, e.g., Oviatt v. Pearce*, 954 F.2d 1470 (9th Cir. 1992) (holding the Sheriff of an Oregon county, along with the county, liable for failure to enact necessary policies, as a final policymaker, at a local prison.)

---

[8] In any case, as detailed above, a reasonable person would be aware that the law forbade the actions the LVMPD Defendants took in this case, including Sheriff Gillespie.  For example, Sherriff Gillespie testified knew of past litigation regarding the First Amendment, and knew that street performers were allowed on the public sidewalks of the Las Vegas Strip. (SUF ¶ 47).

Sheriff Gillespie is a defendant in this action in both his official and his individual, or personal, capacity. The Supreme Court has held that a state official acting in his or her official capacity may be sued for injunctive relief under Section 1983. *Will v. Michigan Dept. of State Police*, 491 U.S. 58, 71 n.10 (1985). The Supreme Court has also held that state officers may be held personally liable for damages under § 1983 based upon actions taken in their official capacities. *Hafer v. Melo*, 502 U.S. 21, 31 (1991). "[P]ersonal-capacity suits… seek to impose individual liability upon a government officer for actions taken under color of state law." *Id.* at 25. The Ninth Circuit has held that police supervisors can be held liable for: "1) their own culpable action or inaction in the training, supervision, or control of subordinates; 2) their acquiescence in the constitutional deprivation of which a complaint is made; or 3) for conduct that showed a reckless or callous indifference to the rights of others." *Cunningham v. Gates*, 229 F.3d 1271, 1292 (9th Cir. 2000). Here, Sheriff Gillespie is liable because he neglected to implement policies or direct others to implement policies to curb the unconstitutional actions of LVMPD officers, of which he was aware. (SUF ¶ 45, 49-52.)

The LVMPD Defendants rely heavily on *Taylor v. List*, 880 F.2d 1040 (9th Cir. 1989) for the proposition that the Sheriff did not personally participate, and is thus entitled to summary judgment. (MSJ at p. 16). In *Taylor*, a prisoner alleged a § claim against prison officials for preventing him from gaining access to books and legal materials needed for self-representation. *Taylor*, 880 F.2d at 1042. The court found that entry of summary judgment in favor of the Lieutenant in charge of his unit was proper, because Taylor failed to show that he "knew of unconstitutional actions by prison guards under his control and failed to prevent them." *Id.* Furthermore the court held that "[a] summary judgment motion cannot be defeated by relying solely on conclusory allegations unsupported by factual data." *Id.*

In contrast, in the case at hand, Plaintiffs have factual data showing Sheriff Gillespie knew of the unconstitutional actions of his police officers as well as the lack of police policy regarding First Amendment rights and failed to implement any changes. In his deposition, Sheriff Gillespie stated that he was ultimately responsible for setting policies at LVMPD. (SUF ¶ 45.) Sheriff Gillespie knew that street performers are allowed on public sidewalks (SUF ¶ 47.), that the courts had handed down a verdict that the sidewalk in front of the Venetian is a public forum where the First Amendment applies. (SUF ¶ 1), and that a member of the public could not be trespassed from a public forum sidewalk, yet he

still failed to implement any policies to that effect. (SUF ¶ 49-52.)  He also failed to direct anyone to develop policies to protect those rights and avoid problems. (*Id.*)  Further, Sheriff Gillespie has never personally taken action to ensure that police officers are trained on First Amendment issues.  (*Id.*  at 56-4-8.)  Thus, unlike in *Taylor*, here Sheriff Gillespie knew of constitutional violations by police officers under his control and failed to prevent them. *See Taylor*, 880 F.2d at 1045.

The Eleventh Circuit has held that whether a Sheriff is responsible for failing to train his officers in a manner which encouraged or permitted those officers' unconstitutional conduct is a question of fact. *Bruce v. Beary*, 498 F.3d 1232, 1249 (11th Cir. 2007) (citing *City of Canton, Ohio v. Harris*, 489 U.S. 378, 388 (1989)).  Here, there is also a question of fact whether Sheriff Gillespie's failure to train officers resulted in constitutional violations.  Therefore summary judgment is inappropriate.

### 7.  Plaintiffs' Municipal Claims Survive Summary Judgment.

There are two bases for holding the LVMPD liable in this case.  First, the LVMD has a custom and practice of, cooperating with casino security officials even when doing soviolates the public's First Amendment rights.  (SUF ¶ 38.)  These customs resulted in the deprivation of Plaintiffs' rights on January 15, 2011.  Local government organizations and municipalities are liable under § 1983 for their policies or customs that injure a plaintiff's civil rights.  *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694-95 (1978).  Second, Sheriff Gillespie's failure to enact policies and training, detailed above, is attributable to the LVMPD and gives rise to "Monell" liability.  *See, e.g., Oviatt v. Pearce*, 954 F.2d 1470 (9th Cir. 1992) (holding Oregon county liable for Sheriff's failure to enact necessary policies, as a final policymaker, at a local prison); *Collins v. City of Harker Heights*, 503 U.S. 115, 123 (1992) (a 'failure to train' is a policy or custom can give rise to liability).  Plaintiffs should overcome summary judgment because they have supplied significant evidence showing inadequate training on the part of the LVMPD that amounts to deliberate indifference to the rights of casino patrons and passers-by who are illegally detained by Las Vegas casinos, as required by *Davis v. City of Ellensburg*, 869 F.2d 1230 (9th Cir. 1989).  (SUF ¶ 39.)

In addition to being held liable for a formally enacted policy, a municipal entity, including a police department "may be sued for constitutional deprivations visited pursuant to governmental

"custom" even though such a custom has not received formal approval through the body's official decisionmaking channels."  *Monell* at 690-91; *see also Adickes v. S. H. Kress & Co.,* 398 U.S. 144, 167-168 (1970).

There are two intersecting customs at issue this case that resulted in the violation of Plaintiffs' rights.  First, there is evidence that LVMPD has a custom of violating street performers' and others' First Amendment rights.  Some LVMPD officials are even openly hostile to street performers and admit to targeting them for enforcement.  (SUF ¶ 7.)  Second, in addition to and related to its custom of violating First Amendment rights on the sidewalks along the Strip, the LVMPD also has a custom of close cooperation with casino officials and simply reinforcing their actions.  For example, while the Venetian is not one of them, some casinos are granted the ability to take on certain law enforcement duties.  (SUF at ¶ 41 ("Certain businesses have agreed to handle low risk in-custody petit larceny, trespass, disturbing the peace, and defrauding an innkeeper incidents without police response.").)  More broadly, the LVMPD and casino security officials work closely together.  (SUF ¶ 38.)  Further, rather than make independent determinations regarding casino actions against patrons and passers-by, the LVMPD routinely ratified casino actions by default.  (SUF ¶ 39 (security officer testified that the LVMPD never questions detainees about the circumstances regarding their detention, Venetian Security Chief Whiddon testified that The LVMPD had never told Venetian security that they "got it wrong" when they detained people)).  The LVMPD has gone so far as to instruct casino security to handcuff and search all persons detained by casinos before LVMPD officers arrives, without making any independent judgment as to the casino's right to actually detain the person.  (SUF ¶ 39.)

These customs were the "moving force" in constitutional violations, as required by *Monell.*  *Monell* at 694.  On the date of the incident giving rise to this litigation, after arriving on the scene and replacing the brothers' handcuffs with their own, the LVMPD officers searched and continued to detain Jason and Sebastian Morciglio without independently determining that such actions were reasonable.  (SUF ¶ 25 (Officer Scott testifying that he had decided to issue a trespass warning after speaking only with Venetian security and before speaking with Plaintiffs)).  Indeed, they had already decided there was no wrongdoing.  *Id.*  They proceeded to issue misdemeanor warnings, breaking LVMPD written policy

for the apparent purpose of supporting the Venetian's efforts to keep Plaintiffs away from the public

sidewalk. (SUF ¶ 32.)

In *Chalmers v City of Los Angeles*, 762 F.2d 753, 759 (1985), a federal district court held that a

city could be held liable for the enforcement, to the point of harassment, of conflicting and inherently

unclear ordinances where the city had notice of the problem with the ordinances and the need to resolve

the inconsistency, yet did nothing about it. Similarly here, as Sergeant Jenkins make clear, ordinances

are being used to harass street performers and are not applied consistently. (SUF ¶ 7.) Also similarly

here, the LVMPD was on notice of a problem and failed to fix it as detailed further below. (SUF ¶ 48.)

Even though a number of LVMPD officials have been and are acting in good faith, they can still be held

liable:

> [A] municipality is liable for " 'systemic' injuries that result not so much from the
> conduct of any single individual, but from the interactive behavior of several government
> officials, each of whom may be acting in good faith." *Owen v. City of Independence,* 445
> U.S. 622, 652, 100 S.Ct. 1398, 1416, 63 L.Ed.2d 673 (1980). The imposition of § 1983
> liability in these circumstances can provide "an incentive for officials who may harbor
> doubts about the lawfulness of their intended actions to err on the side of protecting
> citizens' constitutional rights." *Id.* at 652, 100 S.Ct. at 1416. "Furthermore, the threat that
> damages might be levied against the City may encourage those in a policymaking
> position to institute internal rules and programs designed to minimize the likelihood of
> unintentional infringements on constitutional rights." *Id.*

*Chalmers*, at 758.

**Failure to train**

Even if it did not have an affirmative custom of supporting security officials actions and

harassing performers on the sidewalks, *Monell* liability is established by the LVMPD's failure to train.

A municipality is liable for failing to train its employees under § 1983 when "the need for more or

different training is so obvious, and the inadequacy so likely to result in the violation of constitutional

rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to

the need." *City of Canton v. Harris*, 489 U.S. 378, 390 (1989) (inadequacy of police training creates

liability where it constitutes deliberate indifference to constitutional rights).

Despite the clear protections that apply to the sidewalk, to date, the LVMPD has failed to

ensure that street level officers understand what the law is and how to protect the public's rights on the

sidewalk.  And, while recent efforts have been made to comply with the First Amendment, those efforts are not complete.  (SUF ¶ 51.)

In this case, the LVMPD knew that failing to train officers to independently evaluate the reasonability of detaining and searching individuals held by casino security would result in constitutional violations.  The proliferation of lawsuits against casinos alleging assault and false imprisonment put the LVMPD on notice that casinos' treatment of patrons was often illegal.  (SUF ¶ 4.) The LVMPD was also aware that the Venetian had no authority to trespass people from the public sidewalk.  (SUF ¶ 47.)  However, as noted above, Metro is more interested in rubberstamping the Casino's actions. To accomplish this goal, LVMPD officers remain untrained in the law, and are permitted to assume that security officials are in the right.  LVMPD officers also empower security officers to handcuff detainees (despite the fact detainees might be innocent of wrongdoing), fail to do independent investigations, and issue bogus trespass warnings or citations.   This unwillingness to train its officers correctly violates the rights of people like the Plaintiffs and exposes the LVMPD Defendants to municipal liability.

The LVMPD also knew that casinos would call officers to assist with trespass procedures, for which the officers were inadequately trained. The LVMPD assisted the Venetian in trespassing patrons roughly twice a week.  (SUF ¶ 48.)  Sheriff Gillespie testified that officers had become confused about whether to enforce businesses' complaints against patrons on Las Vegas Boulevard.  (SUF ¶ 51.)  The LVMPD should also have known that officer animus toward street performers would exacerbate the failure to train.  (SUF ¶ 7.)

Despite all this, the LVMPD has failed to train officers to independently evaluate the reasonability of detaining and searching individuals held by casinos.  Sheriff Gillespie testified that he is the final decision-maker at the LVMPD (Gillespie Depo. Tr. 12:9-13:2), and that he has not instructed the LVMPD to train its officers regarding First Amendment rights on the Las Vegas Strip:

> 2 Q. And -- but you have never personally
> 3 specifically directed anyone to develop policies
> 4 regarding First Amendment issues, right?
> 5 A. Correct.
> 6 Q. And you're not sure whether or not they have
> 7 been, right?

8 A. Correct.

(Gillespie Depo. Tr. at 52:2-13; *see also* SUF ¶¶ 44, 49-52.)  While, after much litigation and a decade after the *Venetian* lawsuit, the LVMPD is working on a training for officers to evaluate such situations, (SUF ¶ 51), the LVMPD has failed to ensure that street level officers know the law.  (*See* SUF ¶ 49 (acknowledging that there have been no updates to training despite the Ninth Circuit's rulings regarding the free speech zone in front of the Venetian)).  As a result, as noted above, even a *Sergeant* publicly misstated the law as it applies to street performers.  (SUF ¶ 7.)  One of the LVMPD officers involved in the incident noted his lack of training on the subject of free speech areas and casinos.  (SUF ¶ 52.)  He also noted that the incident may have turned out differently if he had been appropriately trained.  (*Id.*).

The LVMPD officers violated individuals' rights, including those of Jason and Sebastian Perez-Morciglio to be free of unreasonable searches and seizures because they were inadequately trained.  The LVMPD's failure to train officers to independently evaluate whether to continue to detain and search individuals held by casinos was likely to result in constitutional violations.  The LVMPD knew that casinos illegally trespassed passers-by and it probably knew that casinos illegally battered and detained casino patrons.  Yet LVMPD officers regularly assist casinos without independently evaluating the legality of those actions.  They had never been trained otherwise.  In the present case, that failure to train caused the unlawful search, seizure, and detention of Plaintiffs.

Opposition to LVMPD Defendants' Motion for Summary Judgment,
Countermotion for Summary Judgment, and Rule 56(f) Motion

## V.  CONCLUSION

For all these reasons, the Motion for Summary Judgment of the LVMPD Defendants must be denied, and Plaintiffs' claims survive summary judgment.  All claims against Sergeant Kendall Bell survive as he did not join in the motion for summary judgment.

_/s/ Margaret A. McLetchie_
Margaret A. McLetchie, Bar No. 10931
mcletchie@aclunv.org
ACLU OF NEVADA
601 South Rancho Dr. Suite B-11
Las Vegas, NV 89106

Opposition to LVMPD Defendants' Motion for Summary Judgment,
Countermotion for Summary Judgment, and Rule 56(f) Motion

## CERTIFICATE OF SERVICE

I hereby certify that on the day of July 14, 2011, I caused to be served a true and correct copy of the OPPOSITION TO DEFENDANT LAS VEGAS SANDS' MOTION TO COMPEL AND PLAINTIFFS' CROSS MOTION FOR SANCTIONS to all of the interested parties through the courts CM/ECF filing system.

Marquis Aurbach Coffing

Nick Crosby, Esq.

10001 Park Run Dr.

Las Vegas, NV 89145


Lionel Sawyer Collins

Sam Lionel

Robert Hernquist

1700 Bank of America Plaza

Las Vegas, NV 89101



*/s/ Tamika Shauntee*_____

An Employee of the ACLU of Nevada

Opposition to LVMPD Defendants' Motion for Summary Judgment,
Countermotion for Summary Judgment, and Rule 56(f) Motion